# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| **CITY OF ANNAPOLIS, MARYLAND,**<br><br>      **Plaintiff,**<br><br>   v.<br><br>**BP P.L.C.; BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA INC.; CROWN CENTRAL LLC; CROWN CENTRAL NEW HOLDINGS LLC; ROSEMORE, INC.; CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; MARATHON OIL COMPANY; MARATHON OIL CORPORATION; MARATHON PETROLEUM CORPORATION; SPEEDWAY LLC; HESS CORP.; CNX RESOURCES CORPORATION; CONSOL ENERGY INC.; CONSOL MARINE TERMINALS LLC; and AMERICAN PETROLEUM INSTITUTE,**<br><br>      **Defendants.** | **CASE NO.:**<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.**<br><br>**[Removal from the Circuit Court for Anne Arundel County]**<br><br>**Action Filed:  February 22, 2021** |

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE CITY OF ANNAPOLIS AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corporation and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Circuit Court for Anne Arundel County, Maryland, Case No. C-02-CV-21-000250, to the United States District Court for the District of Maryland, pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446, and 43 U.S.C. § 1349(b).  All other defendants that have been joined and served (collectively, "Defendants") have consented to this Notice of

Removal.

       This Court has original federal question jurisdiction pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b), and the Federal Officer Removal Statute, 28 U.S.C. § 1442. Removal is also proper under 28 U.S.C. § 1331 and 1441(a), because the Complaint necessarily arises under federal laws and treaties and out of federal enclaves and presents substantial federal questions.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................. 1

II.    TIMELINESS OF REMOVAL .......................................................... 10

III.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL ..................... 11

IV.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS
       NECESSARILY ARISE UNDER FEDERAL LAW ....................................... 15

V.     THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS
       NECESSARILY RAISE DISPUTED AND SUBSTANTIAL FEDERAL
       ISSUES ................................................................................................ 23

       A.    Plaintiff's Claims Seek To Supplant Federal Energy Policy ............... 24

       B.    Plaintiff's Claims Necessarily Interfere With Foreign Affairs ........... 29

       C.    Plaintiff's Claims Include Federal Constitutional Elements ............... 35

VI.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL
       SHELF LANDS ACT ........................................................................... 37

VII.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER
       REMOVAL STATUTE ........................................................................ 44

       A.    The Courts Construe The Federal Officer Removal Statute Broadly In Favor
             Of Removal ............................................................................... 44

       B.    Defendants Satisfy All Elements Of The Federal Officer Removal Statute ........ 46

             1.    Defendants "Acted Under" Federal Officers ........................... 47

                   a.    Defendants Acted Under Federal Officers By Developing
                         Mineral Resources On The Outer Continental Shelf ................ 50

                   b.    Defendants Acted Under Federal Officers By Developing
                         Mineral Resources On Federal Lands ........................... 65

                   c.    Defendants Acted Under Federal Officers By Operating The
                         Elk Hills Reserve "In the Employ" Of The U.S. Navy ............... 67

                   d.    Defendants Acted Under Federal Officers By Supplying
                         And Managing The Strategic Petroleum Reserve ...................... 75

e.    Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act .......................................... 79

f.    Defendants Acted Under Federal Officers During World War II And The Korean War ......................................................... 80

g.    Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities .................................................................... 86

h.    Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use ................................. 88

i.    Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation .................................................... 95

2.    Defendants' Activities Are Related To Plaintiff's Claims ..................... 99

3.    Defendants Have Colorable Federal Defenses ....................................... 103

VIII.   THE ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES ............................................................................ 105

IX.   PLAINTIFF'S CONCEALMENT ALLEGATIONS ARE IRRELEVANT AND BASED ON DEMONSTRABLY FALSE PREMISES ...................................... 111

X.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER ....................... 122

## I.      INTRODUCTION

The Annapolis press has reported for decades about the possibility that climate change may cause sea levels to rise, warning Plaintiff of the possible consequences if it failed to act.  A 1996 front page article from *The Capital* warned that "[g]lobal warming and erosion means the Chesapeake Bay could rise as much as 4 feet over the next century, gobbling shoreline by the acre and causing regular flooding in downtown Annapolis, according to coastal experts" and noted that "the unprecedented rise isn't getting much attention from state or local planners, a lack of strategy that could have serious repercussions."[1]  Now, after decades of inaction, Plaintiff seeks to shift blame to, and obtain damages from, a select group of companies in the energy industry for their lawful production and sale of oil and gas—products that are of fundamental importance to the economies of Annapolis, the State of Maryland, the United States, and indeed the world.  Plaintiff seeks to punish Defendants for these business activities, which occurred almost entirely outside the borders of Annapolis, to compensate for its own "lack of strategy" that it now alleges is having the "serious repercussions" the local news media saw coming twenty-five years ago.[2]

For more than a century, United States policy has emphasized the fundamental strategic importance of oil and gas to the nation's economic well-being and national security.  *Every* Administration since that of William Howard Taft has taken active steps to *increase* U.S. oil production, as a means of securing our national defense and spurring the economic development that has powered the United States' growth and prosperity over the past century.  Notwithstanding the recent increased focus on alternative sources of energy, petroleum remains the ineluctable backbone of United States energy policy; complete reliance on renewable energy sources at this

---

[1]   Declaration of Tonya Kelly Cronin ("Kelly Decl."), Ex. 2 (The Capital, Annapolis, MD, October 21, 1996).

[2]   *Id.*

time or in the near term is simply not possible, and Plaintiff does not allege otherwise.  For this reason, in 2010, President Obama "announc[ed] the expansion of offshore oil and gas exploration—but in ways that balance the need to harness domestic energy resources and the need to protect America's natural resources."[3]  President Obama explained: "[T]he bottom line is this: given our energy needs, in order to sustain economic growth, produce jobs, and keep our businesses competitive, we're going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."[4]

Plaintiff's claims are at odds with vital federal laws and policies, and seek to supplant those policies through litigation in state court.  Plaintiff asks the Court to find that Defendants' business activities constitute an unlawful "public nuisance" and "trespass," among other violations of Maryland state law.  Under various theories, the Complaint seeks to hold Defendants liable for "extract[ing], produc[ing], refin[ing], manufactur[ing], distribut[ing], promot[ing], market[ing], and[] sell[ing] . . . fossil fuel products."  *See, e.g.*, Compl. ¶ 4.  Plaintiff claims this subjects Defendants to "compensatory" and "punitive damages," as well as an order compelling Defendants to "abate" the alleged nuisance.  Compl. at 164, Prayer for Relief.  Under Maryland law, "abatement" is the functional equivalent of an injunction prohibiting the injurious conduct.  *See Becker v. State*, 363 Md. 77, 87–88 (2001) (citation omitted).  Thus, the Complaint seeks to stop, or at least drastically limit, fossil fuel production and use.

Plaintiff's claims expressly target Defendants' nationwide and global activities.  *See* Compl. ¶ 4.  In fact, Plaintiff's theory sweeps even more broadly, depending necessarily on the

---

[3]   Kelly Decl. Ex. 3 (President Barack Obama, Remarks on Energy at Andrews Air Force Base, Maryland, (Mar. 31, 2010), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-energy-security-andrews-air-force-base-3312010).

[4]   *Id.*

activities of billions of oil and gas consumers, including not only entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, and individual households around the world—virtually every inhabitant of the planet.  Plaintiff does not—and, because climate change occurs only as a result of cumulative, worldwide emissions, it cannot— limit its claims to harms allegedly caused by extraction, production, distribution, sales, marketing, or use of Defendants' products in the City of Annapolis.  And Plaintiff itself is a prodigious consumer of fossil fuels, emitting thousands of tons of $CO_2$ through its own consumption.  Yet, Plaintiff asks this Court to halt Defendants' business activities by assessing massive monetary damages and enjoining, or at least drastically limiting, fossil fuel production and sales.

The scope of Plaintiff's theory is breathtaking—it would reach the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, such as sales to the federal government and production directed *by* the federal government.  *See, e.g.*, *id.* ("Defendants' fossil fuel products play[] a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric $CO_2$ concentrations that have occurred since the mid-20[th] century.  This dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate.").  And because Plaintiff challenges production and combustion over at least the past half-century, the Complaint necessarily puts at issue long-standing decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve, development of energy resources on federal lands including the U.S. outer continental shelf, and the negotiation of international agreements bearing on the development and use of fossil fuels.

The federal issues necessarily raised by Plaintiff's Complaint and the pervasive

implications for federal interests posed by Plaintiff's claims and requests for relief demand resolution by a federal court under federal law.  The determination of how best to address *global* climate change, and the balancing of the costs and benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation.  As the Ninth Circuit recently explained, "any effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches." *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020).  A patchwork of 50 different state-law answers to this necessarily global issue would be unworkable and is precluded under our federal constitutional system.  "If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern."  *North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010).

No matter how it characterizes them, Plaintiff's claims necessarily arise under federal common law.  As the Supreme Court has explained, "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*").  Under our federal constitutional structure, no State's law may regulate—through enacted legislation or court-imposed order—the type of interstate pollution for which Plaintiff seeks to hold Defendants liable here.  All of Plaintiff's claims depend upon the interstate and, indeed, international activities of Defendants' extraction, production, and sale of fossil fuels—lawful products that the overwhelming majority of humans use to heat their homes, power their schools, hospitals, and vehicles, and manufacture limitless products that provide the safety, well-being, comfort, and convenience of modern society.  *See* Compl. ¶¶ 6–10.

4

Beyond the inherently interstate and international character of Plaintiff's liability theories, Plaintiff's nominally state-law claims seek to supplant vital federal laws and policies, which provide independent bases for removal. For fundamental reasons of national security and economic prosperity, the United States government has long promoted specific measures to encourage the production of oil and gas. As indicated above, President Obama sought to secure, expand, and promote the production of oil and gas in the offshore leasing program. And every Administration since that of William Howard Taft has taken active steps to increase U.S. oil production, thereby securing our national defense and spurring economic development that has led to the prosperity and standard of living the United States has enjoyed over the past several decades.

This lawsuit is a misguided attempt to regulate the energy industry's impact on global climate change outside of the legislative and executive branches of the federal government, and thus it necessarily implicates disputed and substantial federal issues. It is therefore also removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005) ("*Grable*"). The Complaint singles out a select group of members of the energy industry in ways inconsistent with those deemed advisable by the federal policymakers responsible for formulating the nation's response to global climate change. In fact, much of the conduct Plaintiff targets has furthered fundamental national and international security and economic policies. Plaintiff's claims thus infringe on and contradict federal energy policies and the federal government's exclusive authority over foreign affairs.

In addition, much of the conduct upon which Plaintiff seeks to base liability and damages took place in locations subject to federal jurisdiction—including the Outer Continental Shelf ("OCS")—and/or under the direction, supervision, and control of officers of the U.S. government. Thus, Defendants properly removed this action pursuant to the express statutory authorization of

the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), which confers federal jurisdiction over all claims "in connection with" production on the OCS.  Defendants also properly removed under the federal officer removal provisions of 28 U.S.C. § 1442(a)(1) because Plaintiff's claims challenge Defendants' conduct performed under federal direction, supervision, and control, including the production and supply of oil and gas products for the U.S. armed forces and other federal agencies to assist them in accomplishing critical national policy objectives.  Defendants' evidentiary record indisputably establishes this Court's jurisdiction under OCSLA and the federal officer removal statute—and includes the declarations of two prominent historians, Professor Tyler Priest of the University of Iowa and Professor Mark Wilson of the University of North Carolina, that explain in detail how Defendants acted under the direction, guidance, supervision, and control of federal officers.  For example, Professor Wilson explains how "the U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime," by employing "direct orders, government ownership, and national controls."  Wilson Decl. ¶ 2.  And Professor Priest explains that for "more than six decades, the U.S. federal [OCS] program filled a national government need," Priest Decl. ¶ 7(1), and federal officials "supervised, directed, and controlled the rate of oil and gas production," *id.* ¶ 48.

Perhaps recognizing that its claims related to fossil fuel production and combustion are removable on multiple grounds, Plaintiff's Complaint tries, at times, to recast the claims as concerning "concealment" or "misinformation" rather than production, sales and combustion.  For example, the Complaint alleges that Defendants have "engaged in a coordinated, multi-front effort to conceal and deny their own knowledge of [the threats of climate change]."  Compl. ¶ 1.  But these allegations are both untenable and implausible:  The scientific research relating to a potential

link between fossil fuel consumption and global climate change is voluminous and has been prominent in the public domain for decades, and no actions by Defendants could have possibly "concealed" this information. *See infra* Section IX.

Despite this knowledge of potential adverse climate impacts from fossil fuel combustion, the United States, the State of Maryland, and the City of Annapolis—like the rest of the world—have made the policy determinations to continue to rely on and use oil and gas at ever-increasing rates. Indeed, Maryland law expressly recognizes that "the production and development of oil and gas resources is important to the economic well-being of the State and the nation," Md. Code Ann., Envir. § 14-101, and the production, distribution, and sale of fossil fuel products "vitally affect the economy of the State, and its public interest, welfare, and transportation," Md. Code Ann., Com. Law § 11-302; *see also* Md. Code Ann., Envir. §§ 14-122, 14-123 (maintaining an "Oil and Gas Fund"); Office of Legal Counsel of Governor of State of Maryland, "Interpretive Guidance Regarding Order of Governor" (Mar. 23, 2020), https://governor.maryland.gov/wp-content/uploads/2020/03/OLC-Interpretive-Guidance-COVID19-04.pdf (during COVID-19 pandemic, categorizing oil and gas companies as "critical infrastructure" and permitting "[c]ompanies engaged in the production, refining, . . . distribution, and sale of oil, gas, and propane products" to remain open). In fact, the federal government reports that world energy consumption is expected to grow 50% by 2050 and will be focused in regions where strong economic growth is driving demand.[5] This makes sense in that numerous studies have shown that lack of access to energy services (*i.e.*, fuel) is a form, outcome, and cause of poverty ("energy poverty") worldwide, having severe adverse effects domestically and globally, with some 1.2 billion people lacking

---

[5] *See* U.S. Energy Info. Admin., *International Energy Outlook 2019* 24–26 (2019), https://www.eia.gov/outlooks/ieo/pdf/ieo2019.pdf.

access to liquid or gaseous fuels for cooking and heating.[6]  Plaintiff cannot plausibly portray this growth in energy consumption as the result of Defendants' alleged "concealment"; rather, it is an inevitable reflection of the world's fundamental need for abundant, affordable, and reliable sources of energy.

Plaintiff is thus careful in its Complaint not to rely exclusively on allegations of "deception," but rather consistently lumps these claims together with production and sales.  *See, e.g.*, Compl. ¶ 4 ("Defendants are extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and/or sellers of fossil fuel products."); *id.* ¶ 159 (alleging that Defendants should have "reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products").  Because Plaintiff's claims are plainly based—at least in part—on the production, sale, and use of fossil fuels, Plaintiff's allegations about deception do not defeat removal.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005) (holding that removal is proper so long as jurisdiction exists over a single claim); *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 463 (5th Cir. 2016) (same), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020).  Indeed, two of the six causes of action alleged by Plaintiff are products liability claims (Third Cause of Action and Fourth Cause of Action).  The *sine qua non* of a products liability claim is a product manufactured or sold by the defendant—here the fossil fuels allegedly produced and sold by Defendants.  *See* Maryland Civil Pattern Jury Instruction 26:17, Strict Tort Liability – Duty of Manufacturer to Warn ("If despite exercising reasonable care in the

---

[6]  *See, e.g.*, United Nations Development Programme (UNDP) and University of Bergen, *Accelerating SDG 7 Achievement, Policy Brief 8 in Support of the First SDG7 Review at the UN High-Level Political Forum 2018, Interlinkages Among Energy, Poverty, and Inequalities* at 65 (2018), https://sustainabledevelopment.un.org/content/documents/18041SDG7_Policy_Brief.pdf

*design, manufacturing, testing, and inspection of the product*, the product still cannot be made safe for its reasonably foreseeable use, and the dangerous condition is not obvious to the user of the product, the manufacturer has a duty to give an adequate warning of the danger.") (emphasis added).

The remedies Plaintiff seeks confirm that this case is not—and cannot be—about alleged "concealment" or misrepresentations alone, somehow divorced from Defendants' production and sales activities and the resulting emissions. The Complaint seeks compensatory damages for all injuries suffered as a result of global climate change, and an order compelling Defendants to abate the alleged nuisance (*i.e.*, global climate change) and *enjoining* Defendants from all activities that may potentially contribute to global climate change (*i.e.*, the production and sale of oil and gas). These claimed remedies do not, and cannot, flow from any misrepresentations or omissions. A misrepresentation cannot cause climate change, hurricanes, or a rise in sea level. Rather, according to the Complaint, those events and Plaintiff's alleged injuries are caused by the production and combustion of fossil fuels—and the numerous other recognized sources of global greenhouse gases, like agriculture, waste management, concrete and steel manufacturing, deforestation, and other land use decisions by countless third parties, including by Plaintiff itself. If Plaintiff's claims were, in fact, based exclusively on alleged concealment and misrepresentations, its asserted damages would necessarily be limited to, at most, any harms attributable to the purported marginal increase in oil and gas consumption caused by the alleged concealment and misrepresentations. But that is not the relief the Complaint demands.

\* \* \* \* \*

This case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses (and relies upon) every day. Oil and gas power our

national defense; keep our homes, offices, factories, hospitals and other essential facilities illuminated, powered, cooled, and ventilated; and transport people and products, including virtually every consumer good—from food to medicine to clothing—across the nation and around the world.  By means of this lawsuit, Plaintiff seeks to overturn decades of federal energy policy and threatens the reliable, affordable supply of energy on which this country, and the world, depends.  Federal law (not state law) must serve as the exclusive source of governing law for such inherently interstate and international policy matters because "the basic scheme of the Constitution so demands." *AEP*, 564 U.S. at 421.  Accordingly, and because Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production of oil and gas on federal lands and under the direction, supervision, and control of federal officers, Plaintiff's Complaint should be heard in this federal forum.

