# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| CITY OF ANNAPOLIS, MARYLAND, | |
| Plaintiff, | |
| vs. | Case Number: 21-cv-00772-SAG |
| BP P.L.C.; *et al.*, | |
| Defendants. | |

**PLAINTIFF CITY OF ANNAPOLIS'S SUPPLEMENTAL REPLY IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND TO STATE COURT**

## TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................................. 1

II.    **ARGUMENT** ..................................................................................................................... 3

    **A.**  **None of Defendants' Federal Officer Arguments Withstand Scrutiny and All Have Been Rejected by District and Circuit Courts Across the Country.** ................. 3

        1.   Annapolis's Allegations and Theory of Liability Are Not "For or Relating To" Any of Defendants' Cited Relationships With The Federal Government. ................... 3

        2.   None of Defendants' Purported Relationships With the Government Satisfy The Statute's "Acting Under" Element. ................................................................ 6

            a.  Defendants' Activities During World War II and the Korean War Were Simple Compliance with Legal Requirements That Do Not Show an "Acting Under" Relationship. .............................................................. 7

            b.  Defendants' Sales of Specialized Fuel to the Military Are Commercial Transactions That Could Not Support Removal. ................................. 10

            c.  Defendants' Oil and Gas Leases on the Outer Continental Shelf Do Not Create an "Acting Under" Relationship. ...................................... 12

            d.  Defendants' Operations at the Elk Hills Petroleum Reserve in California Do Not Provide Federal Officer Jurisdiction. ...................................... 15

            e.  Defendants' Contributions to the Strategic Petroleum Reserve Through Royalty Payments Are Simple Compliance With The Law. .............................. 16

    **B.**  **Defendants'** *Grable* **Arguments Based on Their Own First Amendment Defenses Is Not Supported by Any Judicial Authority and Remains Frivolous.** ....... 16

III.   **CONCLUSION** ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
    25 F.4th 1238 (10th Cir. 2022) ............................................................................ 1, 13

*Burrell v. Bayer Corp.*,
    918 F.3d 372 (4th Cir. 2019) ............................................................................ 17

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015) ............................................................................ 10

*California v. Sky Tag, Inc.*,
    No. CV118638ABCPLAX, 2011 WL 13223655 (C.D. Cal. Nov. 29, 2011) ......................... 19

*Cameron v. Auster Oil & Gas Inc.*,
    420 F. Supp. 3d 532 (W.D. La. 2019) .................................................................... 8

*City & Cnty. of Honolulu v. Sunoco LP*,
    39 F.4th 1101 (9th Cir. 2022) ................................................................... *passim*

*City & Cnty. of Honolulu v. Sunoco LP*,
    No. 20-CV-00163-DKW-RT, 2021 WL 531237 (D. Haw. Feb. 12, 2021) .......................... 5

*City of Hoboken v. Chevron Corp.*,
    No. 21-2728, __ F.4th__, 2022 WL 3440653 (3d Cir. Aug. 17, 2022) ..................... *passim*

*City of Hoboken v. Exxon Mobil Corp.*,
    558 F. Supp. 3d 191 (D.N.J. 2021) .................................................... 10, 18, 19, 20

*City of Oakland v. BP PLC*,
    969 F.3d 895 (9th Cir. 2020) .............................................................................. 1

*Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*,
    996 F.3d 243 (4th Cir. 2021) ........................................................................ 7, 12

*Cnty. of San Mateo v. Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ................................................................ 1, 10, 13, 15

*Connecticut v. Exxon Mobil Corp.*,
    No. 3:20-CV-1555, 2021 WL 2389739 (D. Conn. June 2, 2021) ................................. 19

*Delaware v. BP Am. Inc.*,
    578 F. Supp. 3d 618 (D. Del. 2022)............................................................ 4, 10, 18, 19

*Dougherty v. A O Smith Corp.*,
    2014 WL 3542243 (D. Del. July 16, 2014) ............................................................. 4

*Exxon Mobil Corp. v. United States*,
    No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ............................... 9

*Fry v. Napoleon Cmty. Sch.*,
    137 S. Ct. 743 (2017).......................................................................................... 5

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
  545 U.S. 308 (2005) ................................................................................................ *passim*

*Gunn v. Minton*,
  568 U.S. 251 (2013) ........................................................................................................ 17

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) .......................................................................................................... 18

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) .................................................................... 19, 20

*Keeton v. Hustler Mag., Inc.*,
  465 U.S. 770 (1984) ........................................................................................................ 18

*Massachusetts v. Exxon Mobil Corp.*,
  462 F. Supp. 3d 31 (D. Mass. 2020) ................................................................................ 1

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  31 F.4th 178 (4th Cir. 2022) ................................................................................... *passim*

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ............................................................................................................ 18

*Minnesota v. Am. Petroleum Inst.*,
  No. CV 20-1636, 2021 WL 1215656 (D. Minn. Mar. 31, 2021) ...................................... 1

*Nat'l Rev., Inc. v. Mann*,
  140 S. Ct. 344 (2019) ...................................................................................................... 18

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................................................ 18

*Ortiz v. Univ. of Med. & Dentistry of N.J.*,
  No. 08-2669JLL208-CV-026, 2009 WL 737046 (D.N.J. Mar. 18, 2009) ....................... 20

*Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ....................................................................................................... 5, 6

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S 767 (1986) ......................................................................................................... 18

*Plaquemines v. Riverwood Prod. Co.*,
  No. CV 18-5217, 2022 WL 101401 (E.D. La. Jan. 11, 2022) ........................................... 8

*Rhode Island v. Shell Oil Prod. Co.*,
  979 F.3d 50 (1st Cir. 2020) ............................................................................................. 13

*Rhode Island v. Shell Oil Prods. Co.*,
  35 F.4th 44 (1st Cir. 2022) ................................................................................................ 1