## II.     TIMELINESS OF REMOVAL

1.     Plaintiff, the City of Annapolis, filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court for the County of Anne Arundel, Case No. C-02-CV-21-000250, on February 22, 2021.  A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit 1 to the Declaration of Tonya Kelly Cronin ("Kelly Decl."), filed concurrently herewith.

2.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed less than 30 days after service.  28 U.S.C. § 1446(b).  The Chevron Parties were served on February 26, 2021.  Kelly Decl. ¶ 3.  The consent of the other Defendants is not required because removal does not proceed "solely under section 1441(a)." 28 U.S.C. § 1446(b)(2)(A).  The Chevron Parties remove this action to federal court on several bases, including, for example, 28 U.S.C. § 1442(a)(1).  Nevertheless, all properly joined and served Defendants have consented to removal. Kelly Decl. ¶ 4.  Consent is not required from any Defendant that has not been served.  *See* 28

U.S.C. § 1446(b)(2)(A).[7]

## III.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.      Plaintiff is the City of Annapolis.   Plaintiff brings claims against Defendants seeking damages and equitable relief for "climate crisis-related injuries" it claims to have suffered or alleges it will suffer, such as sea level rise, extreme weather, and other natural phenomena. *See, e.g.*, Compl. ¶¶ 47, 63, 249.   Plaintiff asserts the following claims:   public nuisance, private nuisance, strict liability for failure to warn, negligent failure to warn, trespass, and violations of Maryland's Consumer Protection Act.   In addition to compensatory and punitive damages, in its Prayer for Relief, Plaintiff seeks "disgorgement of profits," as well as "[e]quitable relief, including abatement of the nuisances complained of" in the Complaint.   Compl. at 164, Prayer for Relief.

4.      The Complaint makes clear that Plaintiff's claims center on Defendants' worldwide "*extraction*, *production*, and *consumption*" of oil and natural gas that Plaintiff alleges caused an "increase in global greenhouse gas pollution."   Compl. ¶ 2 (emphases added).   Nevertheless, Plaintiff may try to avoid federal jurisdiction by arguing that its claims are really about Defendants' alleged misrepresentations.   That cannot be the case.   Indeed, if Plaintiff's claims were based solely on misrepresentations, its asserted remedies would necessarily be limited to any marginal increase in greenhouse gas emissions supposedly caused by an alleged "campaign of deception."   Plaintiff's

---

[7]   In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process.   A number of Defendants contend that personal jurisdiction in Maryland is lacking over them, and these Defendants intend to preserve that defense and move to dismiss for lack of personal jurisdiction at the appropriate time. *See, e.g.*, *Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1001 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.") (citing *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive right to object to lack of personal jurisdiction)).

claims include no such limitation. If Plaintiff intends to argue that its claims are based solely on misrepresentations and/or "deception"—which it cannot plausibly do, given the nature of its alleged claims, injuries, and the complex phenomena that result in the injuries Plaintiff alleges— it should, at a minimum, represent that the damages it seeks are limited to those resulting from the incremental amount (if any) by which emissions increased as a provable result of the alleged misrepresentations and omissions. If Plaintiff does not represent that its damages are so limited, it should be foreclosed from arguing in support of remand that its claims are limited to Defendants' alleged misrepresentations and deception. Plaintiff cannot have it both ways.

5.      The Chevron Parties deny that any Maryland court has personal jurisdiction over them and further deny any liability as to Plaintiff's claims. The Chevron Parties expressly reserve all rights in this regard. For purposes of meeting the jurisdictional requirements for removal only, however, the Chevron Parties submit that removal is proper on at least five independent and alternative grounds.

6.      *First*, Plaintiff's claims arise under federal common law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs and navigable waters of the United States. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *AEP*, 564 U.S. at 421–23. Federal law applies in those few areas of the law that so implicate uniquely federal interests that "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422; *see also Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331]."). Because this action necessarily arises under federal law, it is removable under 28 U.S.C. §§ 1331 and 1441(a). *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*

*of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*") (explaining that it is "well settled" that section 1331's "grant of 'jurisdiction will support claims founded upon federal common law as well as those of a statutory origin'") (quoting *Milwaukee I*, 406 U.S. at 100).

7.      *Second*, removal is authorized under 28 U.S.C. § 1331 and § 1441(a) because this action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable*, 545 U.S. 308.

8.      *Third*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to OCSLA.  The allegations in the Complaint make clear that this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9.      *Fourth*, Defendants are authorized to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Despite Plaintiff's purported disclaimers, *see* Compl. ¶¶ 14, 240 n.263, multiple Defendants:  (1) were "acting under" a federal officer; (2) have claims against them that relate to acts under color of federal office; and (3) assert colorable federal defenses.  *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2016); *In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019).  The Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial activities under the direction, supervision and control of federal officers—contributed to the *global* greenhouse gas emissions that Plaintiff claims caused its alleged injuries.  *See, e.g.*,

Compl. ¶ 4.

10.     *Fifth*, removal is authorized under 28 U.S.C. §§ 1331 and 1441(a) because—despite Plaintiff's purported disclaimers, *see* Compl. ¶¶ 14, 240 n.263—the Complaint makes clear that Plaintiff's claims are based on alleged injuries and conduct occurring on federal enclaves.  As such, Plaintiff's claims are removable under federal-question jurisdiction.  *See* U.S. Const. art. I, § 8, cl. 17; *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012) ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

11.     The Chevron Parties will address each of these grounds in additional detail below.  Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific articulations in this Notice.  *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction).  Indeed, the Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal.  *See, e.g.*, *Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 755 (4th Cir. 1996) (citing *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969)).  "[T]he Court is not limited to an examination of the original petition in determining jurisdictional questions."  *Giangola v. Walt Disney World Co.*, 753 F. Supp. 148, 153 n.5 (D.N.J. 1990) (citation and internal quotation marks omitted).

12.     Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

13.     Defendants acknowledge that some of the arguments and evidence set forth below were previously before this Court in *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp.

14

3d 538 (D. Md. 2019) (Hollander, J.) ("*Baltimore I*"), and the Fourth Circuit on review of Judge Hollander's remand order, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*").  That Fourth Circuit decision is currently under review by the Supreme Court, which granted certiorari on October 2, 2020, and heard oral argument on January 19, 2021.  Defendants note that the Fourth Circuit's opinion in *Baltimore II*, which only addressed Defendants' federal officer removal ground, does not preclude removal here, on that ground or any other.  Defendants here present a materially expanded evidentiary record in support of federal officer removal, and assert a number of grounds for removal that the Fourth Circuit did not address.  The same is true of this Court's decision in *Baltimore I*, which addressed Defendants' federal common law, *Grable*, federal enclaves, federal officer removal, and OCSLA grounds for removal.[8]  Defendants cite additional evidence and arguments in support of these grounds here that were not before Judge Hollander in *Baltimore I*.

## IV.   THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW

14.     This action is removable because, as a matter of federal constitutional law and structure, Plaintiff's claims necessarily arise under federal, not state, law.  The issues presented by the Complaint are exclusively federal in nature and state law simply has no role to play.  As the Supreme Court has repeatedly confirmed: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law."  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).  And under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin."  *Nat'l Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100).  Because Plaintiff's claims necessarily arise under federal law, this Court has federal-question jurisdiction and removal is proper.

---

[8]   *Baltimore I* also addressed removal under the bankruptcy removal statute and the federal courts' admiralty jurisdiction, which are not asserted here.

15.     The Court must determine at the outset whether Plaintiff's claims arise under federal or state law.  This analysis does not implicate preemption principles or standards because a claim that "arise[s] under federal common law . . . is a permissible basis for jurisdiction based on a federal question."  *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 383 (7th Cir. 2007); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("[I]f federal common law governs a case, that case [is] within the subject matter jurisdiction of the federal courts.").

16.     Section 1331 extends the original jurisdiction of federal district courts to "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This jurisdictional grant encompasses actions that arise under federal common law, because "a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law."  *Milwaukee I*, 406 U.S. at 100.

17.     Federal common law governs when "a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).  Claims for interstate or international pollution implicate "uniquely federal interests" and must out of necessity be subject to uniform federal law as a matter of fundamental constitutional structure.  In our federal system, each State may make law within its own borders, but no State may "impos[e] its regulatory policies on the entire Nation," *see BMW of N. Am. v. Gore*, 517 U.S. 559, 585 (1996), or dictate our "relationships with other members of the international community," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964).  Federal law therefore must govern inherently interstate or international matters to the exclusion of state law, because "the basic scheme of the Constitution so demands."  *AEP*, 564 U.S. at 421.

18.     The Supreme Court has confirmed repeatedly that when, as here, "we deal with air

16

and water in their ambient or interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *accord, e.g.*, *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'"). Because federal law governs in order to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7. The Supreme Court put the point succinctly in *International Paper Co. v. Ouellette*, observing that "interstate . . . pollution is a matter of federal, *not state*, law." 479 U.S. 481, 488 (1987) (emphasis added). "[S]ome areas involving 'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . *regardless* of whether Congress has shown any intent to preempt the area." *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74, 78 (4th Cir. 1993) (emphasis added). This is one such area.

19.     As the United States recently explained to the Supreme Court in *Baltimore*: "[C]ross-boundary tort claims associated with air and water pollution involve a subject that 'is meet for federal law governance'" because any such putative claims "that seek to apply the law of an affected State to conduct in another State" have an "inherently federal nature." Brief of United States as Amicus Curiae at 26–27, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020) (quoting *AEP*, 564 U.S. at 422). Claims "that seek to apply the law of an affected State to conduct in another State" necessarily "arise under 'federal, not state, law' for jurisdictional purposes, given their inherently federal nature." *Id.* at 27 (quoting *Ouellette*, 479 U.S. at 488). At oral argument, the United States confirmed that Baltimore's claims, like Plaintiff's claims here, "are inherently federal in nature." Tr. at 31:4–5. The United States explained that

17

although Baltimore "tried to plead around th[e Supreme] Court's decision in *AEP*, its case still depends on alleged injuries to the City of Baltimore caused by emissions from all over the world, and those emissions just can't be subjected to potentially conflicting regulations by every state and city affected by global warming." Tr. at 31:7–13.

20.     The two-step analysis the Supreme Court established in *Standard Oil* for determining whether a claim arises under state or federal law for jurisdictional purposes makes clear that this threshold question does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.  Under the applicable two-step approach, courts must:  (1) determine for jurisdictional purposes whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, determine the substance of the federal law and decide whether the plaintiff has stated a viable federal claim.  *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999) (citing *United States v. Standard Oil Co. of Cal.,* 332 U.S. 301, 305 (1947) ("*Standard Oil*")).

21.     Although Plaintiff purports to style its nuisance and other claims as arising under state law, it is the inherently federal nature of the claims stated on the face of the complaint, not Plaintiff's characterization of them as *state-law* claims, that is controlling.[9]  It is well-settled that

---

[9]     14C Wright *et al.*, Fed. Prac. & Proc. Juris. § 3722.1 (rev. 4th ed.) ("[A] plaintiff cannot frustrate a defendant's right to remove by pleading a case without reference to any federal law when the plaintiff's claim is necessarily federal."); *accord, e.g.*, *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (noting courts will "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization"); *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002) (in determining whether "a federal question is presented on the face of the plaintiff's properly pleaded complaint . . . [a] plaintiff's lack of reference . . . to federal law is not controlling") (citing *Am. Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir. 1978) ("[T]he lack of any reference to federal law in the complaint is not controlling" where "the substance of the[] allegations . . . sets forth a claim arising under federal law.")); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997) (citing *Emery*, 579 F.2d at 234) (same); *City of Camden v. Beretta U.S.A. Corp.*, 81 F.Supp.2d 541, 546 (D.N.J. 2000) (same).

the question of whether a case arises under state or federal law is a question of subject matter jurisdiction that the federal court must resolve for itself, subject to its "unflagging obligation" to exercise such jurisdiction where it does exist.[10]  A federal court would contravene this fundamental obligation were it to treat as controlling a complaint's characterization of a plaintiff's claims as state-law claims where, as here, the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution and, therefore, necessarily arise under federal law.

22.     Adhering to the "two-part approach" articulated in *Standard Oil*, the First Circuit in *Swiss American* recognized the key distinction between the "source question and the substance question."  191 F.3d at 43, 45.  The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state."  *Id.* at 43.  The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule."  *Id.*  Whether a claim "arises under" federal law "turns on the resolution of the source question."  *Id.* at 44.  Only that first question—which law applies—is relevant to the removal question and, as such, it must be resolved by a federal court.  As the Supreme Court explained, this "choice-of-law task is a federal task for federal courts."  *Milwaukee II*, 451 U.S. at 349 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973)).

---

[10]  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 821 (1976) (Stewart, J. dissenting) ("[F]ederal courts have a 'virtually unflagging obligation' . . . to exercise the jurisdiction given them"); *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415 (1964) ("When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.") (quoting *Wilcox v. Consolidated Gas Co.,* 212 U.S. 19, 40 (1909)); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not").

23.     Because Plaintiff alleges that climate change occurs as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, *see, e.g.*, Compl. ¶¶ 53–55, any judgment as to the reasonableness of particular emissions or their alleged causal contribution to the overall phenomenon of climate change, inherently requires an evaluation at an interstate and, indeed, international level.  *See AEP*, 564 U.S. at 422 (noting that "[g]reenhouse gases once emitted become well mixed in the atmosphere") (internal quotation marks omitted); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("*Kivalina I*") ("Significantly, the source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[ ] with the accumulation of emissions in California and the rest of the world.'").  Thus, even assuming that state tort law may properly address local source emissions within a specific state, that is unquestionably not the nature or theory of Plaintiff's claim, nor could it be.  Plaintiff seeks to impose tort liability for Defendants' alleged contributions to *global* climate change, based on *global* production and sales, and would require an overarching consideration of *all* of the emissions traceable to the extraction and sale of Defendants' products in each of the states, and, in fact, in the approximately 195 countries of the world.  Plaintiff does not seek damages from Defendants as a result of their *intrastate* activity.  Indeed, Plaintiff did not even attempt to disclaim oil and gas sales and their attendant emissions to the extent they occurred outside Maryland or internationally.  Nor could it.  Just as with its failed attempt to exclude emissions resulting from sales to the federal government and the military, there is no method by which to distinguish the effect of emissions originating inside or outside the forum.  Therefore, given the federal government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning climate change directly

implicate uniquely federal interests as "the immense and complicated problem of global warming requires a comprehensive solution." *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 475 (S.D.N.Y. 2018). As the Ninth Circuit has noted, "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government. *Juliana*, 947 F.3d at 1171. In cases like this, "borrowing the law of a particular State would be inappropriate." *AEP*, 564 U.S. at 422.

24.     Plaintiff's claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Sabbatino*, 376 U.S. at 425 (noting that issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and . . . states have very little authority in this area.").

25.     As is evident from the Complaint's repeated use of the term "*global* warming," the causes of Plaintiff's alleged injuries are not confined to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes. *See* Compl. ¶ 53, Figure 1 (depicting $CO_2$ emissions from various sources); ¶ 59 n.26 ($CO_2$ emissions cause "*global* mean sea level rise" (emphasis added)); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 509, 523–24 (2007) (describing Senate rejection of the Kyoto Protocol because emissions reduction targets did not apply to "heavily polluting nations such as China and India," and the EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *accord* Kelly Decl. Ex. 4 (Remarks Announcing United States Withdrawal From the United Nations Framework Convention on Climate Change Paris Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/ (statement by President Trump announcing United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on China's emissions)).

26.     In short, and as the United States explained as amicus in a similar case, "federal law and policy has long declared that fossil 'fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports.'"  Brief of the United States as Amicus Curiae at 10, *City of Oakland v. BP p.l.c*, No. 18-16663 (9th Cir. Aug. 3, 2020) (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

27.     The Complaint itself demonstrates that the unbounded nature of greenhouse gas

emissions, diversity of sources, and the magnitude of the alleged attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶ 109. But these are complex policy-balancing problems, on a necessarily national scale, and without fixed "right answers." As the Supreme Court put it in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *AEP*, 564 U.S. at 427. As a "question[] of national or international policy," the question of how to address greenhouse gas emissions (which underlies Plaintiff's claims and its requested relief) involves inherently federal concerns and can be resolved only by application of federal law; state law simply has no role to play. *See id*.

28.     Because federal common law governs this "transboundary pollution" and climate change suit regardless of how Plaintiff *labeled* its claims, this action is within this Court's original jurisdiction. *See, e.g.*, *Sam L. Majors Jewelers*, 117 F.3d at 928.

## V.     THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY RAISE DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

29.     Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court has held that suits alleging only state-law causes of action nevertheless "arise under" federal law, even if not exclusively governed by federal law, if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Applying this test "calls for a common-sense accommodation of

judgment to [the] kaleidoscopic situations that present a federal issue." *Id.* at 313 (internal quotation marks omitted) (alteration in original).

30.     Plaintiff's Complaint attempts to supplant federal regulation of greenhouse gas emissions and hold select members of an international industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heat waves, and wildfires that are allegedly caused by global climate change. Plaintiff's claims raise "federal issue[s], actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 313.