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017) ............................................................................................. 3

*United States v. Shell Oil Co.*,
  294 F.3d 1045 (9th Cir. 2002) ....................................................................................... 8, 9

*United States v. Standard Oil Co. of Cal.*,
  332 U.S. 301 (1947) ................................................................................ 12

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007) ................................................................................. 6

**Statutes**

28 U.S.C. § 1331 ......................................................................................... 2

28 U.S.C. § 1415(l) ..................................................................................... 5

28 U.S.C. § 1441 ......................................................................................... 2

28 U.S.C. § 1442 ...................................................................................... 2, 3

28 U.S.C. § 1447(c) ................................................................................ 1, 20

28 U.S.C. § 1452 ....................................................................................... 19

28 U.S.C. § 1605(a)(2) ................................................................................. 6

42 U.S.C. § 9601 ......................................................................................... 9

43 U.S.C. § 1349(b) ..................................................................................... 2

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................. 19

## I.    INTRODUCTION

The day after Defendants filed their supplemental Opposition to Plaintiff's Motion to Remand, *see* Doc. 168 (Aug. 16, 2022) ("Opp."), the Third Circuit Court of Appeals affirmed orders remanding two materially similar cases to state court, because "the plaintiffs filed those suits in state court based only on state tort law" and there was "no federal hook that lets defendants remove them to federal court." *City of Hoboken v. Chevron Corp.*, No. 21-2728, __ F.4th__, 2022 WL 3440653, at *1 (3d Cir. Aug. 17, 2022) ("*Hoboken & Delaware*"). The Third Circuit decision involved jurisdictional arguments identical to those in Defendants' Notice of Removal here, lodged by many of the same Defendants, and the court held they were all meritless. That decision aligns with the Fourth Circuit's controlling decision in *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022) ("*Baltimore*"), which affirmed remand in a similar case, and joins every court to consider Defendants' arguments. In 2022, the Circuit Courts of Appeal for the First, Ninth, and Tenth Circuits have all also affirmed remand orders in closely analogous cases.[1]

Defendants had no objectively reasonable basis to remove this case, and the Court should remand it to state court and award Annapolis attorneys' fees and costs, as Annapolis requested in its moving papers in 2021. *See* Mem. of Law in Support of Plaintiff's Mot. to Remand at 6–9, Doc. 120 (May 13, 2021); 28 U.S.C. § 1447(c).

---

[1] *See City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1106 (9th Cir. 2022) ("*Honolulu*"); *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 50 (1st Cir. 2022) ("*Rhode Island*"); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) ("*San Mateo*"); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1249 (10th Cir. 2022), *cert. petition filed* (June 8, 2022) ("*Boulder*"); *see also Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020); *Minnesota v. Am. Petroleum Inst.*, No. CV 20-1636, 2021 WL 1215656 (D. Minn. Mar. 31, 2021), *appeal filed*, No. 21-1752 (8th Cir. Apr. 5, 2021). The only court anywhere that has accepted any of Defendants' arguments and denied removal was reversed on appeal. *See City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2776 (2021).

Defendants have abandoned most of the arguments advanced in their Notice of Removal except purportedly to preserve them for appellate review,[2] and their Opposition defends just two: jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442, and federal question jurisdiction under 28 U.S.C. §§ 1331 & 1441 based on their purported First Amendment defenses. Every factual and legal contention Defendants rely on has been considered and rejected in one or more of the cases cited above. Defendants simply ignore those decisions, and boast that they have "present[ed] a materially expanded evidentiary record—including the unrebutted declarations of two prominent historians—that is among the most extensive presented to any court to date." Opp. 1. The same record was before the district and circuit courts in *Hoboken & Delaware* and *Honolulu*, however, and each court held without dissent that removal was not warranted.

Annapolis's Motion already addresses all the arguments in Defendants' Opposition, as well as the multiple theories Defendants have abandoned. *See generally* Plaintiff's Supplemental Mem. of Law in Support of Plaintiff's Mot. to Remand, Doc. 166 (July 15, 2022) ("Mot."). Annapolis's discussion here responds, in order, to each of the arguments for federal officer removal jurisdiction Defendants still advance. *See* Part II.A, *infra*. All fail because Annapolis has not sued Defendants "for or relating to" any of the relationships Defendants rely on, nor were Defendants "acting under" the federal government within the meaning of the statute. Annapolis also further addresses the final remaining federal question jurisdiction theory Defendants assert, based on First Amendment

---

[2] Defendants' 123-page Notice of Removal asserted five bases for jurisdiction: (1) Annapolis's state-law claims "arise under federal common law"; (2) the Complaint "necessarily raises disputed and substantial federal questions" on three categories of issues and are thus removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005) ("*Grable*"); (3) the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b) ("OCSLA"); (4) the federal officer removal statute, 28 U.S.C. § 1442; and (5) "injuries and conduct occurring on federal enclaves." *See* Notice of Removal, Doc. 1 at 12–14, ¶¶ 6–10 (Mar. 25, 2021) ("NOR").

defenses. *See* Part II.B, *infra*. That basis for removal is frivolous. *See* Mot. at 17–20.

## II.   ARGUMENT

### A.   None of Defendants' Federal Officer Arguments Withstand Scrutiny and All Have Been Rejected by District and Circuit Courts Across the Country.

Defendants dedicate almost their entire Opposition to arguing that the Court has jurisdiction pursuant to the federal officer removal statute, 28 U.S.C. § 1442. To remove a case under that statute, "a private defendant must show: (1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority." *Baltimore*, 31 F.4th at 228 (cleaned up). Principally at issue here are the first and third elements of the test, known as the "acting under" and "nexus" elements respectively. Defendants fail both tests.