31.     The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to the City of Annapolis, the State of Maryland, or even the United States.  Yet the Complaint attempts to undermine decades of national energy, economic, and environmental policies by prompting a Maryland state court to take control over an entire industry and its interstate commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal regulatory schemes and systems.  It is well-settled that a collateral attack on a federal regulatory regime—an attempt to substitute state law for existing federal standards—presents a substantial federal question.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

A.     **Plaintiff's Claims Seek To Supplant Federal Energy Policy**

32.     *First*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act ("CAA"), 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–47.  Plaintiff's purported state-law claims seek to upend the careful balance Congress has struck between energy production and

environmental protection.  Collectively, as well as individually, Plaintiff's causes of action depend on the interpretation and application of federal statutes, federal regulations, and international treaties.  For example, domestically, the EPA regulates greenhouse gas emissions under the CAA by implementing rules governing both stationary and mobile source emissions.

33.     The Complaint seeks relief for an alleged nuisance.   Plaintiff alleges that Defendants, through their national and, indeed, global activities, "caus[ed] and accelerat[ed] the climate crisis."  Compl. ¶ 162.  Plaintiff alleges that "sea level rise, flooding, erosion, loss of wetlands and beaches, ocean acidification, and other social and economic consequences," are consequences of Defendants' conduct.  *Id.* ¶ 47.

34.     If Maryland law were applicable to Plaintiff's nuisance claims, Plaintiff would be required to prove that the defendants' conduct is "unreasonable."  *Tadjer v. Montgomery Cnty.*, 300 Md. 539, 551–52 (1984) (quoting Restatement (Second) of Torts §§ 821B, 821D).  But under federal law, federal agencies must "assess both the costs and the benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Sept. 30, 1993).  Thus, there has been, and continues to be, a determination by the federal government of the reasonableness of oil and gas production and the greenhouse gas emissions that come with that level of production.

35.     Congress has directed a number of federal agencies to regulate Defendants' conduct, and thus to engage in the same analysis of benefits and costs that Plaintiff would have the state court undertake.  Federal agencies have performed, and continue to perform, these cost-benefit analyses.  *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. 64510, 64518-21 (Oct. 23, 2015) (EPA considering the impacts of

"wildfire" and "extreme precipitation events," such as "droughts, floods, hurricanes, and major storms"). The alleged effects of Defendants' operations are broadly distributed throughout the nation, to all residents as well as all state and government entities. Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily, but not exclusively, the CAA—to meet energy extraction and production needs while achieving environmental protections. *See* Clean Air Act, 42 U.S.C. § 7401(b)(1) (congressional statement that the goal of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources" and promote "the productive capacity" of the country); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801(a) (congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201(b), (k) (congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

36.     Regulation of greenhouse gas emissions is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and the EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of

greenhouse gas emissions from medium- and heavy-duty engines and vehicles). Put simply, "emissions have been extensively regulated nationwide" by the federal government under the CAA. *TVA*, 615 F.3d at 298.

37.     Whether the federal agencies charged by Congress to support both energy and environmental needs for the entire nation have struck an appropriate balance is a question that is "inherently federal in character" and gives rise to federal question jurisdiction. *Buckman Co.*, 531 U.S. at 347; *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (finding federal removal under *Grable* appropriate where claims were "a collateral attack on" agency action under a highly reticulated regulatory scheme). Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime Congress designed, affecting residents of the nation far outside the state court's jurisdiction. *See, e.g.*, *Grable*, 545 U.S. at 312 (stating that claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (stating that removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

38.     The Complaint also calls into question federal government decisions to contract with Defendants for the extraction, development, and sale of oil and gas resources on federal lands. Such national policy decisions have expanded fossil fuel production and use and produced billions of dollars in revenue to the federal Treasury. Reliable, affordable energy is fundamental to

economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the federal government. *See, e.g.*, 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) (describing "fossil fuels" as "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production"). Yet, Plaintiff's purported state-law claims require a determination that the complained-of conduct—the lawful activity of placing oil and gas into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the U.S. Constitution and applicable federal statutes, treaties, and regulations, is a federal question.

39.     The cost-benefit analysis required by Plaintiff's claims would necessarily disrupt the federal regulatory structure of an essential, national industry. "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) ("*Levee Board*"); *see also Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at \*3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds."); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action"). Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

40.     Plaintiff's claims also necessarily implicate substantial federal questions by seeking to obtain compensatory and punitive damages, as well as equitable relief, based on allegations that Defendants waged a "campaign to obscure the science of climate change" and thereby "[d]elayed

28

efforts to curb anthropogenic greenhouse gas emissions." Compl. ¶¶ 149–50. In other words, Plaintiff claims that Defendants engaged in fraud on a federal agency by hiding or misrepresenting the science of climate change from the EPA, Department of Transportation, and other federal agencies. Setting aside the sheer implausibility of Plaintiff's theory that Defendants could have misled federal agencies about core scientific facts addressed by the U.N. Intergovernmental Panel on Climate Change ("IPCC") and publicly known for decades, it is well-settled that claims that a defendant has engaged in fraud on a federal agency arise under federal law. Claims of fraud on a federal agency arise exclusively under federal law. *Buckman Co.*, 531 U.S. at 347 ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on federal agencies have never come within the 'historic police powers of the States.'") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)).

## B.     Plaintiff's Claims Necessarily Interfere With Foreign Affairs

41.     *Second*, Plaintiff's claims impede the foreign-affairs power by seeking to regulate global climate change, which has been and continues to be the subject of major international treaties. In international negotiations, the United States has sought to balance environmental policy with robust economic growth. After President Clinton signed the Kyoto Protocol in 1997, for example, the U.S. Senate expressed its view in a 95-0 vote that the United States should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong. (1997). Congress then enacted a series of laws barring EPA from implementing or funding the Protocol. *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000). And President Biden—in one of his first acts in

office—rejoined the Paris Agreement on January 20, 2021, *see* Kelly Decl. Ex. 114, which provides that government efforts to address "the threat of climate change" should occur "in the context of sustainable development" and "take into consideration" the economic "impacts of response measures."  Kelly Decl. Ex. 6, art. 2, § 1; *id.* art. 4, § 15.  More broadly, the nation's climate change policy is also inextricably "infus[ed]" into its "trade policies," "foreign aid programs," "bilateral discussions and even [its] military readiness."  Kelly Decl. Ex. 7.

42.    Claims that turn on the interpretation of federal treaties are removable under *Grable*.  The scope of a treaty "is a matter of federal law and federal treaty interpretation and must be determined from an examination of the four corners of the treaty."  *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977); *see also Horton v. Toyota Tech. Ctr., U.S.A., Inc.*, 1991 WL 333722, at *2 (C.D. Cal. Dec. 2, 1991) (claims raised "substantial questions of federal law" because the "allegations necessarily require interpretation of the FCN Treaty").

43.    Plaintiff's claims necessarily involve the interpretation of treaties that address the global emission of greenhouse gases.  The Complaint repeatedly ties the claims to climate change and its alleged consequences.  The Complaint recites reports and analyses that discussed the potential link between climate change and rising sea levels.  *E.g.*, Compl. ¶¶ 64–124.  And the Complaint's theory of causation for all its claims is clear: use of Defendants' products causes $CO_2$ emissions, and those emissions (together with greenhouse emissions from other sources) cause climate change, which in turn causes sea level rise.  *See id.* ¶¶ 4–5, 141.

44.    The Complaint asserts that Defendants' activities have led to increased greenhouse gas emissions, thereby causing a public nuisance.  A public nuisance is defined as an "an unreasonable interference with a right common to the general public."  *Tadjer*, 300 Md. at 551–52.  As noted above, under Maryland law, public nuisance claims require a plaintiff to prove that

the defendant's conduct is "unreasonable." *Id*. Resolving whether Defendants' conduct is "unreasonable" will require a court to impermissibly second-guess the balancing the federal government has or will undertake in entering into international treaties and agreements with respect to greenhouse gas emissions and global climate change.

45.     Multiple federal treaties directly address the global emission of greenhouse gases. A 1989 United Nations resolution called for coordinated action because climate change would contribute to "the potential global problem of sea-level rise." *See* G.A. Res. 44/206 ¶ 1 (Dec. 22, 1989).   In 1992, many countries (including the United States) signed the United Nations Framework Convention on Climate Change.  That convention required each signatory to, among other things, "adopt national policies and take corresponding measures on the mitigation of climate change, by limiting its anthropogenic emissions of greenhouse gases." *See* UNFCCC Art. IV(2)(a) (May 9, 1992).  The Paris Accord imposes similar obligations.  After recognizing the "importance of ensuring the integrity of all ecosystems, including oceans," the treaty requires signatories to commit to "[h]old[] the increase in the global average temperature to well below 2°C above pre-industrial levels."  Kelly Decl. Ex. 6 (Paris Accord, T.I.A.S. No. 16-1104 Art. II(1)(a) (Nov. 4, 2016)).   Notably, the Paris Accord explicitly balances concerns about public health against continued economic growth—the same kind of balancing called for by Maryland nuisance law. *See id.* Art. IV(19) (providing that signatory nations should implement long-term low greenhouse gas emission development strategies in a way that "tak[es] into account their common but differentiated responsibilities and respective capabilities, in the light of different national circumstances"); *id.* Art. IX(4) (provision of financial resources by developed countries to assist developing countries "should aim to achieve a balance between adaptation and mitigation, taking into account country-driven strategies, and the priorities and needs of developing country Parties").

46.     Adjudicating Annapolis's public nuisance claim would require the state court to re-evaluate the policy considerations that motivated the federal government to recently rejoin the Paris Accord, including the proper balance to be struck between the objectives of limiting greenhouse gas emissions, reducing sea level rise, and growing the economy.  This is a federal issue that is disputed and substantial.

47.     Plaintiff's Complaint also raises substantial federal issues because the asserted claims necessarily encompass issues of foreign policy and carefully balanced regulatory considerations at the international level, including the foreign affairs doctrine.  Plaintiff's claims expressly challenge and seek to govern extraterritorial conduct, thereby implicating the foreign-policy prerogatives of the federal government's executive branch as to climate change and energy security treaties.  Such claims are inherently federal in nature:  "an issue concerned with . . . ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law."  *Sabbatino*, 376 U.S. at 425; *see also United States v. Belmont*, 301 U.S. 324, 331 (1937) ("[T]he external powers of the United States are to be exercised without regard to state laws or policies. . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

48.     Accordingly, Plaintiff's claims necessarily raise substantial federal questions that are appropriate for federal court resolution because they implicate issues of foreign relations that are committed to the federal government and exclusively governed by federal law.  *See, e.g.*, *Republic of Philippines*, 806 F.2d at 346, 352–54 (nominally state-law claim "arises under federal law" when it "necessarily require[s] determinations that will directly and significantly affect

American foreign relations"); *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 542–43 (5th Cir. 1997) ("[S]tate-law tort claims" arose under federal law because they "raise[d] substantial questions of federal common law by implicating important foreign policy concerns.").

49.     Through this action, Plaintiff seeks to have a state court regulate greenhouse gas emissions worldwide, far beyond the borders of Annapolis, Maryland, or even the United States. The remedies Plaintiff seeks—equitable relief and damages that could drastically reduce fossil fuel production, *see* Compl. at 164 (Prayer for Relief)—contravene and threaten to undermine U.S. energy security policy, including through international trade policy, treaties, and agreements.  For example, in 1959, President Dwight D. Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of national security."  Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686 § 8(a), 72 Stat. 678 (1958).  The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."  Kelly Decl. Ex. 8 (Statement by the President Upon Signing Proclamation Governing Petroleum Imports, 1 Pub. Papers 240 (Mar. 10, 1959)).  President Eisenhower further explained United States foreign and domestic policy as follows:  "Petroleum, wherever it may be produced in the free world, is important to the security, not only of ourselves, but also of the free people of the world everywhere."  *Id.*  After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least ninety days of net oil imports.  *See* Agreement on an International Energy Program art. 2,

Nov. 18, 1974, 1040 U.N.T.S. 271.  The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve.  *See, e.g.*, 42 U.S.C. § 6231(b);  Nat'l Energy Policy Dev. Grp., National Energy Policy 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.  Plaintiff's claims infringe on the federal government's environmental, trade, and energy policies that require the United States to speak with one voice in coordinating with other nations.

50.     Plaintiff also seeks to have the state court second-guess diplomatic efforts to address climate change.  For example, Plaintiff contends that Defendants engaged in a campaign to undermine national and international efforts, like the Kyoto Protocol and Paris Accord, to rein in greenhouse gas emissions.  Plaintiff apparently believes that the United States should have adopted a different foreign policy, and that it would have done so had Defendants acted differently. But "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to state laws or state policies whether they be expressed in constitutions, statutes, or judicial decrees."  *Pink*, 315 U.S. at 233.  States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Americans United for Separation of Church & State v. Reagan*, 786 F.2d 194, 199 (3d Cir. 1986) ("The power in question—the conduct of foreign affairs—is not only vested in the Government of the United States, but is vested exclusively so.").  Yet Plaintiff seeks to replace international negotiations and congressional and executive decisions with its own preferred foreign policy on climate change issues, using the ill-suited tools of equitable relief under Maryland common law and private litigation in a state court.  When states have enacted laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.  *See Crosby v. Nat'l*

*Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420–24 (2003).

      **C.**    **Plaintiff's Claims Include Federal Constitutional Elements**

    51.    *Third*, Plaintiff's claims necessarily include federal constitutional elements.  The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern like climate change, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, including factual falsity, actual malice, and proof of causation of actual damages.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986) (explaining that state common-law standards "must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (holding public officials have the burden of proving with "convincing clarity" that a "statement was made with 'actual malice'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

    52.    These First Amendment issues are not "defenses" but rather constitutionally required elements of the claim on which Plaintiff bears the burden of proof—by clear and convincing evidence—as a matter of federal law.  *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious interference with contract or business.").

    53.    To be sure, most state-law misrepresentation claims are not removable because they

typically do not implicate the broader federal interests at issue in this case. As shown above, those federal interests are themselves unquestionably "substantial" under *Grable*. So is the speech that Plaintiff is trying to suppress because its claims address a subject of national and international importance that falls within the purview of federal authority over foreign affairs and domestic economic, energy, and security policy. "Climate change has staked a place at the very center of this Nation's public discourse," and "its causes, extent, urgency, consequences, and the appropriate policies for addressing it" are "hotly debated." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial of certiorari). Moreover, Plaintiff is a public entity seeking to use the machinery of its own state courts to impose *de facto* regulations on Defendants' nationwide speech on issues of national public concern. *Cf. Sullivan*, 376 U.S. at 264 ("[An] action brought by a public official against critics of his official conduct" "require[s]" "safeguards for freedom of speech."). But "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Falwell*, 485 U.S. at 56 (internal quotation marks and citation omitted). First Amendment interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims to regulate speech on issues of "public concern." *Hepps*, 475 U.S. at 774. Given the compelling federal interests at stake here, federal courts may entertain the claims at issue in this case "without disturbing any congressionally approved balance of federal and state judicial responsibilities," making removal appropriate. *Grable*, 545 U.S. at 314.

54.    Indeed, freedom of speech is "most seriously implicated . . . in cases involving disfavored speech on important political or social issues," chief among which in the contemporary context is the question of "[c]limate change," which "is one of the most important public issues of the day." *Mann*, 140 S. Ct. at 344 (noting recourse to a federal forum is especially warranted in suits "concern[ing] a political or social issue that arouses intense feelings," because "a plaintiff

may be able to bring suit in whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the plaintiff's point of view" (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))).  Plaintiff's attempt to regulate Defendants' speech on the important public matter of climate change through litigation thus necessarily raises substantial First Amendment questions that belong in federal court.

## VI.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

55.     This Court has original jurisdiction pursuant to OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  In OCSLA, Congress granted federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("[T]h[e] language [of § 1349(b)(1)] [i]s straightforward and broad.").  The OCS includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.  Plaintiff's claims encompass *all* of Defendants' worldwide "exploration, development, extraction . . . and . . . production" of fossil fuels.  *E.g.*, Compl. ¶ 29(a); *see also id.* ¶ 33(a).  Therefore, Plaintiff's claims necessarily encompass all such activities by Defendants on the OCS and fall within the "broad . . . jurisdictional grant of section 1349."  *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

56.     Under OCSLA, oil and gas activities on the OCS can be governed only by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the

37

United States" to the OCS.  43 U.S.C. § 1333(a)(1).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]." *Id.* § 1333(a)(2)(A).

57.     As *Parker Drilling* explains, "The OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." 139 S. Ct. at 1889 (quotation marks omitted, alteration in original).  Plaintiff's attempt to affix a state-law label to its claims thus cannot defeat removal.  Courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on Maryland law, arise under the 'law of the United States' under [43 U.S.C.] § 1333(a)(2)" such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 193 (1st Cir. 2004).  Accordingly, Plaintiff's claims are removable under OCSLA.[11]

58.     In order to vindicate the substantial federal interests in the OCS leasing program, Congress established original federal court jurisdiction over "the *entire range of legal disputes* that it knew would arise relating to resource development on the Outer Continental Shelf." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985) (emphasis added).  OCSLA is "a sweeping assertion of federal supremacy over the submerged lands outside of the three-mile [Submerged Lands Act] boundary" and is to be interpreted broadly in favor of removal. *Ten Taxpayer Citizens Grp.*, 373 F.3d at 188.  "Between 1954 and 2016 . . . production

---

[11]  Under *Parker Drilling*, Plaintiff's claims related to operations on the OCS are also removable under 28 U.S.C. § 1331 because they arise under federal law.

from offshore leases totaled more than 20 billion barrels of oil" and "the federal government collected an estimated $80 billion in signature bonuses and $150 billion in royalties—not adjusted for inflation—from offshore oil and gas leases."  Priest Decl. ¶ 7(1).  Many of the Defendants in this lawsuit and their alleged predecessors, successors, or subsidiaries worked to develop the oil and gas resources on the OCS under federal government supervision.[12]

59.     The breadth of OCSLA federal jurisdiction reflects the Act's "expansive substantive reach."  *See id.*  Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id.* at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

60.     Consistent with Congress's intent, courts repeatedly have found OCSLA

---

[12]   The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.  Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

jurisdiction where the claims involved conduct that occurred on the OCS or where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.  *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

61.     OCSLA jurisdiction exists even where a complaint pleads no substantive OCSLA claims.  *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163 (finding OCSLA jurisdiction and denying motion to remand despite complaint's failure to plead any substantive OCSLA claims).  Although the Complaint here attempts to "disclaim[] injuries arising on federal property," *see* Compl. ¶¶ 14, 240 n.263, Plaintiff's claims and injuries necessarily arise out of and are connected with production and exploration on the OCS.  As Plaintiff concedes elsewhere in its Complaint, emissions from the combustion of fossil fuels cannot be traced to their sources and Plaintiff's alleged injuries are caused by undifferentiated "global greenhouse gas pollution" generally.  *Id.* ¶ 2.  Indeed, the Complaint directly alleges that "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere."  *Id.* ¶ 260.