#### 1.   Annapolis's Allegations and Theory of Liability Are Not "For or Relating To" Any of Defendants' Cited Relationships With The Federal Government.

None of Defendants' dealings with the federal government confer jurisdiction because Annapolis has not brought this action "for or relating to" any of them. The statute's "nexus" element requires a removing party to demonstrate "a connection or association" between "the alleged government-directed conduct" and "the conduct charged in the Complaint." *Id.* at 233–34 (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)). That is not the case here because, most directly, Annapolis has disclaimed recovery for injuries from Defendants' fuel sales directly to or for the government. Separately, as already discussed in Annapolis's Motion, the Fourth Circuit's holding in *Baltimore* controls because the Complaint here, as there, "clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign," and Defendants do not and cannot allege any of that disinformation or promotion was done under government auspices. Mot. 23; *see id.* 22–25.

First, the Complaint "disclaims injuries arising from special-formula fossil-fuel products that Defendants designed specifically for, and provided exclusively to, the federal government for use by the military." Compl. 14, ¶ 14; *see* Mot. 32. That disclaimer covers production of military aviation fuel or "avgas" during World War II and the Korean War, as well as sales of specialty fuel to the military over time, and necessarily means this case was not commenced "for or relating to" those products. *See, e.g.*, Mot. 32. The district court in *Delaware* found a nearly identical disclaimer effective. The court held the disclaimer was "not a 'jurisdictional disclaimer' that categorically disclaims jurisdiction conferred by the federal officer removal statute, but is instead a 'claim disclaimer' that 'expressly disclaim[s] the claims upon which federal officer removal was based,'" and "'federal courts have consistently granted motions to remand' based on 'claim disclaimers.'" *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 635 (D. Del. 2022) (quoting *Dougherty v. A O Smith Corp.*, 2014 WL 3542243, at *10 (D. Del. July 16, 2014)). The Third Circuit affirmed on the same basis:

> In their complaints, both Hoboken and Delaware insist that they are not suing over emissions caused by fuel provided to the federal government. . . . Resisting this conclusion, the companies say that these suits cannot separate harm caused by military fuel use from harm caused by civilian fuel use. So they ask us to disregard these disclaimers as 'merely artful pleading designed to circumvent federal officer jurisdiction.' [citation] But the disclaimers are no ruse. . . . Instead, Delaware and Hoboken carve out a small island that would needlessly complicate their cases.

*Hoboken & Delaware*, 2022 WL 3440653, at *8 (cleaned up). The same analysis applies here.

Second, and more broadly, none of the relationships dissected in Defendants' removal notice and Opposition have anything to do with Annapolis's allegations, again for the reasons already discussed in Annapolis' Motion and in the Fourth Circuit's decision in *Baltimore*. The crux of Annapolis's Complaint is that Defendants failed to warn consumers and the public about known dangers associated with fossil fuel products and deceived the public regarding those

dangers. *See*, *e.g.*, Compl. 9, 11–14, ¶¶ 1,7–12. Defendants' Notice of Removal and Opposition do not connect those allegations to anything they claim they did at federal behest, because there is no such connection. *See* Mot. 22–23. As Annapolis has already discussed, the Court is not required to "credit" Defendants theory of the case. *See id.* The *Honolulu* district court explained:

> Put simply, if Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs, because this Court must "credit" that theory. To do so, though, would completely ignore the requirement that there must be a causal connection *with the plaintiff's claims.*

*City & Cnty. of Honolulu v. Sunoco LP*, No. 20-CV-00163-DKW-RT, 2021 WL 531237, at *7 (D. Haw. Feb. 12, 2021), *aff'd,* 39 F.4th 1101 (9th Cir. 2022). The same obtains here.

Defendants try to avoid the outcome reached by every court to consider the federal officer removal nexus requirement in a climate-deception case by urging a different legal standard entirely. They say that in evaluating the nexus requirement, "'[w]hat matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading.'" Opp. 28 (quoting *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017); *see also Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015)). But *Fry* and *Sachs* are not federal-officer removal cases, or cases about federal subject-matter jurisdiction at all. *Fry* construed the administrative exhaustion requirements of the Individuals with Disabilities Education Act ("IDEA"), which require claimants to follow certain dispute resolution procedures "before the filing of a civil action under [any other disability laws] seeking relief that is also available under" IDEA. 28 U.S.C. § 1415(l); *see Fry*, 137 S. Ct. at 754–55. The IDEA asks whether the complaint "in fact 'seeks' relief available under the IDEA—not, as a stricter exhaustion statute might, whether the suit 'could have sought' relief available under the IDEA," and the Court determined the standard for when that is so. *Id.* at 755. *Sachs*, on the other hand, construed an exception in the Foreign Sovereign Immunity Act, "which provides in part that a foreign state does not enjoy

immunity when 'the action is based upon a commercial activity carried on in the United States by the foreign state.'" *Sachs*, 577 U.S. at 31 (quoting 28 U.S.C. § 1605(a)(2)). Neither decision sheds any light on the federal-officer removal statute, or anything about the facts of this case. And, in any event, the gravamen of Annapolis's complaint arises from Defendants' alleged deceptive marketing; as the Fourth Circuit expressly held in *Baltimore*, "[w]hen read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign." 31 F.4th at 233; *see* Mot. 23.

There is no connection between any of the conduct Defendants say they did under federal direction and Annapolis's causes of action. The Court can grant remand on that basis alone.