62.     Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program that aims to develop and exploit the oil and gas resources of the federal OCS. 43 U.S.C. § 1334 *et seq.*  Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion . . . in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of

Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[13]  In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the last six years, together with 1.034 trillion cubic feet of natural gas.  Bureau of Safety and Environmental Enforcement, Outer Continental Shelf Oil and Gas Production (Oct. 6, 2020), https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

63.     Certain Defendants (or their predecessors, subsidiaries, or affiliates) participate in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 1.1 trillion cubic feet of natural gas from the federal OCS in the Gulf of Mexico alone.  Kelly Decl. Ex. 9 (Production by Operator Ranked by Volume for the Gulf of Mexico Region, 1947-1995, MMS).  In 2016, Chevron U.S.A. produced more than 49 million barrels of crude oil and more than 49 billion cubic feet of natural gas from the OCS in the Gulf of Mexico.  U.S. Dep't of Interior, Bureau of Safety & Envtl. Enf't, *Gulf of Mex. Region, Prod. by Operator Ranked by Vol.* (2016), https://www.data.boem.gov/ Production/Files/Rank%20File%20Gas%202016.pdf.  According to data published by the U.S. Bureau of Ocean Energy Management ("BOEM"), numerous other Defendants conduct, and have conducted for decades, similar oil and gas operations on the federal OCS.  According to data published by the Department of Interior for the period of 1947 to 1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil

---

[13]  The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

volume, is a Defendant (or predecessor of a Defendant) or one of their subsidiaries.[14]   Also according to the Department of the Interior, in every subsequent year, from 1996 to the present, at least three of the top five OCS operators in this area is a Defendant (or a predecessor) or one of their subsidiaries.[15]   Indeed, Defendants (and their subsidiaries or affiliates) presently hold, in whole or in part, approximately 22.1% of all OCS leases.   *See Bureau of Ocean Energy Management, Lease Owner Information*,   https://www.data.boem.gov/Leasing/ LeaseOwner/Default.aspx.[16]

64.     The Complaint itself makes clear that a substantial part of Plaintiff's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."   *Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction" of "oil, coal, and natural gas." Compl. ¶ 2.  And a substantial quantum of those activities arises from OCS operations.  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432 (recounting that, historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production).  Plaintiff also alleges that emissions have risen due to increased OCS extraction technologies.  *See, e.g.*, Compl. ¶¶ 143– 45 (discussing Arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS).  And while Plaintiff identifies certain additional energy projects that occurred in

---

[14]   U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., *Ranking Operator by Oil*, https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil.

[15]   *Id.*

[16]   As explained in note 12 above, the Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.

Canadian waters, *id.* ¶ 98, Defendants conduct similar activity in American waters.

65.     Even if Plaintiff's claims were based solely on allegedly deceptive promotion of oil and gas by Defendants (which they are not, as explained herein), that would not prevent removal based on OCSLA.  For example, Plaintiff alleges that Defendants "funded . . . think tanks, front groups, and dark money foundations pushing climate change denial,"  Compl. ¶ 138, and supposedly misled regulators and public officials, *id.* ¶¶ 263, 275.  Even accepting this allegation as true, Plaintiff's claims would be removable under OCSLA because, as explained above and below, its theory of causation includes that such actions lead to increased demand for, and thus increased production of, oil and gas leading to increases in greenhouse gas emissions, which has allegedly caused changes to the climate and Plaintiff's alleged injuries.  Thus, production of oil and gas—a substantial portion of which occurred on the OCS—is a direct and necessary link in the alleged causal chain upon which Plaintiff's claims depend.  Moreover, Defendants' alleged concealment and misrepresentations would have had the alleged effect of "evad[ing] regulation" and convincing policy makers to continue production on the OCS and elsewhere.  *Id.* ¶ 126.

66.     Jurisdiction is also proper under OCSLA for the separate and independent reason that the *relief* sought by Plaintiff is unquestionably "in connection with" an OCS operation because it would affect Defendants' OCS extraction and development operations.  *See, e.g.*, Compl. at 164, Prayer for Relief (seeking abatement and damages that would inevitably affect exploration and production on the OCS).  Under Maryland law, a request for abatement is functionally the same as seeking to *enjoin* Defendants' production of oil and gas.  *See Becker*, 363 Md. at 87 ("'The underlying principle governing equitable relief in suits to abate nuisances is that the injury is of such a nature that the complaining party cannot obtain an adequate remedy at law.  Thus, in nuisance cases, . . . the equity court will grant an injunction where the injury is irreparable and

cannot be adequately compensated in damages.'") (quoting *Adams v. Commissioners of Town of Trappe*, 204 Md. 165, 169–70, (1954)).  Plaintiff's desired remedies would clearly "alter[] the progress of production activities on the OCS" and "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Such a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349."  *Amoco Prod. Co.*, 844 F.2d at 1210.

## VII.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

67.    The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  A party seeking removal under section 1442 must show:  (1) that it "acted under" a federal officer; (2) that plaintiff's claims are "for or relating to" an act under color of federal office; and (3) that it has a "colorable federal defense."  *Sawyer*, 860 F.3d at 255, 254; *see also In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 467 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*").  So long as federal officer jurisdiction can be exercised as to one Defendant, the entire action is properly removed.  *See* 28 U.S.C. § 1367.  Defendants easily meet these criteria.

### A.    The Courts Construe The Federal Officer Removal Statute Broadly In Favor Of Removal

68.    "[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum."  *Def. Ass'n of Philadelphia*, 790 F.3d at 466.  The Supreme Court has emphasized that "the statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad."  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Courts have repeatedly held that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute."  *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014);

*see also Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) ("Throughout our analysis, we pay heed to our duty to 'interpret Section 1442 broadly in favor of removal.'") (quoting *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)). At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941, 945 (7th Cir. 2020). A federal court must "credit the defendant's theory of the case," *Leite*, 749 F.3d at 1124, and "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 471; *see also id.* at 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory."). Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated. *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"). In *Acker*, for example, the Supreme Court "credit[ed] the [defendants'] theory of the case for purposes of both elements of [the] jurisdictional inquiry and conclude[d] that the [defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" 527 U.S. at 432.

69.     Plaintiff's alleged injuries arise from global climate change, a phenomenon that purportedly arises from all of Defendants' production and sales activities (as well as activities of innumerable other sources). Defendants' position that Plaintiff's purported injuries necessarily rely on Defendants' production and distribution of oil and gas is a reasonable one. Plaintiff's Complaint alleges that greenhouse gas emissions caused by billions of consumers' use of fossil fuels—which were produced, in part, at the federal government's direction—allegedly resulted in

Plaintiff's purported harms.  Accordingly, there would be no alleged harm, and therefore no case, without the emissions allegedly caused (in part) by Defendants' oil and gas production.  Where "[b]oth the [plaintiffs] and the [defendants] have reasonable theories of this case" the court's role is "to credit only the [defendants'] theory so long as the theory is 'plausible.'" *Baker*, 962 F.3d at 941, 947.  Defendants' theory is more than plausible, and thus should be credited by this Court.

### B. Defendants Satisfy All Elements Of The Federal Officer Removal Statute

70.    Defendants satisfy all three elements of the federal officer removal statute.  First, Defendants have acted under federal officers by repeatedly performing critical and necessary functions for the U.S. military to further the national defense and acting pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal objectives under federal direction, supervision, and control.  Defendants have acted under federal officers in numerous ways, including by: (1) developing mineral resources on the OCS through highly technical leases that were overseen and managed by federal supervisors; (2) developing mineral resources on federal lands through specialized leases that were overseen and managed by federal supervisors; (3) operating the Elk Hills reserve "in the employ" of the U.S. Navy; (4) supplying fuel for and managing the Strategic Petroleum Reserve; (5) allocating their products pursuant to the Emergency Petroleum Allocation Act; (6) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (7) building, operating, and managing government petroleum production facilities; (8) producing and supplying large quantities of highly specialized, noncommercial-grade fuels for U.S. military use that conformed (and still conform) to unique military specifications; and (9) constructing pipelines for oil transportation at the direction and control of the federal government.  Second, Plaintiff's claims relate to these acts under federal officers because there is "a connection or association between the act[s] in question and the federal office." *Sawyer*, 860 F.3d at 258.  Plaintiff has brought suit for

the downstream effects of all global combustion of oil and gas and the resulting emissions of greenhouse gases, which necessarily includes the combustion of products created for and at the direction of the federal government.  Third, Defendants have several "colorable federal defenses," including the government-contractor defense, preemption, federal immunity, commerce clause defenses, due process, the foreign affairs doctrine, and the First Amendment.

### 1.   Defendants "Acted Under" Federal Officers

71.   Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades.  It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."  42 U.S.C. § 15927(b)(1); *see also* 83 Fed. Reg. 23295, 23296 (Final List of Critical Minerals 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production.").  As Professor Wilson explains: "Over the last 120 years, the U.S. government has relied upon the oil and gas industry to control oil supplies and expand the production of petroleum products, in order to meet military needs and enhance national security."  Wilson Decl. ¶¶ 1–2.

72.   Defendants "acted under" federal officers because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143, 152; s*ee also St. Charles Surgical Hospital, LLC v. Louisiana Health Serv. & Indemnity Co.*, 2021 WL 857473 (5th Cir. Mar. 8, 2021) ("In order to satisfy the 'acting under' requirement, a removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive. . . .  Instead, the 'acting under' inquiry examines the *relationship* between the removing party and relevant federal officer, requiring courts to

determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor.").

73.     Both the Supreme Court and courts in the Fourth Circuit have made clear that "the statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson*, 555 U.S. at 147; *see also Aqueous Film-Forming Foams*, 2019 WL 2807266, at *2 ("[T]he phrase "acting under" is "broad" and should be "liberally construed" in favor of the removing Defendant."). Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong. *Baker*, 962 F.3d at 942. "The words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.' The 'triggering relationship' encompasses a broad range of relationships, including, but not limited to, agent-principal, *contract or payment*, and employer-employee relationships." *Doe v. UPMC*, 2020 WL 5742685 at *3 (W.D. Pa. Sept. 25, 2020) (emphasis added and internal citations omitted).

74.     For decades, Defendants have acted under the direction, supervision, or control of federal officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy. Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims based on this "special relationship" be heard in federal court. *Baker*, 962 F.3d at 941–42 (holding that "[t]he crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government," which exists where an entity "provide[s] the federal government with materials that it need[s]"—particularly during wartime). The federal government has required and promoted the production of oil and gas for decades to meet the U.S. military and national economy needs, even as the public and the world increasingly recognized and understood the potential link

between greenhouse gas emissions and global climate change.[17]  Indeed, the federal government continues to promote domestic production of fossil fuels through a variety of lease programs, grants, loan guarantees, tax provisions, and contracts.  For example, the Office of Fossil Energy states that the government seeks American energy dominance, which "promotes U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[18]

75.    Not surprisingly, Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for the national defense and economic well-being.  Each of these examples provided below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government.  Any one of them alone is sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum production, which Plaintiff now seeks to disrupt.[19]

---

[17]  For example, the federal government took a number of other actions to promote the domestic production of oil and gas to protect important state actions.  These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L. No. 93-275, 88 Stat. 96 (1974).  The report published pursuant to the FEA stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small.  For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico."  Kelly Decl. Ex. 10, at 1012 (H.R. Doc. No. 93-406).  The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power."  *Id.*  More recent administrations have continued to promote the development of oil and gas on the OCS through, *e.g.*, the Energy Policy Act of 2005 which, among other things, sought "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques."  Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

[18]  U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

[19]  The examples provided in this section, and other sections, of this Notice of Removal are meant

a.      **Defendants Acted Under Federal Officers By Developing Mineral Resources On The Outer Continental Shelf**

76.     As noted above, Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs." 43 U.S.C. § 1332(3).  The initial regulations "went well beyond those that governed the average federally regulated entity at that time."  Priest Decl. ¶ 19.  As Professor Priest explains: "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS."  *Id.* (citing 19 Fed. Reg. § 250.11, 2656) (emphases added).  In fact, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS."  *Id.* ¶ 20.

77.     Federal officials in the Department of Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration.  *Id.* ¶ 19.  Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 19, and had authority to suspend operations in certain situations, Priest Decl. ¶ 20.  And, the supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* ¶ 20 (internal quotation marks omitted).[20] As Professor Priest explains, these federal officials

only to provide illustrative examples.  These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein.  Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

[20] The federal government uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes.  *See* Kelly Decl. Ex. 19 § 6(b)

"did not engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22.  Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

78.    In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things:  "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and "required the installation of subsurface safety devices on all OCS wells." *Id.* ¶ 24 (citations omitted).  Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25.  These controls went far beyond typical regulations, as the federal government imposed requirements as the resource owner to achieve its economic and policy goals. *E.g.*, *id.* ¶¶ 28, 32.

79.    During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[21]  Demand continued to climb into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil.  The United States increasingly turned to foreign countries, particularly in the Middle East, for oil.  In fact, the amount of oil that the United States imported doubled from 3.2 million barrels per

---

("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added).  A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material term of the lease contract. *See* Kelly Decl. Ex. 22 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).  This would be akin to a commercial rental lease providing that the landlord has sole discretion to specify the rent owed.

[21]    Kelly Decl. Ex. 11, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

day in 1970 to 6.2 million barrels per day in 1973.[22]  By April 1973, President Nixon warned

Congress of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared.  Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world.  Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis.  But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[23]

80.     To avert a national energy crisis, President Nixon ordered a dramatic increase in

possible production on the OCS:

> Approximately half of the oil and gas resources in this country are located on public lands, primarily on the Outer Continental Shelf [OCS].  The speed at which we can increase our domestic energy production will depend in large measure on how rapidly these resources can be developed.  I am therefore directing the Secretary of the Interior to take steps which would triple the annual acreage leased on the Outer Continental Shelf by 1979, beginning with expanded sales in 1974 in the Gulf of Mexico and including areas beyond 200 meters in depth under conditions consistent with my oceans policy statement of May, 1970.[24]

81.     Before the nation's precarious energy balance could stabilize, events abroad would

exacerbate the crisis.  The 1973 OPEC Oil Embargo "led to nationwide shortages of petroleum, a

$60 billion drop in GNP, [and] more rapid inflation," among other harms.[25]  The government called

---

[22]  Kelly Decl. Ex. 12, at 591 (Yergin, *The Prize*).

[23]  Kelly Decl. Ex. 13 (Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html).

[24]  *Id.*

[25]  U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v=onepage&q&

upon the oil and gas industry, including Defendants, to address this shortage.  *See infra* ¶ 129.  The nation's energy woes continued to mount in the mid-to-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976–77, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[26]  Yet the nation's dependency on imported oil continued to increase.  By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[27]  The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

82.     In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[28]  President Nixon explained:

> Let me conclude by restating our overall objective.  It can be summed up in one word that best characterizes this Nation and its essential nature.  That word is "independence."  From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence.  In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . .  What I have called Project Independence 1980 is a

---

f=false.

[26]  *Id.*

[27]  *Id.* at tbl. IV-1.

[28]  Annual Message to the Congress on the State of the Union, 1 Pub. Papers 56, 94 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/134?rgn=full+text;view=image.

series of plans and goals set to [e]nsure that by the end of this decade, Americans will not have to rely on any source of energy beyond our own.[29]

83.     In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[30]  Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."  *Id.*

84.     During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS:  "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration—including deep drilling—in frontier areas of the Outer Continental Shelf. . . .  The Federal Government can conduct this program by using the same drilling and

---

[29]   Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov. 25, 1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image. After the Arab Oil Embargo, there was immense public pressure for Washington to "do something"— to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies.  Kelly Decl. Ex. 12, at 660 (Yergin, *The Prize*).  *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/.

[30]   43 U.S.C. § 1802 (1) & (2);  *see California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981);  *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

exploration firms that are usually hired by oil companies.  The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[31]  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government.  Kelly Decl. Ex. 14.

85.     This was not the only proposal at the time to create a national oil company.  *See* Priest Decl. ¶¶ 52–53; 121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975); Kelly Decl. Ex. 14.  Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'"  *Id.*  Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority."  121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975).  Representative Harris explained:  "The creation of a quasi-public corporation such as Ampower can and should perform these functions on public lands" to "[e]nsure that the public's oil and gas is developed in the public interest."  Kelly Decl. Ex. 14, 9275–76.  These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—*acting as agents*—to achieve this federal objective with expanded federal supervision and control.  *See* Priest Decl. ¶ 55.