### 2. None of Defendants' Purported Relationships With the Government Satisfy the Statute's "Acting Under" Element.

Defendants' relationships with the government also do not support removal because Defendants have not shown they were "acting under" a federal superior within the meaning of the statute. "In cases involving a private entity, the 'acting under' relationship requires that there at least be some exertion of 'subjection, guidance, or control' on the part of the federal government." *Baltimore*, 31 F.4th at 229 (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151 (2007)). A contractor acts under the government "where the relationship [i]s 'an unusually close one involving detailed regulation, monitoring, or supervision,'" and the contractor assists with "the fulfillment of a government need." *Id.* (quoting *Watson*, 551 U.S. at 153). Both "'precedent and statutory purpose' make clear that '"acting under" must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior,'" and "'simply *complying* with the law' does not constitute the type of 'help or assistance necessary to bring a private [entity] within the scope of the statute,' no matter how detailed the government regulation or how intensely the entity's activities are supervised and monitored." *Id.* (quoting *Watson*, 551 U.S. at 152, 153) (citations

omitted). "Even when a contract specifies the details of the sales and authorizes the government to supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute." *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021).

###### a. Defendants' Activities During World War II and the Korean War Were Simple Compliance with Legal Requirements That Do Not Show an "Acting Under" Relationship.

Defendants argue federal officer removal is warranted based on their sale or provision of specialized products to the government during World War II and the Korean War. None of their arguments hold water. The Defendants' wartime allegations cannot support removal because they have not shown any Defendant "act[ed] under" a federal officer with respect to either WWII or the Korean War, as multiple district and circuit courts have held. Defendants argue "the federal government exerted extraordinary control over Defendants during wartime to guarantee the supply of oil and gas for wartime efforts, such as high-octane aviation gasoline ('avgas')." Opp. 10–11. The same arguments were before the district and circuit courts in *Honolulu* and *Hoboken & Delaware*, based on the same evidence, and were rejected. The result here is the same: Defendants' wartime business relationships with the United States do not support removal.

Defendants allege, for example, that "[w]ith the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ('PAD') under authority of the Defense Production Act ('DPA')," which "issued production mandates" Defendants were obliged to follow. Opp. 13. The Ninth Circuit in *Honolulu* held that did not satisfy the statute:

> Defendants did not act under federal officers when they produced oil and gas during the Korean War and in the 1970s under the Defense Production Act (DPA). DPA directives are basically regulations. When complying, Defendants did not serve as government agents and were not subject to close direction or supervision. The government sometimes invoked the DPA in wartime, but . . . Defendants' compliance with the DPA was only lawful obedience. That is not enough.

7

*Honolulu*, 39 F.4th at 1107–08. Once again, the same result obtains here.

Defendants' legal authorities do not support their contention that the oil industry was effectively nationalized during the Second World War. Defendants cite *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002), for the proposition that "the United States government exercised significant control" over avgas production and other "high-priority war programs." Opp. 11. What *Shell Oil Co.* actually says is that while "PAW, and other government agencies had the authority to require production of goods at refineries owned by the Oil Companies, and even to seize refineries if necessary, in fact they relied almost exclusively on contractual agreements to ensure avgas production." 294 F.3d at 1049–50; *see also id.* at 1050 ("Throughout the war, the Oil Companies designed and built their facilities, maintained private ownership of the facilities, and managed their own refinery operations."). Defendants assert the PAW strong-armed them into compulsory service, but the only concrete examples they cite concern production of avgas and its components. Opp. 10–12. *Shell Oil* makes clear that World War II avgas production was a cooperative endeavor and companies like Defendants "affirmatively sought contracts to sell avgas to the government" that "were profitable throughout the war." 294 F.3d at 1050. Avgas production was "more like an arm's-length business deal" that "involve[d] a typical commercial relationship" and is thus inadequate to establish federal-officer jurisdiction. *See Honolulu*, 39 F.4th at 1108; *see also Par. of Cameron v. Auster Oil & Gas Inc.*, 420 F. Supp. 3d 532, 543–44 (W.D. La. 2019) (rejecting defendants' efforts in state-law environmental action to "characterize the U.S. oil and gas industry as essentially an agent of the federal government during World War II" and finding defendants "have not demonstrated the 'subjection, guidance, or control' required"); *cf. Par. of Plaquemines v. Riverwood Prod. Co.*, No. CV 18-5217, 2022 WL 101401, at *9 (E.D. La. Jan. 11, 2022) (granting remand to state court) ("The oil industry was indeed highly regulated, supervised,

and monitored during WWII, and the regulation was both highly detailed and often quite specific. . . . The PAW was given power to direct. It threatened to direct. But threats are not themselves direction.").[3]

Even if Annapolis had not disclaimed injuries relating to products sold or provided to the government, and Defendants could satisfy the acting under element, the Complaint *still* does not seek relief "for or relating to" Defendants' actions during World War II and the Korean war, because the misrepresentations central to Annapolis's allegations all took place years after those wars ended. The Complaint's earliest allegations concerning Defendants' *knowledge* of the climatic effects of their fossil fuel products begin in 1954, *see* Compl. 49, ¶ 64, and the bulk of them allege knowledge in the 1960s through the 1980s, *see id.* at 50–71, ¶¶ 69–101. And critically, the Complaint's allegations concerning Defendants' *public misrepresentations* focus primarily on conduct beginning in or about 1988. *See id.* at 73–93, ¶¶ 106–141. The wartime production

---

[3] Defendants' other citation, *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020), *appeal dismissed*, No. 20-20590, 2021 WL 5545961 (5th Cir. June 18, 2021), is not to the contrary. In that wide-ranging decision, the court considered the equitable allocation of environmental response costs in a cost-recovery action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq*. ("CERCLA"). It held that "the government's knowledge and acquiescence in the contamination-causing activities" at two avgas refineries supported "a substantial allocation of the response costs to the government," but that "the government's *role* at the refineries, . . . supports a lower equitable share for the government," and ultimately allocated only 15% of response costs at one facility to the government and 25% of response costs at the other. *See id.* at *55–56 (emphasis added). The decision has nothing to do with federal officer removal under § 1442. Rather, it is consistent with the court's finding in *Shell Oil* that the government's primary method of obtaining aviation fuel during the war was "providing economic pressure and incentives for the refinery owners to enter into contracts with the government to produce avgas and other war materials," and that "the government was not an operator of the refineries" under CERCLA. *Id.* at *47. Evidence of economic pressure and incentives to attract contractors is not evidence of subjection, guidance, and control for removal.