86.     It is significant that Congress considered creating a national oil corporation to develop the oil and gas resources on the OCS, as many other countries seeking to exploit their

---

[31]   *See* Kelly Decl. Ex. 15 (121 Cong. Rec. S903-11 (1975)).

domestic petroleum resources have done.  Ultimately, Congress decided that the best and most efficient way to meet the enumerated national objectives was to contract with private energy companies, including many of the Defendants here, to produce oil and gas from these federal lands. The result was a closely supervised leasing program directed by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests.[32]  As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

87.    One of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products," and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[33]  This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

88.    Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible.  In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on

---

[32]    *See* Kelly Decl. Ex. 15 (Cong. Rec. S903-11 (Jan. 27, 1975)).

[33]    Kelly Decl. Ex. 10, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

supplies of oil and gas."[34]  The Committee concluded that "[d]evelopment of our OCS resources will afford us needed time—as much as a generation—within which to develop alternative sources of energy."[35]

89.     The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[36]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)–(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[37]

90.     In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production.  Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995).  And in the 2000s, the Bush Administration opened up

---

[34]  Kelly Decl. Ex. 16, at 254 (H.R. Rep. No. 94-1084 (1976)).

[35]  Kelly Decl. Ex. 17, at 1460 (H.R. Rep. No. 95-590 (1977)).

[36]  *See id.* at 173 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[37]  *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil." [38]

91.     As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies.  They reflect the creation of a valuable national security asset for the United States over time."  Priest Decl. ¶ 7(1) (emphasis added).  The development of the OCS was a "political and policy-driven project to incorporate the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security." *Id.*  "The federal OCS program procured the services of oil and gas firms to develop urgently needed resources on federal offshore lands that the federal government was unable to do on its own." *Id.*  The federal government "had no experience or expertise," and "[t]herefore . . . had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18.  But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests and accordingly, "[t]he policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling." *Id.* ¶ 7(2).  "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.*  The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration.  *See* Priest Decl. ¶ 79.  For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence

---

[38]   *Statement By President George W. Bush Upon Signing [H.R. 6111]*, 2 Pub. Papers 2218 (Dec. 20, 2006), https://books.google.com/books?id=o2ei8yOphboC&printsec=frontcover#v=onepage&q&f=false.

on foreign oil threatens our economy." *Id.* ¶ 78.

92.     The leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with a government approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[39]  BOEM maintains oversight over the lessees as they operate on federal land.  Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[40]  Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[41]  Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[42]  At all stages—from exploration, to preparation for developing and producing oil and

---

[39]  *See generally* Kelly Decl. Exs. 18–21; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

[40]  *See generally* Adam Vann, Cong. Rsch. Serv., RL33404, Offshore Oil and Gas Development: Legal Framework (2018), RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and oversight procedures).

[41]  Kelly Decl. Ex. 18 § 10 (emphases added).

[42]  *E.g.*, 30 C.F.R. §§ 250.101–115, 250.130–146, 250.168–295, 250.400–463 (BSEE) &

gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies.  The relevant agency must then find, complete, and approve these plans before any such work can begin.  BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

93.     The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[43]   In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[44]  This requirement has existed since 1974,[45] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[46]

94.     Through federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. §181 *et seq.* ("MLA"), discussed below, are an exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause under which the lessee

---

550.101–147 (BOEM).

[43]  *See* Kelly Decl. Ex. 18 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[44]  30 C.F.R. § 250.1159.

[45]  *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[46]  75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Kelly Decl. Ex. 19 § 3. But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.  Nor may a federal lessee assign its lease to another person without express government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

95.  The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984).  The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[47]  The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property.  The government reserves the right to purchase up to 16⅔% of lease production, less any royalty share taken in-kind.[48]  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[49]

---

[47]  Kelly Decl. Ex. 18 § 14; Kelly Decl. Ex. 19 § 15(d); *see* 43 U.S.C. § 1341(b).

[48]  43 U.S.C. § 1353(a)(2).  The United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f).

[49]  *Id.*  In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).  Kelly Decl. Ex. 19 § 15(c); *see* 43 U.S.C. § 1337(b)(7).

96.     Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[50]  The Secretary may suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[51]

97.     As the above statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run-of-the-mill regulation.  On the contrary, it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157.

98.     Authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program is massive and includes details regarding the national need for oil and gas and how the leasing program meets those needs.[52]

---

[50]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.").

[51]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

[52]  *See, e.g.*, 2012–2017 EIS.

99.     These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS in order to further the national interest, not merely the commercial interests of the lessees.  In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. Treasury averages more than $10 billion per year from OCS bonuses, rental payments, and royalties.  In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the 2012-2017 EIS concluded that such alternatives would not meet the federal government's purpose and need because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[53]

100.    The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[54] Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for the action . . . as it leaves a void in planning for national energy needs."[55]

101.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much

---

[53]  *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[54]  43 U.S.C. § 1344(a)–(e).

[55]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

as 36% of domestic oil production and 25% of domestic natural gas production.[56]  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government.  Moreover, the activities of lessees (including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS in order to achieve the federal government's policy objectives.  If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself in order to implement Congress's directives regarding production of oil and gas from the OCS.

102.    The federal government's control over oil and gas production is thus fundamentally different from the government's regulation of tobacco products, which the Supreme Court addressed in *Watson*.  There, the Court recognized that a private party does not come within the scope of the federal officer removal statute "simply [by] *complying* with the law."  *Watson*, 551 U.S. at 152.  Accordingly, "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."  *Id.* at 153.  This is because mere regulation does not indicate that the federal government would undertake the regulated activity if private actors did not—the government regulates tobacco products because of their health risks, not because tobacco production is a federal imperative.  Plaintiff's claims, by contrast, seek to punish Defendants for activities conducted under the close supervision of the federal government that

---

[56]  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

effectuate national energy policy and support the national defense. Plaintiff's claims thus implicate precisely the type of "special relationship" that supports federal officer removal. *Id.* at 157.

### b. Defendants Acted Under Federal Officers By Developing Mineral Resources On Federal Lands

103.     Defendants also acted under the direction, supervision and control of the federal government in developing mineral resources on federal lands onshore. The Interior Department's Bureau of Land Management ("BLM") leases, similar to OCS leases, provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[57]

104.     The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[58] "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Kelly Decl. Ex. 118.

105.     For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[59] BLM leases also provide that "Lessor reserves the right to ensure that production is sold at reasonable prices and to

---

[57]   Kelly Decl. Ex. 21 § 4 (emphasis added).

[58]   *Id.*

[59]   30 U.S.C. § 192.

prevent monopoly."[60]  In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).[61]

106.    The federal government also uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes, which is a provision included in BLM leases.[62]   A typical commercial private lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract.  *See* Kelly Decl. Ex. 22 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).  This would be akin to a commercial lease providing that the landlord has sole discretion to specify the rent owed.

107.    Through federal leases, the government balances economic development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[63]  The Secretary may also direct or grant suspensions of operations.[64]  BLM onshore leases also require the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[65]

108.    The MLA limits the onshore federal oil and gas lease acreage that may be held by

---

[60]   Kelly Decl. Ex. 21 § 10.

[61]   30 U.S.C. § 192.

[62]   *See* Kelly Decl. Ex. 21 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

[63]   43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[64]   *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[65]   Kelly Decl. Ex. 21 § 6.

any one person, enforceable by an action in federal court. 30 U.S.C. § 184(d), (h). The government has the right to obtain "prompt access" to facilities and records. *See* 30 U.S.C. § 1713. And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 30 U.S.C. § 181.

109.   As discussed with respect to OCS leases, *supra* Section VII.B.1.a., a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees. These are activities that the federal government would itself have to undertake without Defendants and thus removal is proper. *Watson*, 551 U.S. at 157.

### c.   Defendants Acted Under Federal Officers By Operating The Elk Hills Reserve "In the Employ" Of The U.S. Navy

110.   Defendants have played an essential role in assisting the federal government with meeting its petroleum needs to power the nation's economy and the U.S. military to ensure national security. The connection between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships. President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910: "As not only the largest owner of oil lands, but as a propsective [sic] large consumer of oil by reason of the increasing use of fuel oil by the Navy, the Federal Government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."[66] This national security concern led to the September 2, 1912 executive order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies. Kelly Decl. Ex. 24.

---

[66]   Kelly Decl. Ex. 23 (Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy, 64th Cong. 761 (1915)).

111.   At the turn of the twentieth century, government lands in the West were being rapidly turned over to private owners.  At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal- to oil-burning.  In response to arguments that the government should preserve oil for naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order.  The establishment of the Reserve, however, was expressly made subject to preexisting private ownership.  There are approximately 46,000 acres within the Reserve, and Standard Oil of California ("Standard Oil") (Chevron's predecessor) owned approximately one-fifth and the Navy owned the remainder.  The Standard Oil lands were not in one block, but were checker-boarded throughout the Reserve.[67]

112.   "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[68] "Congressional intent was to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[69]   In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes.  Standard Oil and the Navy eventually developed an understanding that neither would drill additional wells or produce oil inside the Reserve without

---

[67]   The history of Elk Hills is recounted in *Standard Oil*, 545 F.2d at 624.

[68]   Kelly Decl. Ex. 25 U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[69]   Kelly Decl. Ex. 26 (U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) ("GAO Report"), https://www.gao.gov/assets/220/210337.pdf).

providing six months' notice to the other.[70]  In doing so, Standard Oil agreed to maintain the Reserve for national security purposes.  The maintenance of the Reserve itself under the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[71] Standard Oil's efforts ensured that the Reserve was ready to produce oil for the U.S. war efforts in World War II.

113.    World War II marked a new phase.  "Shortly after the entrance of the United States into the war, it became apparent that additional crude oil production would be required on the West Coast."[72]  Standard Oil and the Navy began negotiations for production on the Reserve.  On March 1, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[73]

114.    The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944.  The UPC "governed the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve."  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  It provided that the Elk Hills Reserve "was to be operated as a single property (a unit) and granted the Navy, subject to the provisions of the contract, *absolute control* over (1) the time and rate of exploration and development and (2) the quantity and rate of production."[74]  The UPC shows the federal government's "full and absolute" power

---

[70]    *See Standard Oil*, 545 F.2d at 627.

[71]    *See generally* GAO Report.

[72]    *Id.* at 14.

[73]    *Id.*

[74]    *Id.* at 15 (emphasis added).

and "complete control" over fossil fuel exploration, production, and sales at the reserve.  *See* Kelly Decl. Ex. 6 (Statement of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, Hearing on Amendment Proposed to Unit Plan Contract Governing Development and Operation of Naval Reserve Petroleum No. 1 (Elk Hills), U.S. House of Representatives, Committee on Naval Affairs, at 3737–38 (Sept. 9, 1946)) ("It must be recognized that although Navy and Standard entered into a unit-plan contract . . . the interests of each are conflicting.  It is to Navy's interest to conserve as much oil as possible in the ground . . . [and] it is to Standard's interests to produce its oil as rapidly as is consistent with maintaining a balance between economical production and greatest ultimate recovery.  The conflict of interest between Navy and Standard Oil was decided in Navy's favor upon the execution of the unit-plan contract, for absolute control over the time, manner, and rate of production is vested in the Secretary of the Navy subject to the control of Congress.").

115.    The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[75]  *See* Kelly Decl. Ex. 27 (Statements of Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, Hearing Records at 3693–94) ("[The] agreement between Navy and Standard . . . placed the control of production from both Standard and Navy lands under the absolute control of the Secretary of the Navy.").

116.    "[The] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[76]

117.    "[The] Navy shall have *full and absolute power* to determine from time to time the

---

[75]   Kelly Decl. Ex. 20, Recitals § 6(d)(i) (emphases added).

[76]   *Id.* § 3(a) (emphasis added).

rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[77]

118.    "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[78]  In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard."[79]

119.    The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard Oil was entitled to receive, or increase the rate of production.[80]

120.    Standard Oil (and later Chevron) could participate in an Operating Committee, which was responsible for production decisions such as the number, design, and location of wells and facilities.  Both the Navy and Standard Oil had an equal vote on the Committee, but in the event of a tie the Secretary of Navy held the tiebreaker.[81]

121.    Critically, the federal government had to decide who would operate its portion of the Reserve—the Navy, a private contractor, or someone else.  The "*Navy chose to operate the reserve through a contractor rather than with its own personnel*" and opened the contract to

---

[77]    *Id.* § 4(a) (emphasis added).

[78]    *Id.* § 3(b).

[79]    *Id.* § 9(a).

[80]    *Id.* §§ 4(b), 5(d)(1).

[81]    *See id.*

competitive bidding.[82]   Standard Oil "bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[83]   Although the Navy could have developed the resources on the Reserve itself, it decided to use a third-party contractor to maximize production as quickly as possible.   This is reflected in government documents explaining the decision to hire Standard Oil to operate the Reserve, which also noted that Standard Oil offered to perform the work without making a profit:

> A substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre. . . .   The Standard Oil Company of California was chosen as operator because it was the only large company capable of furnishing the facilities for such a development program and partially because it was the largest private owner of lands in the Reserve.   The Navy has expressed its appreciation of the patriotism of the Standard Oil Company in undertaking such a project at cost with no profit to be received by the Company.[84]

122.   The Operating Agreement provided that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof."   *See* Kelly Decl. Ex. 29, at 3.   Standard's Oil's operation and production at Elk Hills for the Navy were subject to substantial supervision by Navy officers; and naval officers directed Standard Oil to conduct operations to further national policy.   For example, "[s]hortly after the unit plan contract was signed, the Congress, according to DOE, authorized the production at [the Elk Hills Reserve] at a level of 65,000 B/D [barrels per day] to address fuel shortages and World War II military needs."[85]

---

[82]   *Id.*

[83]   *Id.*

[84]   *See* Kelly Decl. Ex. 28, at 1 (Elk Hills Historical Documents).

[85]   GAO Report at 15.

Production reached this "peak of 65,000 barrels per day in 1945."[86]  As another example, in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary [of] the Navy."  *See* Kelly Decl. Ex. 30, at 3.

123.    Standard Oil's operation and production at Elk Hills for the Navy were subject to substantial and continued oversight and inspections by Navy officers.  The Operating Agreement between the U.S. Navy and Standard Oil directs that "OPERATOR *[Standard Oil] is in the employ of the Navy Department* and is responsible to the Secretary thereof through the Officer in Charge and the Director, Naval Petroleum and Oil Shale Reserves."[87]  In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[88]

124.    Accordingly, for at least 31 years, Standard Oil operated Elk Hills under the "subjection, guidance or control" of federal Navy officers.  *Watson*, 551 U.S. at 151; *see id.* at 153–54 (noting that removal was proper where company "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war").  At a

---

[86]  GAO Fact Sheet at 3.

[87]  *See* Kelly Decl. Ex. 29 (Contract No. Nod-9930).

[88]  *See* Kelly Decl. Ex. 31.

minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

125.    After the OPEC oil embargo in 1973–74, Congress authorized preliminary activity to develop Elk Hills and other National Reserves to their full economic potential.    *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-245 (1974).  In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves.  The President has requested that every effort be made to increase domestic production of petroleum, and Standard is focusing its attention on this objective.[89]

126.    A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*."[90]  Congress directed production at Elk Hills to be significant.  Indeed, Commander Roger Martin, the naval officer in charge of the facility, explained:  "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]."[91]  Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving to the federal government of approximately $1 billion annually.

127.    In 1977, Congress transferred the Navy's interests and management obligations to

---

[89]    *See* Kelly Decl. Ex. 32 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[90]    Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976); *see also* Kelly Decl. Ex. 34.

[91]    Kelly Decl. Ex. 34.

the Department of Energy ("DOE"), and Chevron continued its interest in the joint operation until 1997, when the Reserve was sold.  From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[92]

128.    Although other prime contractors operated Elk Hills for the Navy following 1975, Standard Oil and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[93]  Under the Navy's direction and control, Chevron conducted exploration and production on the Reserve to fulfill the government's demand for significant production from the Reserve.  Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

### d.    Defendants Acted Under Federal Officers By Supplying And Managing The Strategic Petroleum Reserve

129.    In response to the Oil Embargoes of the 1970s, Congress created the Strategic Petroleum Reserve ("SPR") in the 1975 Energy Policy Conservation Act, Pub. L. No. 94-163, 89 Stat. 871, to protect the country's energy security.  The SPR was a "stockpile of government-owned petroleum managed by the DOE [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[94]  Several

---

[92]    *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[93]    *See* Kelly Decl. Ex. 35, at 192–93 (History of Naval Petroleum Reserve No. 1) (describing the June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day).

[94]    *See* H.R. Rep. No. 115-965, at 3 (2017), https://www.congress.gov/congressional-report/115th-congress/house-report/965/1.

Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

130.    The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1978 [sic], and for an eventual storage system of at least 500 million barrels by December 1982. It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions." Kelly Decl. Ex. 36 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

131.    Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." For example, after the September 11, 2001 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the DOE and the Department of the Interior."[95] From 1999 to December 2009, the U.S. government's "primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[96] During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil

---

[95] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001), https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[96] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Oct. 7, 2020).

through the RIK program" valued at over $6 billion.[97]

132.    The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[98]   The federal government also contracted with some of the Defendants (including predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[99]   The government also contracted with Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. *See, e.g.*, Kelly Decl. Ex. 40, at 19.

133.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana.  "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum

---

[97]   Kelly Decl. Ex. 37 (U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18 (2011) ("SPR 2010 Report")); *see id.* at 39 (Table 13).

[98]   *See, e.g.*, Kelly Decl. Ex. 38 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[99]   *See, e.g.*, Kelly Decl. Ex. 39 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. on Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm.

Reserve as a sales and distribution point in the event of a drawdown."[100]  Starting January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company).[101]  Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline Company] . . . *must support the SPR as a sales and distribution point in the event of an SPR drawdown*."[102]  And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas.[103]

134.   The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[104]  The United States has exercised this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.[105]  Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are part of the

---

[100]  *See* SPR 2010 Report at 16.