Defendants rely on, by contrast, ends in 1952 and primarily occurred during the 1940s. *See* NOR

80–85, ¶¶ 136–43; Opp. 10–13. [4] There is no connection.

### b. Defendants' Sales of Specialized Fuel to the Military Are Commercial Transactions That Could Not Support Removal.

Next, Defendants argue they "continue to produce and supply large quantities of highly

specialized fuels that are required to conform to exact DOD specifications to meet the unique

operational needs of the U.S. military." Opp. 13–14. This position fails for the same reasons as

Defendants' arguments concerning wartime operations. Defendants' manufacture and sale of

"non-commercial grade fuels" to the miliary, *see* Opp. 17, has been an ordinary commercial

relationship that does not satisfy the statute's "acting under" requirement. "[A] person is not

'acting under' a federal officer when the person enters into an arm's-length business arrangement

with the federal government," *San Mateo*, 32 F.4th at 757, especially where, as here, "the

government was relying on the expertise of [its contractors] and not vice versa." *Cabalce v.

Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 728 (9th Cir. 2015)).

Defendants' own documents show that the design, development, and production of

specialty fuels has been principally in Defendants' hands and has not been under the government's

subjection, guidance, or control. With respect to the Blackbird spy plane project, for example, the

exhibits included with Defendants' Notice of Removal show the government's "management

philosophy" was to restrain bureaucrats from "substituting their judgment for that of the

contractors," such that "[r]equirements for Government approval as a prerequisite to action were

---

[4] *See City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 208 (D.N.J. 2021) ("Defendants also provide new information about the government's control of the oil and gas industry during World War II. . . . Defendants' new information addresses conduct that predates Plaintiff's allegations."); *Delaware*, 578 F. Supp. 3d at 635 ("Defendants' activities during the Korean War, [and] the two World Wars . . . are irrelevant for purposes of removal because Defendants' alleged disinformation campaign, which is what the instant case is actually about, started 'decades later.'").

minimal."[5] The same is true of Blackbird's predecessor projects. According to a historical report of the OXCART and U-2 programs, excerpts of which Defendants rely on, private contractors took the lead in designing, developing, and manufacturing the planes. The government told its contractors what planes and performance specifications it wanted, leaving day-to-day operations and management to the contractors. "[T]he lack of detailed and restricting [government] specifications" is a primary reason the "creative designers" in charge of the OXCART and U-2 programs "produced state-of-the-art aircraft in record time."[6]

The Defense Logistics Agency ("DLA") contracts Defendants cite are no different. *See* Opp. 15. Like any commercial agreement, those contracts informed the fuel manufacturer what kind of product the government wanted—*e.g.*, a fuel with certain additives. *See* Kelly Decl. Exs. 69, 90–95. As in any commercial agreement, the contracts also gave the government the right to inspect and ensure that the fuels delivered were, in fact, the fuels requested. *See, e.g.*, Kelly Ex. 62, Doc. 6 at at 9–10. Those "quality assurance" provisions are "typical of any commercial contract," *Baltimore*, 31 F.4th at 231, and nothing in the DLA contracts shows the federal government oversaw or controlled day-to-day development or manufacturing tasks.

---

[5] The Notice of Removal cites a document titled "Development of the Lockheed SR-71 Blackbird," authored by Clarence L. Johnson, as Exhibit 60 to the Kelly Declaration in support of the Notice. That document appears not to have been attached to the Kelly Declaration, and Exhibit 60 is instead listed as "a true and correct copy of the NEXCOM contract numbered NNA250-00-C-0077." *See* Kelly Decl. 9, ¶ 63. However, the appropriate document is attached to the Notice of Removal in the *Anne Arundel County* docket. The quotations Annapolis provides here can be found in Exhibit 60 to the Declaration of Tyler Kelly Cronin, at *Anne Arundel County v. BP P.L.C. et al.*, No. 1:21-cv-1323, Doc. 1-5 at 142–43 (May 27, 2021).

[6] Exhibit 59 to the Kelly Declaration provides a two-page excerpt from Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954–1974* (1992). The Notice of Removal provides a url hyperlink to the complete 400-page report. *See* NOR 90, ¶ 152 n. 125. The quotation here appears at page 320.

Nothing in *Arlington County v. Express Scripts Pharmacy* alters the result. The defendants there were entities that contracted with the Department of Defense to administer the "TRICARE Mail-Order Pharmacy" or TMOP, a prescription drug service under TRICARE, a "federal health insurance program administered by DOD to provide medical care to current and retired service members and their families." *Arlington Cnty.*, 996 F.3d at 248–49 (4th Cir. 2021) (cleaned up). Critically, "DOD is required by law to enter into contracts for the provision of healthcare services to TRICARE members," (servicemen, veterans, and their families), and its pharmacy contractors therefore "were essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the TMOP program." *Id.* at 253–54. The pharmacy companies were effectuating a government program that the Department of Defense was required by statute to provide, related to the quintessential government function of providing healthcare benefits to military veterans. *Cf. United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) ("Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces."). On those facts, the court held the defendants were acting under the Department of Defense. Nothing here is anything like the relationships in *Arlington*.