[101]  *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[102]  U.S. Dep't of Energy, *Strategic Petroleum Reserve Annual Report for Calendar Year 2018*, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

[103]  *See* Kelly Decl. Ex. 37 (SPR 2010 Report) at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[104]  See 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

[105]  *See* Kelly Decl. Ex. 41 U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Oct. 7, 2020); Kelly Decl. Ex. 115, at 16, 34.

causal chain leading to Plaintiff's alleged injuries—were subject to federal government direction, control, and supervision.[106]

  e.  **Defendants Acted Under Federal Officers Pursuant To The Emergency Petroleum Allocation Act**

  135. Also in response to the oil embargoes of the 1970s, Congress passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 635 (1973), in order to manage resulting shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." *Oversight—Mandatory Petroleum Allocation Programs: Hearings Before the S. Comm. on Interior and Insular Affs.*, 93rd Cong., 25 (1974) (Statement of John C. Sawhill, Deputy Administrator, Federal Energy Office) ("Mandatory Allocation Hearings"). Pursuant to the Act, from 1974 to 1981 the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products." H.R. Rep. No. 93-1443 at 6 (1974) (Statement of John C. Sawhill, Deputy Administrator, Federal Energy Office). This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis. *See* Mandatory Allocation Hearings at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; where a Defendant's crude oil supplies exceeded a certain benchmark, it was forced to sell to others who fell below that benchmark. *See id.* at 41. Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national

---

[106] *See* U.S. Dep't of Energy, *Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Oct. 23, 2020).

energy crisis which is a threat to public health, safety, and welfare" requiring "prompt action by the Executive branch."  Pub. L. No. 93-159, sec. 2(a)(1) & (3), 87 Stat. 628.

### f.      Defendants Acted Under Federal Officers During World War II And The Korean War

136.    World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it.  *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36, at 4 (Nov. 28, 1945) ("Our overseas forces required nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together.  In both essentiality and quantity, oil has become the greatest of all munitions."); Kelly Decl. Ex. 42 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949)) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security.").  As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for planes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity.   The government created agencies to control the petroleum industry, including Defendants, *see infra* ¶ 138, to build refineries; direct the production of certain petroleum products; and manage scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory." Kelly Decl. Ex. 43, at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)).

137.    In 1941, President Roosevelt created the Office of Petroleum Coordinator and

designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense.[107]

President Roosevelt explained that:

> [r]ecent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program ... One of the essential requirements ... which must be made the basis of our petroleum defense policy ... is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.[108]

The Office of Petroleum Coordinator promptly began issuing a number of "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

138.    In 1942, President Roosevelt established several *agencies* to oversee wartime production.  Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.  The PAW centralized the government's petroleum-related activities.  It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  *See generally United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002) ("*Shell I*") (discussing

---

[107] 2020 WL 5573048, at *10 (S.D. Tex. Sept. 16, 2020).

[108] *Id.*

federal control).  The "PAW told the refiners what to make, how much of it to make, and what quality."[109]  *See* Kelly Decl. Ex. 44 (Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary.")); Kelly Decl. Ex. 45 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").  The Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[110]

139.    The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production.  Kelly Decl. Ex. 46 at 28, 171, 177–79, 184 & n.18. As Professor Wilson explains:  "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them."  Wilson Decl. ¶ 11.  Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority

---

[109]  *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014) ("*Shell II*") (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)).

[110]  *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines."  *Id.*

140.    The PAW's directives to Defendants were often coercive.  The PAW's message to the oil and gas industry was clear:  It would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way."[111]  The PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[112]  In sum, the federal government deployed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives.

141.    The court in *Exxon Mobil Corp. v. United States* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under CERCLA:  "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry."  2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020), *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13, 2020).  The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction.  *Id.* at *11, *12 (J. Howard Marshall, the former Chief Counsel for the Petroleum Administration for War, testified that "companies that 'weren't making essential war materials' were simply not able to run their refineries.").  In fact, the federal government "insiste[d]

---

[111]  Kelly Decl. Ex. 47 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[112]  Kelly Decl. Ex. 48 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8. Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under "direct contract with the Army Ordnance Department."[113]

142. The controls placed on the production of petroleum during World War II extended through the Korean War. *See id.* at *27 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products"). Indeed, the U.S. Navy took possession over Crown Central Petroleum Corporation ("Crown Central") "refinery, pipe line and related facilities" in October 1945, requiring Crown Central to "conduct its normal business and operations . . . subject, however, to such modifications as may be directed by the Officer-in-Charge," a Navy Vice Admiral.[114] The Navy took possession of the Crown Central facilities, among others, pursuant to President Truman's Executive Order No. 9639. That order allowed the Secretary of the Navy to "operate the plants, facilities, and property" "used in the transportation, refining, and processing of petroleum and petroleum products" in order to avoid a shortage of those products, without which "the war effort [would] be unduly impeded or delayed."[115] The United States government also authorized the full development of its own energy resources by directing large-scale oil production

---

[113] Kelly Decl. Ex. 46, at 222 (Frey & Ide, *A History of the Petroleum Administration for War* (1946)); *see Exxon Mobil Corp.*, 2020 WL 5573048, at *13; Harold Nockolds, *The Engineers*, 28 (1949).

[114] Kelly Decl. Ex. 49 (Letter from U.S. Navy Vice Admiral Ben Morrell to Crown Central Petroleum Corporation).

[115] Kelly Decl. Ex. 50 (Exec. Order No. 9639, Authorizing the Secretary of the Navy to Take Possession Of and Operate Certain Plants and Facilities Used in the Transportation, Refining and Processing of Petroleum and Petroleum Products (Oct. 4, 1945)).

at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron Corporation's predecessor Standard Oil of California under contract with the U.S. Navy.

143.    The United States Department of Defense ("DOD") is the United States' single largest consumer of energy, and one of the world's largest users of petroleum fuel.  *See* Kelly Decl. Ex. 51; Lengyel, Colonel, USAF, Gregory J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007), http://military-gospel.tygae.org.za/pdf/2007-08_USAF-B_DoD-EnergyStrat-OldDogNewTricks-LengyelCol.pdf.   For more than a century, "these products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines."  *Exxon Mobil Corp.*, 2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success").  In fiscal year 2019 alone, the DOD purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[116]  As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces."  Kelly Decl. Ex. 52, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)).  "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century."  Wilson Decl. ¶ 2.  The "U.S. government has controlled and directed oil companies in

---

[116]  Kelly Decl. Ex. 51 Def. Logistics Agency Fact Book.

order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.* ¶ 2.

g. **Defendants Acted Under Federal Officers By Constructing, Operating, And Managing Government Petroleum Production Facilities**

144. Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities. During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*." Wilson Decl. ¶ 14 (emphasis added). "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . [in order] to comply with government orders." *Id.* ¶ 15. These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities. *Id.* ¶ 19. Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945. *Id.* Several other Defendants or their predecessors operated similar production equipment and facilities for the government. *Id.* ¶ 20.

145. Defendants built plants and manufactured war products for the Allied effort. For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period. The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a

blending agent" to make "avgas."  Kelly Decl. Ex. 53; *see also* Wilson Decl. ¶ 23.

146.    In addition, the government's need for highly specialized fuels, discussed *infra* Section VII.B.1.h., necessitated changes to Defendants' refining equipment and operations.[117] And the impacts of the government's particular fuel specifications on Defendants' operations were typically long-lasting.[118]  For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.[119]

147.    The federal government entered into contracts with predecessors or affiliates of Defendants Chevron and Shell Oil Company, as well as ExxonMobil, to obtain "vast quantities of avgas."[120]  These contracts provided federal officers with the power to direct the operations of Defendants.  For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[121]  To maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts."  *Shell II*, 751 F.3d at 1287.  At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas

---

[117]  *See* Kelly Decl. Ex. 54 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)).

[118]  Kelly Decl. Ex. 55 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[119]  Kelly Decl. Ex. 56 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

[120]  Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

[121]  JA002, JA027, *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 (emphases added).

production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war."[122]

148.   With respect to Exxon Mobil's affiliates, the government exerted substantial control over the refineries' actions, including decisions on how and when to use raw materials and labor. *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *8, *14.

### h.   Defendants Acted Under Federal Officers By Supplying Highly Specialized Fuels For Military Use

149.   Many of the Defendants have produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts. Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense capabilities," Kelly Decl. Ex. 57.

150.   During World War II, the federal government asserted substantial control over Defendants, directing the development and production of avgas.[123] Because avgas was "the most

---

[122] *Shell II*, 751 F.3d at 1287.

[123] During the war, more than 80% of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country. Kelly Decl. Ex. 46, at 1, 169 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945* (1946)).

critically needed refinery product during World War II and was essential to the United States' war effort," *Shell II*, 751 F.3d at 1285, the United States government "exercised significant control" over the means of its production during World War II. "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, in order to maximize production of fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *Shell I*, 294 F.3d at 1049–50.

151.    To this day, Defendants supply the DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements. U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants, *and contractors* to deliver fuel to every corner of the world, ashore and afloat."  Kelly Decl. Ex. 58 (emphasis added).  "By 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40.  Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[124]  DESC procures a range of military-unique, petroleum-based

---

[124] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels. Several other Defendants have also produced (and continue to produce) these critical products for the U.S. military.

152.    For example, during the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[125]   Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[126]   Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government

---

[125] *See* Kelly Decl. Ex. 59, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 (1992)), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft.   The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level. Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 60 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 61 (Ben Rich & Leo Janis, Skunk Works 127, 205 (1994)).

[126] Kelly Decl. Ex. 62 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 63 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

contracts for the OXCART program.[127]   Under the OXCART program, Shell Oil Company also "tested" "refinery procedures" to ensure fuels were "up to standard."[128]   In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company was helping the government to produce an essential item that it needed for national defense purposes.  *See Watson*, 551 U.S. at 153.

153.    As another example, from at least 2010–2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with the DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel, millions of gallons of which were destined for use at Naval Air Station Patuxent River in Maryland.  *See* Kelly Decl. Exs. 69 at 8–14; *id.* Exs. 39–43, 83–89.[129]   The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with special additives.  *See* Kelly Decl. Ex. 59, at 5, 7, 10; *id.* Ex. 90.

154.    Similarly, Marathon Petroleum subsidiary Tesoro Corporation and BP entities have

---

[127]   Kelly Decl. Ex. 64 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex. 65 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)); *id.* Ex. 66 (CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 67 (CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 68 (CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963)); *id.* Ex. 69 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962)).

[128]   Kelly Decl. Ex. 70 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

[129]   Given that Plaintiff's claims encompass *all* of Defendants' production and sales activities, and its alleged injuries arise from *global* climate change, Plaintiff necessarily complains about the federal government's emissions from jet fuel supplied by Defendants on U.S. military bases, and thus federal enclave jurisdiction supports removal.  *See John Crane-Houdaille*, 2012 WL 1197391, at *1 ("A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

contracted with the DLA to provide a significant quantity of specialized military fuels over decades.[130]  Tesoro entered into at least fifteen contracts with the DLA between 1983 and 2011 to supply highly specialized military jet fuels, such as JP-4, JP-5, and JP-8.[131]  And BP entities contracted with the DLA to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use in *the past four years alone*.  Kelly Decl. Ex. 71, at 5.  Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76.  DLA required that the fuels contain specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver additives ("LIA").  *Id.*  Such additives are essential to support the high performance of the military engines they fuel.

155.    The DOD exerted significant control over Tesoro's and the BP entities' actions in fulfilling these contracts, seeking to ensure that these unique fuels (1) ignite, but do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3) efficiently combust to allow for longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[132]

---

[130] The contract examples in this section are only meant to be illustrative.  These contract examples are by no means an exhaustive collection of the contracts that Defendants executed with the federal government to supply specialized military fuels during the relevant time period.

[131] The contracts were executed by various Tesoro subsidiaries, such as Tesoro Refining and Marketing Company and Tesoro Alaska Petroleum Company.  For a list of the Tesoro contract numbers and dates, *see* Kelly Decl. Ex. 91.

[132] Kelly Decl. Ex. 72 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 73, tbl. 1, 2–9 (Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987*, AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel*, NREL/SR-510-30611, at 4–6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

156.    To meet its unique operational needs, the DOD required that Tesoro and the BP entities supply each fuel in accordance with highly specialized, DOD-mandated specifications.  As one would expect when dealing with highly specialized military equipment, these fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.

157.    In particular, the specifications require express amounts of "military unique additives that are required by military weapon systems," such as SDA, FSII, and CI/LI.[133]  "[T]his [additive] requirement is unique to military aircraft and engine designs,"[134] and each additive served a vital role in allowing the DOD to fulfill its mission safely and efficiently.

158.    The DOD *required* Tesoro and the BP entities to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[135]

159.    The DOD *required* Tesoro and the BP entities to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice

---

[133] Kelly Decl. Ex. 92, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)).  Tesoro Alaska Petroleum Company's September 5, 2007 contract with DLA Defense Energy Supply Center to supply JP-8 required that Tesoro meet the specifications of MIL-DTL-83133E.  *See* Kelly Decl. Ex. 91.  Similarly, several of the BP entities' DLA contracts to supply JP-8 required that the BP entities meet the specifications of MIL-DTL-83133J.  Kelly Decl. Ex. 71, at 4; *id.* 75 (MIL-DTL-83133J specs).

[134] *Id.* at 10

[135] Kelly Decl. Ex. 72 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 73 at 28, 35 (Air Force Lab, *Military Jet Fuels*); Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel*, ARWAL-TR-85-2076, at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge."), https://apps.dtic.mil/dtic/tr/fulltext/u2/b100948.pdf.

crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[136]

    160.    The DOD *required* Tesoro and the BP entities to use CI/LI to (1) improve lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevent corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[137]

    161.    In addition, the DOD specifications required Tesoro and the BP entities to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.[138]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[139]

---

[136]  Kelly Decl. Ex. 80 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 72 § 1.4.1.1; *id.* Ex. 73, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 93 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel*, TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft.  When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

[137]  Kelly Decl. Ex. 81 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 72 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 73, at 28, 30, 38–39 (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 82 (MIL-PRF-32490 (LIA) specs).

[138]  Kelly Decl. Ex. 92, at 6 (MIL-DTL-83133E); *id.* Ex. 73, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels); *id.* Exs. 74–77, 79 ((the JP-5 specs (MIL-DTL-5624W); the NATO-76 specs (MIL-DTL-16884N and -16884P); and Def Stan 091-91 (Jet A-1) Issue 9 specs)).

[139]  Kelly Decl. Ex. 92, at f76 (MIL-DTL-83133E); *see also id.* Ex. 78 (ASTM D1655-20 Jet A specs).

162.    If the fuels did not conform to the exact specifications, the DOD exerted control over Tesoro and the BP entities by requiring them to either repair or replace the products at no increase in contract price.

163.    The DOD's detailed specifications for the makeup of the military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government in each of these examples.  *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal).  These specialized jet fuels are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction, *see Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998); *Baker*, 962 F.3d at 943, and not the category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*.

> **i.    Defendants Acted Under Federal Officers By Constructing Pipelines For Oil Transportation**

164.    Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war.  During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[140]

165.    "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfield and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,'

---

[140]  Kelly Decl. Ex. 94, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[141] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 157 (E.D. Ark. 1947) ("*WEP I*").[142]

166. Federal officers exerted operational control over the Inch Pipelines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *See, e.g.*, *WEP I*, 72 F. Supp. at 157; *WEP II*, 175 F.2d at 336. The government also required approval and set the salaries of all personnel that WEP employed. *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini. The sales price was cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

167. Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines,

---

[141] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc. and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Kelly Decl. Ex. 116 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1–2 (Aug. 28, 1947)); *id.* Ex. 46, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* (1946)).

[142] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

respectively, and exerted substantial control over WEP, and thus Defendants.  The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines.  The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to the Atlantic ports" that were "los[t] through enemy action."  The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum."[143]  *See* Kelly Decl. Ex. 95, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

168.    The government controlled all oil WEP moved through the pipelines on its behalf.[144]  During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity"

---

[143] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

[144] 8 Fed. Reg. at 1069, § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

for "the cross-Atlantic fronts."[145]  The Inch Lines "*were built for a single purpose, to meet a great war emergency*. . . . [T]hey helped to win a war that would have taken much longer to win without them."  Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945).  Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities.  *Watson*, 551 U.S. at 154.

169.    At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA").  The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[146]  As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on the industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952."  Wilson Decl. ¶ 28.

170.    The government also invoked the DPA immediately after the 1973 Oil Embargo to address "immediate and critical" petroleum shortages by the military.[147]  Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[148]  The Interior Department subsequently "issued directives to 22 companies

---

[145]  Kelly Decl. Ex. 46, at 104–05, 108.

[146]  *See* Kelly Decl. Ex. 96 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)).  *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

[147]  *See* Kelly Decl. Ex. 97 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[148]  Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6,

[including Defendants or their predecessors or subsidiaries[149]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[150]

### 2.   Defendants' Activities Are Related To Plaintiff's Claims

171.   Plaintiff's claims are "for or relating to" acts Defendants performed under color of federal office.  To meet this prong, there need only be "a connection or association between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 471.  The Removal Clarification Act of 2011 inserted the words "or relating to" into the statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court."  *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  But even before the Removal Clarification Act, a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do by the Government.'"  *Id.* (quoting *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (emphasis added).  The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d at 292; *see also Baker*, 962 F.3d at 943.

---

1973).

[149]   The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Kelly Decl. Ex. 98 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)).  Kelly Decl. Ex. 99 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

[150]   *See* Kelly Decl. Ex. 99.

172.    It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if Plaintiff's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time frame relevant to Plaintiff's claims.  *Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016).  For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to plaintiff's purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price controls," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use.  *Id.* at 940–41, 945.[151]  Similarly, in *Defender Association of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done under federal direction (representing defendants in federal habeas proceedings).  790 F.3d at 471–72.