### c. Defendants' Oil and Gas Leases on the Outer Continental Shelf Do Not Create an "Acting Under" Relationship.

Defendants next ask to relitigate an issue they lost in *Baltimore* (and in every other circuit to consider the issue), namely their position that their leasing oil and gas recovery rights from the federal government on the Outer Continental Shelf means they are acting under federal officers. *See* Opp. 18–23. Defendants acknowledge that the Fourth Circuit in *Baltimore* was "not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of 'unusually close' relationship that courts have previously recognized as supporting federal officer removal,"

31 F.4th at 232, but say they have "provide[d] substantial evidence that the OCS leasing program subjects them to exactly that sort of control," Opp. 19. Annapolis already explained why Defendants' "new" material does not change the outcome in *Baltimore*. *See* Mot. 26–28. Annapolis supplements that discussion here to respond to arguments highlighted in Defendants' Opposition.

Defendants first cite their declarant, Professor Tyler Priest, for the proposition that leases pursuant to the Outer Continental Shelf Lands Act are "*not merely commercial transactions*" because "it was the *federal government*, not the oil companies, that 'dictated the terms, locations, methods, and rates of hydrocarbon production on the OCS'" pursuant to detailed orders. *See* Opp. 19–20 (emphasis in original). The Ninth Circuit found the same argument meritless in *Honolulu*:

> Defendants rely on a history professor who specializes in oil exploration. The professor chronicles offshore oil leases and government control over such operations, which Defendants contend show a high degree of supervision. But the government orders show only a general regulation applicable to all offshore oil leases. Indeed, Defendants' expert portrays the "OCS orders" as "directions and clarifications to all operators on how to meet the requirements in the C.F.R." General government orders telling Defendants how to comply are not specific direction and supervision, which the removal statute requires.

*Honolulu*, 39 F.4th at 1109. That holding is consistent with *Baltimore*, and with the rulings of the First, Third, and Tenth Circuits considering and rejecting the same leases for the same reasons.[7]

Next, Defendants make the jaw-dropping claim that "[w]ithout Defendants, the federal government would have needed to create a national oil company, as it contemplated doing, to meet national energy needs and ensure national security," and specifically "would have been forced to develop the federally owned oil resources on the OCS itself," a task "state-owned companies perform in several other countries." Opp. 26; *see* Opp. 21–22. That position is frivolous for

---

[7] *See Hoboken & Delaware*, 2022 WL 3440653 at *8; *Boulder*, 25 F.4th at 1253; *San Mateo*, 32 F.4th at 759–60; *Rhode Island v. Shell Oil Prod. Co.*, 979 F.3d 50, 59 (1st Cir. 2020), *cert. granted, judgment vacated on other grounds*, 141 S. Ct. 2666 (2021).

multiple reasons. As Defendants concede, the 1970s "propos[als for] creating a national oil company to develop the OCS" that Defendants' rely on "were ultimately rejected," and none became law. Opp. 21. They show no congressional intent and no exertion of control over Defendants. *See* Mot. 27 & n.9.  Moreover, the bills Defendants contend "call[ed] for the creation of a national oil company," Opp. 21; *see* NOR 54–55, ¶ 84, do not say what Defendants claim. Defendants highlight a 1975 bill from Senator Hollings, but in the Senator's own words the bill would have created an agency to "*measure* promptly the extent of the publicly owned oil and gas resources on the OCS" to ensure "bids for production rights on federally explored tracts are truly representative of the value of the resources." Kelly Decl. Ex. 15, Doc. 2 at 284 (emphasis added).[8]

Separately, Defendants' selling OCS oil and gas to consumers plainly does not "help[] officers fulfill [a] basic governmental task[]." *See Baltimore*, 31 F.4th at 229. The reason "[t]he federal government 'had no prior experience or expertise'" in oil and gas development, *see* Opp. 19, is that fossil fuel production for commercial sale has *never* been a task of the federal government. Finally, Defendants' contention that the government chose to "hire third parties" to "extract and sell" OCS resources, Opp. 20, is a patent misrepresentation. *Defendants pay the government* royalties to lease drilling rights on OCS lands, not vice-versa, and "oil produced under [the leases] is produced to sell on the open market, not specifically for the government." *See Hoboken & Delaware*, 2022 WL 3440653, at *8. Defendants' contention that they have acted under federal officers by leasing OCS mineral rights has been universally rejected. and is frivolous.

---

[8] Senator Hollings underscored the bill's purpose: "It would not be wise to auction off a much-loved irreplaceable antique without first getting an objective appraisal of its value. Our oil and gas resources, like the antique, are valuable and irreplaceable. We cannot continue to auction them off at prices based on the buyers' own appraisals . . . ." Kelly Decl. Ex. 15, Doc. 2 at 284.

### d.  Defendants' Operations at the Elk Hills Petroleum Reserve in California Do Not Provide Federal Officer Jurisdiction.

Pressing ever forward, Defendants next contend that Standard Oil of California, a Chevron predecessor, acted under federal officers through its management of the Elk Hills Petroleum Reserve in California. Opp. 23–24. *Baltimore* held that a 1944 unit production contract ("UPC") between Standard Oil and the Navy governing their co-ownership of the reserve did not support removal. 31 F.4th at 235–38; *accord San Mateo*, 32 F.4th at 758–59. But Defendants say they "do not argue that removal is proper based on the UPC" here, and instead say Standard Oil "acted under federal officers pursuant to a separate agreement," namely the Operating Agreement through which the government hired Standard Oil to complete some tasks. Opp. 23. Annapolis explained in its Motion that Defendants' own documents show Standard Oil's Operating Agreement at Elk Hills was at most an arm's-length contractual relationship with the Navy, and both parties' primary obligation for most of the life of the contract was to keep oil in the ground. *See* Mot. 29–30. The Ninth Circuit in *Honolulu* held the same agreement did not support removal:

> [Defendants] offer a different contract between the parties ("Operating Agreement"), which is separate from the "Unit Production Contract" in *San Mateo* [and *Baltimore*]. Defendants argue that the Navy had "exclusive control" over the time and rate of exploration, and over the quantity and rate of production at Elk Hills. And Defendants uncovered evidence showing that the Navy employed Standard Oil.
>
> We reject Defendants' arguments. While one could read the language about the Navy's "exclusive control" as detailed supervision, what instead happened was the Navy could set an overall production level or define an exploration window, and Standard Oil could act at its discretion. The agreement gave Standard Oil general direction—not "unusually close" supervision.