173.    Numerous federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 471, 474, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 941, 945.

174.    Plaintiff alleges that Defendants' production and sale of oil and gas—which necessarily include production and sales under the direction, supervision and control of federal

---

[151] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at *1, *6 (5th Cir. 1998) (per curiam) (federal officer removal was proper where the plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

officers described above—led to the combustion of these oil and gas products, which led to the release of greenhouse gases by end users—also including the federal government.  Critically, the oil and gas upon which Plaintiff bases its claims include the *very same* oil and gas that Defendants extracted and produced under the direction, supervision, and control of the federal government.  Moreover, the federal government directed, supervised, and controlled Defendants' production, sale, and distribution of oil and gas to help it accomplish critical domestic and foreign policy objectives.

175.    Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed in the implementation of federal policy initiatives under federal direction, supervision, and control of federal officers.  This is more than enough to satisfy the nexus element of the federal officer removal statute, which requires only "a connection or association between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 474 (holding same).  At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia*, 790 F.3d at 474, a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications, and Plaintiff's attempt to impose liability on Defendants for that very same conduct.  *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

176.    Plaintiff's allegations regarding Defendants' alleged misrepresentations and "deception" do not change the analysis in any way.  This is because, as explained above, Plaintiff's claims, as pleaded, depend on the premise that Defendants' *production* of fossil fuels caused Plaintiff's alleged injuries.  *See, e.g.*, Compl. ¶ 259.  Defendants have demonstrated that they acted

under the direction, supervision and control of federal officers in producing oil and gas for decades, and therefore this case is removable to federal court.

177.    Similarly, Plaintiff's attempt to disclaim "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government" is ineffective and cannot defeat removal.   Compl. ¶¶ 14, 240 n.263.   This disclaimer is a transparent—and ineffective—attempt to artfully plead around removal.   Courts consistently reject attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiff's claims.   *See Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) ("[Plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable. . . . [T]hey are clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense."); *see also, e.g.*, *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels).   Moreover, the disclaimer is inappropriate in the present case, because, as the Supreme Court has recognized, and Plaintiff acknowledges, greenhouse gases cannot be traced to any particular source or any particular jurisdiction.   *See AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere."); *see* Compl. ¶ 260.   Plaintiff's claims are thus based on *global* emissions that are impossible to trace to any particular source.   Accordingly, Plaintiff has no basis on which to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

178.    For similar reasons, the Western District of Michigan recently rejected an attempt by a group of plaintiffs to avoid federal officer removal that went even further than Plaintiff's

disclaimer attempts here.  Plaintiffs in *Nessel v. Chemguard, Inc.* alleged injuries caused by environmental contamination from certain firefighting agents that were sold for both military and civilian purposes.  2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).  Plaintiffs attempted to avoid removal with respect to civilian production and sales by *filing two separate complaints*— one for injuries resulting from chemicals produced for the military, and one for the commercially produced versions of those same agents.  The court found that it had federal officer removal jurisdiction over the commercial-only complaint because plaintiffs did not establish that injuries from commercial chemicals and military chemicals "will be distinguishable."  *Id.* at *3.  It explained that despite plaintiffs "divid[ing] the two complaints," "[t]he Court . . . will likely have to engage in a detailed fact-finding process to determine whether the injuries . . . can be distinguished" and that "right now, there is not clear evidence either way.  It is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office."  *Id.*  Plaintiff here does not even try to separate its claims and injuries into two separate complaints—rather, it flatly asserts that its injuries are caused by the cumulative production and combustion of *all* oil and gas production for decades.  *See, e.g.*, Compl. ¶ 4; *see also Nessel*, 2021 WL 744683, at *3 ("Plaintiffs' artful pleading does not obviate the facts on the ground" demonstrating that "Defendants were at least plausibly acting under color of federal office during the relevant timeframe.").

### 3.    Defendants Have Colorable Federal Defenses

179.    Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); federal immunity, *see Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016); and others.  *Boyle* is analogous.  In *Boyle*, the Supreme Court applied a federal common-

law government contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13. In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 21 (1940)). Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

180. Plaintiff's claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and Due Process Clauses, *id.* amends. V & XIV, § 1, and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230–31. Because the relief Plaintiff seeks would have "the practical effect" of "control[ling] conduct beyond the boundaries of [Maryland]," its claims are barred by the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst.*, 491 U.S. 324, 336–37 (1989). Similarly, imposing such extraordinary extraterritorial liability on lawful, government-encouraged conduct would constitute "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

181. The foreign affairs doctrine also precludes exercises of state law that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440 (1968)). This prohibition extends to state-law causes of action. *See Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or

impairs the policy or provisions of a treaty or of an international compact or agreement.").  As explained above, Plaintiff's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations.  *See In re Assicurazioni Generali*, *S.P.A.*, 592 F.3d 113, 115, 119–20 (2d Cir. 2010).  And, finally, to the extent Plaintiff's claims target Defendants' statements, they are barred by the First Amendment.  As the Supreme Court has held, lobbying activity is protected from civil liability.  *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F. Supp. 2d 602, 620 (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001) ("*Noerr–Pennington* immunity . . . applies to . . . state common law claims.").  This is true even if "the campaign employs unethical and deceptive methods."  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("[T]he holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit.").

182.    These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute.  *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## VIII.    THE ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES

183.    Plaintiff's claims necessarily depend upon holding Defendants liable for their oil and gas operations, and Defendants have produced and sold oil and gas on federal enclaves, including military bases in Maryland and elsewhere.  Despite Plaintiff's purported disclaimers, Compl. ¶¶ 14, 240 n.263, Plaintiff cannot differentiate between emissions occurring as a result of

Defendants' oil and gas operations on federal enclaves and those resulting from operations elsewhere, *see* Compl. ¶ 260.  The climate change phenomenon at the heart of Plaintiff's claims occurs as a result of global, cumulative emissions.  In addition, Plaintiff challenges Defendants' conduct in the District of Columbia, *see, e.g.*, Compl. ¶¶ 106–20, 126–41, a federal enclave. Further, Plaintiff's attempt to disclaim injuries to federal property in the City of Annapolis, including the Naval Academy, independently fails because those injuries are inseparable from purported injuries to city property.  The allegations in the Complaint therefore establish federal enclave jurisdiction.  *See, e.g.*, *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 713 (E.D. Tex. 1998).

184.    This Court has original jurisdiction under the federal enclave doctrine.   The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331."  *John Crane-Houdaille*, 2012 WL 1197391, at *1.

185.    The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status."  *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).  Federal jurisdiction is available if "some" of the events or damages alleged in the complaint occurred on a federal enclave.  *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's]

claims arose on federal enclaves"); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (holding jurisdiction will lie where at least "some of the events alleged . . . occurred on a federal enclave").

186.    In targeting Defendants' oil and gas operations, Plaintiff necessarily sweeps in those activities that occur on military bases and other federal enclaves.  *See, e.g.*, *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service:  Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf. Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department— pursuant to a joint operating agreement with the Navy.  *See supra* Section VII.B.1.c.; *Chevron U.S.A. Inc. v. United States*, 116 Fed. Cl. 292, 205 (2014).

187.    In addition, the Complaint relies upon conduct occurring in the District of Columbia, which is itself a federal enclave.  *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 929 n.42 (D.D.C. 1967).  Plaintiff claims that the Defendants, including American Petroleum Institute—which Plaintiff concedes is "incorporated in Washington, D.C.," Compl. ¶ 36(a)—and certain industry trade associations

misled federal regulators and caused them to adopt policies that did not adequately curtail the production and use of fossil fuels. *Id.* ¶¶ 106–20. This alleged lobbying activity, the misleading of federal regulators, and the resulting "under-regulation" of fossil fuels, could *only* occur in the District of Columbia, where the EPA, the Department of the Interior, the DOE, the Department of Transportation, the Department of State, Congress, and other departments of the federal government are located.

188.    Moreover, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade associations," and providing funding to "think tanks," which allegedly had the effect of "evading regulation" of fossil fuel products by "deceiving" policymakers about "the role of fossil fuel products in causing global warming." Compl. ¶¶ 108, 125–41. Similarly, the Complaint points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities. *Id.* Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further underscoring the presence of federal jurisdiction. *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012). As the Ninth Circuit has contemplated, free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts. *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992) (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the court deemed to be "within the federal enclave"). Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, a basis of its injury, and because Plaintiff complains of damages allegedly occurring on federal enclaves, a state court is not the appropriate forum to adjudicate the merits of this dispute.

189.    Additionally or alternatively, the exercise of federal enclave jurisdiction is proper

because:  (1) Plaintiff's claims allegedly occurred on a federal enclave in Maryland, *i.e.*, military bases and reservations in Maryland that were acquired by declaration of taking, Presidential executive order, purchase, or otherwise for military purposes; and (2) Plaintiff's claims involve substantial federal interests such that a federal question is presented.

190.    At least one federal enclave, the Annapolis Area Naval Complex—which includes the United States Naval Academy—is located in the City of Annapolis.[152]  The U.S. Naval Academy is ranked first in the nation's Top Public Schools per U.S. News and World Report, and enrolls approximately 4,500 midshipmen, each of whom has their full tuition covered by the U.S. Navy in exchange for going on to serve in the Navy or Marine Corps.[153]  The campus is over 330 acres,[154] and includes both academic and physical training facilities, preparing thousands of naval officers for service.[155]  Defendants, including CITGO Petroleum Corporation ("CITGO"), have supplied oil and gas to the Annapolis Naval Complex.  For example, CITGO has supplied gasoline to a naval exchange gas station on the Complex.  *See* Kelly Decl. Ex. 100.  Moreover, the U.S. Naval Academy maintains and operates several boilers and emergency generators that it has conceded in its public filings with the State of Maryland produce "the following greenhouse gases (GHGs) related to Clean Air Act requirements:  carbon dioxide, methane, and nitrous oxide.  These GHGs originate from the combustion process occurring in the facility's boilers, water heaters, and internal combustion engines."  *See* Kelly Decl. Ex. 101.

---

[152]  *See* U.S. Naval Academy Base Guide, https://www.military.com/base-guide/us-naval-academy#:~:text=US%20Naval%20Academy%20Base%20Guide,Annapolis%2C%20and%20other%20tenant%20commands.

[153]  *See* United States Naval Academy, https://www.usnews.com/best-colleges/united-states-naval-academy-2101/overall-rankings.

[154]  *See* 2015 Navy Guide to Annapolis, https://issuu.com/etrident/docs/2015_navy_guide.

[155]  *See* U.S. Naval Academy, Admissions, https://www.usna.edu/Admissions/Academics/index.php#fndtn-panel4-Physical.

191.    While Plaintiff attempts to disclaim injury arising from acts occurring on federal property, *see* Compl. ¶¶ 14, 240 n.263, emissions from the combustion of oil and gas sold or consumed on federal enclaves cannot be "carved out" from contributing to climate change, *see AEP*, 564 U.S. at 422; *Kivalina I*, 663 F. Supp. 2d at 880; Compl. ¶ 260, and thus there is no rational way for Plaintiff to distinguish between the harms allegedly resulting from conduct on federal enclaves and those allegedly resulting from conduct at any other location.  As such, because Plaintiff's claims derive from conduct on or in federal enclaves, they do not belong in state court.

192.    Further, Plaintiff cannot disclaim "injuries to federal property" in Annapolis where those injuries are inseparable from alleged injuries to Annapolis property.  *See* Compl. ¶¶ 14, 240 n.263.  For example, Plaintiff alleges that flooding at one Annapolis landmark, City Dock, may impact other "downtown commercial and surrounding residential areas" through storm drainage systems.  *See id.* ¶ 238(a).  But Plaintiff does not state—nor could it—that the Naval Academy is any less connected to "downtown commercial and surrounding residential areas" than City Dock is.  In fact, Plaintiff supports its allegations of increased flooding to the City by relying on a report focused, in relevant part, almost exclusively on purported injuries to the Naval Academy.  *See id.* ¶ 238(a) n.239 (citing Military Experts Panel Report: Sea Level Rise and the U.S. Military's Mission, Ctr. For Climate & Security (Feb. 2018), https://climateandsecurity.org/wp-content/uploads/2018/02/military-expert-panel-report_sea-level-rise-and-the-us-militarys-mission_2nd-edition_02_2018.pdf).  Plaintiff further ignores the fact that any of the City's mitigation plans and efforts will necessarily impact, and must necessarily involve, parallel mitigation plans and efforts at the Naval Academy.  *See id.* ¶ 240.  Plaintiff's alleged injuries therefore necessarily encompass injuries to the Naval Academy, which constitute an independent basis for federal enclave jurisdiction.

193.    Because Plaintiff's claims derive from conduct on or in federal enclaves, and from injuries to federal enclaves, they do not belong in state court.

## IX.    PLAINTIFF'S CONCEALMENT ALLEGATIONS ARE IRRELEVANT AND BASED ON DEMONSTRABLY FALSE PREMISES

194.    This action—which necessarily implicates the production, sale, and use of oil and gas—belongs in federal court for the reasons discussed above.   Plaintiff's allegations of Defendants' supposed "concealment" and "misrepresentations" do not change the jurisdictional analysis and should be recognized for what they are:   a strained attempt to evade federal jurisdiction.

195.    Faced with federal precedent foreclosing it from pursuing the precise type of policy-making relief it seeks,[156] Plaintiff has *labeled* its claims as sounding in state common law under a theory purportedly focused on concealment and misrepresentation.  But Plaintiff's claims do not and cannot rest solely on alleged misrepresentations; they instead rise and fall on a chain of causation linking all of Defendants' production and sale of oil and gas to global climate change and the allegedly resulting harms for which Plaintiff seeks relief.  Production and consumption are critical links in Plaintiff's causal chain:   Plaintiff claims that Defendants' alleged misrepresentations led to sustained or increased demand, production, and consumption of oil and gas, which led to increased emissions, which led to global climate change, causing Plaintiff's alleged injuries.  Plaintiff itself places production of oil and gas in the (tenuous) causal chain between Defendants' alleged misrepresentations and Plaintiff's alleged harm.  And, as explained above, Plaintiff seeks sweeping relief—including compensatory damages and abatement—based not only on Defendants' alleged misrepresentations, but also on global production and

---

[156] *See, e.g.*, *AEP*, 564 U.S. at 421–22; *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855–58 (9th Cir. 2012); *Standard Oil*, 332 U.S. at 305–06.

consumption of oil and gas over several decades.

196.    Moreover, Plaintiff's concealment and misrepresentation allegations ignore the vast public record establishing that the risks of climate change, including its potential impacts on Maryland, have been discussed publicly since at least the 1950s.  The world has known for many decades that the combustion of fossil fuels releases greenhouse gases into the atmosphere, which may contribute to global warming and climate change.  Scientists have publicly described these effects since the nineteenth century.  In 1896, Svante Arrhenius reported that "if the quantity of carbonic acid increases in geometric progression, the augmentation of the temperature will increase nearly in arithmetic progression."[157]  Similarly, in 1938, G.S. Callendar observed that "the increase in mean temperature, due to the artificial production of carbon dioxide, is estimated to be at the rate of 0.003°C per year at the present time."[158]

197.    And there is no dispute that, to this day, the federal government, and many state governments, continue to encourage oil and gas production despite being well aware of the potential effects it may have on global climate change—for the national economic and security reasons that President Obama and others have explained.  *See Juliana*, 947 F.3d at 1164 ("A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change.").

198.    By the early 1950s, the potential link between fossil fuel use and climate change had been reported in the media.  In 1953, popular media publications, including the *New York*

---

[157] Svante Arrhenius, *On the Influence of Carbonic Acid in the Air upon the Temperature of the Ground*, 41 Philosophical Magazine and Journal of Science 237, 267 (1896), https://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

[158] Kelly Decl. Ex. 102 at 223 (G.S. Callendar, *The Artificial Production of Carbon Dioxide and Its Influence on Temperature*, 64 Q.J. Royal Meteorological Soc'y 199 (1938)).

*Times*, *The Washington Post*, *Time Magazine*, and *Popular Mechanics*, as well as Maryland's *Evening Sun*, reported research concluding that "Earth's ground temperature is rising 1½ degrees a century as a result of carbon dioxide discharged from the burning of about 2,000,000,000 tons of coal and oil yearly."[159]

199.    National and Maryland newspapers similarly reported the potential risks of sea level rise from global warming as early as the 1950s and 60s.  In 1957, a front-page article in *The Washington Post* titled "*Teller Sees World-Flooding Peril Due to Industrial Overheating*" reported that prominent nuclear physicist Edward Teller had noted that "increase[s] in carbon dioxide [are] the result of the ever mounting uses of fuel energy such as coal, oil and derivatives during the industrial age" and, as a result, "the *ice caps on the poles will begin to melt* and the amount of water on the earth will increase . . . [and] '[s]uch places as *New York and Holland would be inundated*.'"[160]  This was two years *before* Teller's speech to API, which is referenced in the complaint.  Compl. ¶ 66.  That same year, *The Baltimore Sun* published an article titled "*40-Foot Ocean Rise Foreseen*," which said "the melting of the ice caps is being speeded [up] by man's 'tremendous use' of oil and gas."[161]

200.    The potential impact of climate change was a frequent topic in newspaper articles in the decades that followed.  Searches for "greenhouse effect," "global warming," or "climate

---

[159]  Kelly Decl. Ex. 117 (Popular Mechanics, *Growing Blanket of Carbon Dioxide Raises Earth's Temperature* (August 1953)); *see also id.* Ex. 30 (W.K., *How Industry May Change Climate*, N.Y. Times (May 24, 1953)); *id.* Ex. 103 (Time Magazine, *Invisible Blanket* (May 25, 1953)); *id.* Ex. 104 (Wash. Post, *Industrial Gases Warming Up Earth, Physicist Notes Here* (May 5, 1953)); *id.* Ex. 105 (Evening Sun, Baltimore, *Smoke Raising Temperature: J.H.U. Man* (May 4, 1953)).