*Honolulu*, 39 F.4th at 1109.

Defendants' Opposition does not discuss or distinguish *Honolulu* or the arguments in Annapolis's Motion, and instead repeats the misleading contents of the removal notice. Defendants again urge, for example, that in "November 1974, the Navy directed Standard Oil to increase

production [at Elk Hills] to 400,000 barrels per day to meet the unfolding energy crisis." Opp. 24.

As Annapolis explained, Standard Oil did not follow the "direction" to increase production and

instead withdrew from the operating agreement entirely; any expanded production thereafter was

completed by successors to the contract. Mot. 29–30. Every court that has considered the question

has found that the Elk Hills Operating Agreement does not support removal.

> ### e. Defendants' Contributions to the Strategic Petroleum Reserve Through Royalty Payments Are Simple Compliance With The Law.

Finally, Defendants say they "'acted under' federal officers by supplying federally owned

oil for and managing the Strategic Petroleum Reserve for the government." Opp. 25. That

argument, like the rest, has been rejected by every court that has considered it. The Ninth Circuit's

opinion in *Honolulu* succinctly disposes of the position:

> Defendants argue that they acted under federal officers when they repaid
> offshore oil leases in kind and contracted with the government to operate the
> Strategic Petroleum Reserve (SPR). . . . The SPR is a federally owned oil
> reserve created after the 1973 Arab oil embargo. [cite] Many Defendants pay
> for offshore leases in oil and deliver it to the SPR. Another Defendant leases
> and operates the SPR and by contract must support the government if there is
> a drawdown on the reserve.
>
> But Defendants cannot show "acting under" jurisdiction for SPR
> activities. First, payment under a commercial contract—in kind or
> otherwise—does not involve close supervision or control and does not equal
> "acting under" a federal officer. Second, operating the SPR involves a typical
> commercial relationship and Defendants are not subject to close direction.

*Honolulu*, 39 F.4th at 1108. And, again, Annapolis has not sued Defendants "for or relating to"

anything they did relative to the SPR.

> ## B. Defendants' *Grable* Arguments Based on Their Own First Amendment Defenses Is Not Supported by Any Judicial Authority and Remains Frivolous.

Defendants' position that Annapolis's complaint necessarily raises substantial and disputed

federal issues sounding in the First Amendment remains frivolous, and their Opposition adds

nothing to the arguments in their Notice of Removal. Their brief relies on and misrepresents the

same cases cited in the removal notice, does not respond to any of the authority in Annapolis's Motion, and doubles down on facially erroneous legal positions. There is no objectively reasonable basis for Defendants' *Grable* argument and it must be rejected.

The *Grable* doctrine defines the "slim category of cases in which state law supplies the cause of action but federal courts have jurisdiction under § 1331 because the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Baltimore*, 31 F.4th at 208 (cleaned up) (quoting *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019). In that category, "[f]ederal-question jurisdiction exists over a state-law claim if a federal issue is: '(1) necessarily raised, (2) actually disputed, (3) substantial, *and* (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'" *Id.* (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)). *See* Mot. 12–14.

Defendants' removal notice asserted three theories of *Grable* jurisdiction, arguing that a substantial federal issue was necessarily raised because Annapolis's state-law claims 1) "seek to supplant federal energy policy," *see* NOR 24–29, ¶¶ 32–40) "impede the foreign-affairs power" of the federal government, *see* NOR 29–35, ¶¶ 41–50) "necessarily include federal constitutional elements" sounding in the First Amendment, *see* NOR 359–37, ¶¶ 51–54. Defendants have abandoned their "federal energy policy" and "foreign-affairs" arguments, and do not discuss or reference them in their Opposition. *See* Opp. 33–35. The Opposition nonetheless presses Defendants' First Amendment theory, asserting that Annapolis's claims "still arise under federal law for purposes of *Grable* jurisdiction because they necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment." Opp. 33. For the reasons discussed in Annapolis's Motion, that argument is plainly, unquestionably wrong. Mot. 17–19. Annapolis has

not asserted any First Amendment claims and is not required to prove any issues related to the First Amendment as an element of any of its claims under Maryland law. *See id.*

The Third Circuit reached the same conclusion in its August 2022 decision in *Hoboken & Delaware*. The defendants there "raise[d] First Amendment problems" as a basis for *Grable* jurisdiction, "stress[ing] that these suits charge them with misrepresenting 'matters of public concern' about climate change." *Hoboken & Delaware*, 2022 WL 3440653, at *4. The court dismissed the argument out of hand:

> But though the First Amendment limits state laws that touch speech, those limits do not extend federal jurisdiction to every such claim. State courts routinely hear libel, slander, and misrepresentation cases involving matters of public concern. The claims here arise under state law, and their elements do not require resolving substantial, disputed federal questions.

*Id.* The district court opinions in *Hoboken & Delaware* discussed exactly the cases Defendants rely on here, and found them all inapposite for the reasons discussed in Annapolis's Motion. *See Hoboken*, 558 F. Supp. 3d at 204–05; *Delaware*, 578 F. Supp. 3d at 632–35; *compare* Opp. 33–35. The cases were either litigated entirely in *state court* prior to review in the Supreme Court,[9] or were litigated in district court on *diversity* grounds.[10] The decisions say nothing about removal of state law claims from state to federal court, or about federal subject-matter jurisdiction at all.