[160]  Kelly Decl. Ex. 106 (Wash. Post, at A1 (Dec. 8, 1957) (emphases added) (internal quotation marks omitted)).

[161]  Kelly Decl. Ex. 107 (The Baltimore Sun, *40-Foot Ocean Rise Foreseen* (Apr. 7, 1957)).

change" in the Newspapers.com archives for Maryland papers between 1957 and 2000 alone identify more than 21,000 results. The same search in all U.S. newspapers covered by Newspapers.com between 1957 and 2000 yields more than 350,000 matches. Scientific journals published an exponentially growing volume of articles addressing climate change, with one researcher identifying more than 222,000 published scientific articles about climate change from 1980 to 2014 alone.[162] Plaintiff's assertions that Defendants somehow deceived or concealed the relationship between greenhouse gas emissions and climate change are belied by this exceptionally long, substantial, and robust public discussion for more than 60 years.

201.    Plaintiff's allegations are further undermined by the undisputed fact that the U.S. government was well aware of the potential link between fossil fuel use and global climate since at least the 1950s and, notwithstanding such knowledge, made the policy decisions to not only actively encourage and promote production of domestic oil and gas but to continue to mandate, direct, and control their production. Testimony before Congress in 1956 revealed that "[b]ased on figures given out by the United Nations . . . by the year 2010, we will have added something like 70 percent of the present atmospheric carbon dioxide to the atmosphere. This is an enormous quantity. . . . [I]t may, in fact, *cause a remarkable change in climate.*"[163] Also in 1956, a study funded by the Office of Naval Research found that "[t]he extra $CO_2$ released into the atmosphere by industrial processes and other human activities may have caused the temperature rise during the present century" and predicted "that *this warming trend will continue, at least for several*

---

[162] Robin Haunschild, Lutz Bornmann & Werner Marx, *Climate Change Research in View of Bibliometrics*, PLOS ONE, July 2016.

[163] Kelly Decl. Ex. 108 (Second Supplemental Appropriation Bill: Hearing on H. Doc. 330 Before the Subcommittees of the Committee on Appropriations, 84th Cong. 472–73 (1956)) (emphasis added).

*centuries*."[164]

202.    In 1965—more than 20 years before Plaintiff alleges Defendants began their purported campaign of deception—President Lyndon B. Johnson proclaimed to Congress that "[t]his generation has *altered the composition of the atmosphere on a global scale* through radioactive materials and a steady increase in carbon dioxide from the burning of fossil fuels,"[165] and the President's Science Advisory Committee explained: "By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%.  This may be sufficient to *produce measurable and perhaps marked changes in climate*, and *will almost certainly cause significant changes in the temperature and other properties of the stratosphere*."[166]

203.    President Nixon's administration also recognized and understood the potential impacts of climate change, even as it worked assiduously to increase oil and gas production from federal lands.  As former Harvard professor and future U.S. Senator Daniel Patrick Moynihan put it at the time:  "It is now pretty clearly agreed that the $CO_2$ content will rise 25% by 2000. This could increase the average temperature near the earth's surface by 7 degrees Fahrenheit.  This in turn could *raise the level of the sea by 10 feet.  Goodbye New York.  Goodbye Washington*, for that matter."[167]

---

[164] Gilbert N. Plass, *The Carbon Dioxide Theory of Climatic Change*, 8 Tellus 140 (1956), http://nsdl.library.cornell.edu/websites/wiki/index.php/PALE_ClassicArticles/archives/classi c_articles/issue1_global_warming/n7._Plass__1956corrected.pdf (emphasis added).

[165] Special Message to the Congress Transmitting Report on the National Wilderness Preservation System, 1 Pub. Papers 161 (Feb. 8, 1965), http://www.lbjlibrary.net/collections/selected-speeches/1965/02-08-1965.html (emphasis added).

[166] Envtl. Pollution Panel, President's Sci. Advisory Comm., Restoring the Quality of Our Environment:   Report   of   the   Environmental   Pollution   Panel   9   (1965), https://hdl.handle.net/2027/uc1.b4315678 (emphasis added).

[167] Kelly Decl. Ex. 109 (Memorandum from Daniel P. Moynihan for John Ehrlichman (Sept. 17, 1969)) (emphasis added).

204.    So too did the Carter Administration:  A report requested by the Director of the Office of Science and Technology Policy concluded that "[w]e now have *incontrovertible evidence that the atmosphere is indeed changing* and that we ourselves contribute to that change. Atmospheric concentrations of carbon dioxide are steadily increasing, and *these changes are linked with man's use of fossil fuels* and exploitation of the land."[168]  The report also found that as "[c]arbon dioxide continues to increase, the study group finds *no reason to doubt that climate change will result and no reason to believe that these changes will be negligible.*"[169]

205.    The federal government's understanding of, and warnings about, the potential link between fossil fuel use and global climate change continued into the Reagan administration and beyond.  For example, a 1983 EPA report concluded that "[e]vidence continues to accumulate that *increases in atmospheric carbon dioxide ($CO_2$) and other 'greenhouse' gases will substantially raise global temperature*" and that its findings "support the conclusion that a global greenhouse warming is neither trivial nor just a long-term problem" and "*call for an expeditious response.*"[170] A 1983 report from the Carbon Dioxide Assessment Committee concluded that the "increase [in

---

[168] Climate Research Board, *Carbon Dioxide and Climate: A Scientific Assessment* (July 23–27, 1979), https://www.bnl.gov/envsci/schwartz/charney_report1979.pdf (emphases added).

[169] U.S. Envtl. Prot. Agency, *Can We Delay A Greenhouse Warming?* (1983) (emphasis added). Additionally, in 1980, The Global 2000 Report was published and a Congressional Hearing Before the Congressional Subcommittee on International Economics of the Joint Economic Committee was held to discuss the report.  The Report found that "[r]ising CO2 concentrations are of concern because of their potential for causing a warming of the earth.  Scientific opinion differs on the possible consequences, but a widely held view was that highly disruptive effects on world agriculture could occur before the middle of the twenty-first century."  *The Global 2000 Report: Hearing Before the Subcommittee on International Economics of the Joint Economic Committee*, 96th Cong. 36 (1980), https://www.jec.senate.gov/reports/96th%20Congress/The%20Global%202000%20Report%20(998).pdf.

[170] *Can We Delay A Greenhouse Warming?*, supra note 169 (emphases added).

atmospheric $CO_2$] is *primarily attributable to burning of coal, oil, and gas*."[171]  And in 1988, James Hansen of NASA testified before the Senate—which, according to the Complaint, received "coverage on the front-page of *The New York Times*" (Compl. ¶ 108(a))—that "[g]lobal warming has reached a level such that we can ascribe with *a high degree of confidence a cause and effect relationship between the greenhouse effect and the observed warming*."[172]  *The Baltimore Sun* also featured similar coverage of that testimony.[173]

206.    Plaintiff's claim that Defendants had exclusive, unique, early, or superior knowledge about the potential link between fossil fuel use, greenhouse gas emissions, and climate change is demonstrably false.  The vast public record of media articles, scientific journals, and government reports over the course of the past fifty-plus years makes clear that any claim of "concealment"—actionable or otherwise—is absurd.

207.    To be clear, this long history of public knowledge and discussion about the risk of global warming from carbon dioxide emissions does not mean, as Plaintiff suggests, that there was no scientific debate about the causes and potential impacts of climate change.  For example, the IPCC, "a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts," Compl. ¶ 108(c), concluded in 1990 that there was insufficient data to determine that observed warming trends were due to human activities:  "Thus, it is not possible at this time to attribute all

---

[171]  Bd. on Atmospheric Scis. And Climate, Comm'n on Physical Scis., Mathematics, and Res., Nat'l   Rsch.   Council,   Changing   Climate   1   (1983), https://download.nap.edu/cart/download.cgi?record_id=18714 (emphasis added).

[172]  *Greenhouse Effect and Global Climate Change: Hearing Before the Committee on Energy and Natural Resources*, 134th Cong. 39 (1988) (testimony of Dr. James Hansen), https://www.sealevel.info/Hansen.0623-1988_oral.pdf (emphasis added).

[173]  Kelly Decl. Ex. 110 (The Baltimore Sun, *Greenhouse effect cited for hot '88* (June 24, 1988)).

or even a large part of the observed global warming to the enhanced greenhouse effect on the basis of observational data currently available."[174]   The IPCC further noted that "[t]here are many uncertainties in our predictions particularly with regard to the timing, magnitude and regional patterns of climate change due to our incomplete understanding" of various issues, like the sources of greenhouse gases, clouds, oceans and polar ice sheets.[175]   By 1995, the IPCC still had not concluded with certainty that there was a human influence on climate: "Our ability to quantify the human influence on global climate is currently limited because the expected signal is still emerging from the noise of natural variability, and because there are uncertainties in key factors."[176]   Ultimately, the IPCC could only conclude that "the balance of evidence suggests" that there is a human influence on climate.[177]

208.    It was not until 2001 that the IPCC stated that new evidence indicated that human activity was "likely" (meaning 66–90% probability) responsible for "most" of the warming observed:  "There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities."[178]   Even that caveated conclusion was questioned by the National Academies of Science, however, which cautioned that the conclusions in the IPCC's 2001 report should not be overstated: "Climate projections will always be far from perfect. Confidence limits and probabilistic information, with their basis, should always be considered as an integral part of the information that climate scientists provide to policy and decision makers. Without them, the IPCC [2001 report] could give an impression that the science of global warming

---

[174]  Kelly Decl. Ex. 111, at 254 (IPCC (1990)).

[175]  *Id.* at xii (IPCC (1990)).

[176]  Kelly Decl. Ex. 112, at 22 (IPCC (1995)).

[177]  *Id.*

[178]  Kelly Decl. Ex. 113, at 10 (IPCC (2001)).

is 'settled,' even though many uncertainties still remain."[179]

209.    In a report to Congress in 1991 titled "U.S. Efforts to Address Global Climate Change," the U.S. Department of State and U.S. EPA, like the IPCC, recognized the risk of climate change but noted that significant scientific uncertainties remained: "The possibility of global climate change has become an issue of great concern in the international community and within the United States.  Much is unknown, however, about whether or not such changes have been detected, when and how they might occur, or what can be done about it. . . .  [M]any scientific and economic uncertainties remain about possible climate change, its impacts, and societal responses. Much remains to be known about the magnitude and extent of a possible climate change."[180]  In 2002, even after the IPCC's report noting the "likely" contribution of human activities to climate change, EPA's "Guide to Climate Change" noted: "The Earth's surface is becoming warmer, and evidence is mounting that human activities are likely contributing to the warming trend.  Still, uncertainties exist about exactly how much of the warming is due to human activities, whether recent temperature trends are truly outside the range of natural climate variability, and the effect that warming could have on our climate, lives, and habitat."[181]  In short, the scientific and policy debate about the causes, timing, impacts, and responses to climate change was occurring in thousands of newspaper articles, scientific publications, and government reports.  Plaintiff's assertions that Defendants concealed the truth and "embarked on a decades-long campaign" to

---

[179]  Comm. on the Sci. of Climate Change, Div. of Earth & Life Studies, Nat'l Rsch. Council, Climate Change Science: An Analysis of Some Key Questions 22 (2001), https://www.nap.edu/catalog/10139/climate-change-science-an-analysis-of-some-key-questions.

[180]  U.S. Envtl. Prot. Agency, U.S. Efforts to Address Global Climate Change 1-2 (1991), https://nepis.epa.gov/Exe/ZyPDF.cgi/9101OZWK.PDF?Dockey=9101OZWK.PDF.

[181]  Kelly Decl. Ex. 5, at 2 (U.S. Envtl. Prot. Agency, EPA's Guide to Climate Change (2002)).

fabricate uncertainty ignore the vast public record and are plainly false.  Compl. ¶ 110.

210.   Yet, despite this public knowledge and the extensive public debate about the risks of climate change, the consumption of oil and gas, including by the federal government and Plaintiff itself, increased dramatically during this period.  From 1960 to 2018, consumption of both oil and gas in the United States more than doubled.[182]  Even from the 1990s, domestic consumption of oil and gas has increased by 20% and 57%, respectively, through 2018.[183]  In 2018, the United States consumed more energy than ever before, with fossil fuels accounting for 80% of this record-breaking consumption.[184]

211.   Given that the United States, and the world, has continued to rely on and use oil and gas at ever-increasing rates, with full knowledge and understanding that such usage may potentially have adverse climate impacts, there can be no real doubt that increased production and consumption of oil and gas were not caused by Defendants' alleged "concealment," but by the country's—and the world's—fundamental and vital need for energy.  In fact, the federal government has reported that world energy consumption is expected to grow by 50% by 2050 and will be focused in regions where strong economic growth is driving demand.[185]

212.   For this reason, the federal government has continued to actively promote, mandate, and direct domestic production of oil and gas, providing both incentives for and contracts with Defendants to obtain these products in the national interest.  In particular, the federal government

---

[182]  U.S. Energy Info. Admin., State Energy Data System (SEDS), All Consumption Estimates – US (2018), https://www.eia.gov/state/seds/sep_use/total/pdf/use_US.pdf.

[183]  *Id.*; *see also* U.S. Energy Info. Admin., *Today in Energy* (Apr. 16, 2019) https://www.eia.gov/todayinenergy/detail.php?id=39092.

[184]  Hannah Ritchie & Max Roser, *Fossil Fuels, Our World in Data*, https://ourworldindata.org/fossil-fuels (last visited Oct. 7, 2020).

[185]  *See* U.S. Energy Info. Admin., *International Energy Outlook 2019*, 24–26 (2019), https://www.eia.gov/outlooks/ieo/pdf/ieo2019.pdf.

has continued to encourage domestic production on the OCS because, in part, it has concluded that even if this domestic source of oil and gas were cut off, consumers would simply obtain "oil and gas from other sources," including foreign sources, which would put our national security and economy at risk and "leave a void in planning for national energy needs."[186]   Indeed, the environmental analysis required to reauthorize the OCS leasing program recognized the existence of climate change but nonetheless concluded that relying on renewable energy sources at the current time would be neither possible nor advantageous.[187]   Similarly, in 2001 the federal government issued a report emphasizing the national interest in promoting domestic oil and gas development and explained that "we must continue meeting the nation's energy requirements by the means available to us."[188]   The report's findings led to the Energy Policy Act of 2005, which encouraged further exploration of the OCS and other onshore federal lands through contracts with Defendants.[189]   And, as noted above, in 2010 President Obama recognized the need to balance

---

[186]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2012-030, OCS Oil and Gas Leasing Program:  2012-2017 Final Programmatic Environmental Impact Statement,              4-606,              4-643              (2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Oil_and_Gas_Energy_Progra m/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/2012-2017_Final_PEIS.pdf (projecting changes to domestic oil and gas supplies if OCS leases were halted); U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program, 82 Fed. Reg. 6643 (Jan. 17, 2017).

[187]  U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2016-060, OCS Oil and Gas Leasing Program: 2017-2022 Final Programmatic Environmental Impact Statement, Vol. 1, at 1-11 (2016), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2012-2017/BOEMOceanInfo/fpeis_volume1.pdf ("The development of renewable energy sources is strategically important, but the development of these resources in the foreseeable future does not fully or partially satisfy the purpose of and need for the Proposed Action [i.e., meeting the nation's current energy demand].").

[188]  U.S. Nat'l Energy Policy Dev. Grp., Reliable, Affordable, and Environmentally Sound Energy for America's Future, 1–13 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

[189]  Energy Policy Act of 2005, Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

production with alternative sources of energy, and expanded the offshore leasing program.  *See supra* note 3.

## X.      THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

213.    Based on the allegations in the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1442, 1367(a), as well as 43 U.S.C. § 1349(b).  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1441(a) and 1446.

214.    The United States District Court for the District of Maryland is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Circuit Court for the County of Anne Arundel.  *See* 28 U.S.C. § 1441(a).

215.    All defendants that have been properly joined and served have consented to the removal of the action, *see* Kelly Decl. ¶ 2, and there is no requirement that any party not properly joined and served consent.  *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *HBCU Pro Football, LLC v. New Vision Sports Properties, LLC*, 2010 WL 2813459, at *2 (D. Md. July 14, 2010) ("Defendants . . . who are unserved when the removal petition is filed need not join it.") (quoting *Getty Oil Corp. v. Ins. Co. of N. America*, 841 F.2d 1254, 1262 n.9. (4th Cir. 1988) (alterations in original)).[190]  Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 to the Kelly Declaration.  Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings,

---

[190] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442.  *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

and orders" received by the Chevron Parties in the action.  Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court for Anne Arundel County, pursuant to 28 U.S.C. § 1446(d).

216.    Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court for Anne Arundel County.


                                      Respectfully submitted,

DATED:  March 25, 2021                BAKER, DONELSON, BEARMAN,
                                      CALDWELL & BERKOWITZ, PC

                                      /s/ *Tonya Kelly Cronin*
                                      Tonya Kelly Cronin (Bar No. 27166)
                                      Alison C. Schurick (Bar No. 19770)
                                      Kyle S. Kushner (Bar No. 20305)
                                      100 Light Street, 19th Floor
                                      Baltimore, MD 21202
                                      Telephone: (410) 862-1049
                                      Facsimile: (410) 547-0699
                                      Email: tykelly@bakerdonelson.com
                                      Email: aschurick@bakerdonelson.com
                                      Email: kskushner@bakerdonelson.com

                                      *Attorneys for Defendants Chevron Corporation and
                                      Chevron U.S.A. Inc.*