Defendants still insist that the First Amendment issues in the cases they cite are "not defenses, but constitutionally required elements of the claim on which the plaintiff bears the burden of proof *as a matter of federal law*." Opp. 34. But as the district court in *Hoboken* held and the

---

[9] *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 10 (1990) (Ohio); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S 767, 771 (1986) (Pennsylvania); *New York Times v. Sullivan*, 376 U.S. 254, 263–64 (1964) (Alabama); *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 345 (2019) (Alito, J., dissenting from denial of certiorari) (District of Columbia).

[10] *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 48 (1988); *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 772 (1984).

Third Circuit affirmed, that is simply wrong: "Each of the cases [defendants cite] involve a federal constitutional defense to a state tort law. Critically, the federal court's jurisdiction in each of these cases did not appear to turn on the existence of the constitutional defense." *Hoboken*, 558 F. Supp. 3d at 204; *accord Delaware*, 578 F. Supp. 3d at 633 ("Defendants cite no authority for the proposition that the First Amendment—through *Grable* jurisdiction—converts state law causes of action involving speech into federal causes of action for purposes of assessing jurisdiction."); *see also Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555, 2021 WL 2389739, at *10 (D. Conn. June 2, 2021) ("ExxonMobil fails to cite any authority . . . for the proposition that these limits would apply to such claims in a manner that would embed any First Amendment issues within state law claims—as opposed to providing ExxonMobil with a federal defense."). Defendants ignore the persuasive authority in Annapolis's Motion, from both the on-point decisions in climate-related cases cited above and from cases discussing Defendants' theory in detail and rejecting it. *See California v. Sky Tag, Inc.*, No. CV118638ABCPLAX, 2011 WL 13223655 (C.D. Cal. Nov. 29, 2011) (rejecting defendant's *Grable* jurisdiction theory that plaintiff's claim would impose prior restraint on defendant's speech as "no different than other First Amendment defenses that courts have repeatedly found did not support removal jurisdiction"); *see also* Mot. 18–19.

The two district court cases Defendants cite for the position that First Amendment issues "are not defenses" say the opposite of what Defendants claim. In *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 511 F. Supp. 2d 742, 761–63 (S.D. Tex. 2005), the court held that it had subject-matter jurisdiction pursuant to the bankruptcy removal statute, 28 U.S.C. § 1452, not because of a federal question. It discussed the First Amendment only in the context of credit rating agency defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6), and held that the plaintiff "ha[d] not met its pleading burden to state a claim in light of Defendants' First

Amendment _defense_." _Id._ at 826 (emphasis added). And in _Ortiz v. Univ. of Med. & Dentistry of N.J._, the plaintiff brought a state-law employment discrimination claim alleging that she had been wrongfully terminated "in retaliation for Plaintiff's exercise of her right to freedom of speech, association and right to petition . . . _in violation of the First and Fourteenth Amendments to the United States Constitution **and** provisions of the New Jersey State Constitution._" No. 08-2669JLL208-CV-026, 2009 WL 737046, at *5 (D.N.J. Mar. 18, 2009) (emphasis in original). The plaintiff's complaint "repeatedly and boldly s[ought] relief for violations of her rights under the United States Constitution" such that "Plaintiff's stated cause of action require[d] proof of violation of federal law as an essential element to recovery." _Id._ at *7. The case said nothing about the _defendants'_ First Amendment rights, and "[n]othing in _Ortiz_ stands for the broad proposition that any constitutional issue, no matter how it is raised, is sufficient to invoke federal jurisdiction." _Hoboken_, 558 F. Supp. 3d at 205.

The Defendants' arguments that their own unspecified First Amendment defenses "injec[t] affirmative federal-law elements into the plaintiff's cause of action," Opp. 33, is not supported by existing law or any nonfrivolous argument for extending existing law.

## III.    CONCLUSION

Defendants' arguments in opposition to remand are all clearly meritless, and many of them are frivolous. Defendants had no objectively reasonable basis to remove this case in the first place, and five circuit courts have affirmed remand orders in materially similar cases while this case has sat on the Court's docket. The Court should grant Annapolis's Motion to Remand to State Court, and award Annapolis attorneys' fees pursuant to 28 U.S.C.§ 1447(c).

Dated: September 6, 2022                    Respectfully submitted,

                                           **CITY OF ANNAPOLIS**
                                           **OFFICE OF LAW**

                                           /s/ D. Michael Lyles

                                           D. Michael Lyles
                                           City Attorney, #13120
                                           160 Duke of Gloucester Street
                                           Annapolis, Maryland 21401
                                           T: 410-263-7954
                                           F: 410-268-3916
                                           dmlyles@annapolis.gov

                                           Joel A. Braithwaite
                                           Assistant City Attorney, #28081
                                           160 Duke of Gloucester Street
                                           Annapolis, Maryland 21401
                                           T: 410-263-7954
                                           F: 410-268-3916
                                           jabraithwaite@annapolis.gov

                                           **SHER EDLING LLP**
                                           Victor M. Sher (*pro hac vice*)
                                           Matthew K. Edling (*pro hac vice*)
                                           Martin D. Quiñones (*pro hac vice*)
                                           100 Montgomery St., Ste. 1410
                                           San Francisco, CA 94104
                                           Tel:    (628) 231-2500
                                           Fax:    (628) 231-2929
                                           Email:  vic@sheredling.com
                                                   matt@sheredling.com
                                                   marty@sheredling.com

                                           *Attorneys for Plaintiff City of Annapolis*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on the 6th day of September, 2022, the foregoing document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Martin D. Quiñones*
Martin D. Quiñones
