## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CITY OF ANNAPOLIS, MARYLAND** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-21-00772** |
| **v.** | * | |
| | * | |
| **BP P.L.C., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

| | | |
|---|---|---|
| **ANNE ARUNDEL COUNTY, MARYLAND** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-21-01323** |
| **v.** | * | |
| | * | |
| **BP P.L.C., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

* * * * * * * * * *

## <u>MEMORANDUM OPINION</u>

Plaintiffs City of Annapolis and Anne Arundel County (collectively "Plaintiffs") – political

subdivisions within the State of Maryland – filed actions against more than twenty "major

corporate members of the fossil fuel industry" (collectively "Defendants") in the Circuit Court for

Anne Arundel County, Maryland.  *See* Complaint & Demand for Jury Trial, *City of Annapolis,*

*Maryland v. BP P.L.C., et al.*, No. 21-cv-00772 (D. Md. Mar. 25, 2021), ECF 17[1]; *see also*

Complaint & Demand for Jury Trial, *Anne Arundel County, Maryland v. BP P.L.C., et al.*, No. 21-

cv-01323 (D. Md. May 27, 2021).  The two complaints seek damages and equitable relief under

---

[1] For ease of reference, citations to an Electronic Case File (ECF) will refer to filings in *City of Annapolis, Maryland v. BP P.L.C., et al.*, No. 21-cv-00772.  The parties in both cases have submitted near-identical briefings, except for changes to the relevant plaintiff's name and ECF numbers.

state common law and Maryland's Consumer Protection Act for Defendants allegedly concealing climate-related harms caused by fossil fuels. *Id.*

Defendants removed the cases to federal court, ECF 1, and Plaintiffs filed a motion to remand to state court, ECF 118. Defendants moved to stay the proceedings pending a potential grant of certiorari in the Supreme Court in a similar case, ECF 158, to which the Plaintiffs responded, ECF 160, and Defendants replied, ECF 163. Before ruling on the motion to stay, this Court requested completed briefing on Plaintiffs' Motion to Remand. *See* Letter Order, ECF 164. The issue of whether the case belongs in state or federal court has now been fully briefed, ECF 166 (Pl.'s Mem.), ECF 168 (Defs.' Opp'n), ECF 169 (Pl.'s Reply), and no hearing is necessary, *see* Local Rule 105.6 (D. Md. 2021). For the following reasons, Defendants' Motions to Stay Proceedings will be denied and Plaintiffs' Motions to Remand to State Court will be granted.

## I.    BACKGROUND

The cases brought by Annapolis and Anne Arundel do not stand alone. Since 2017, over twenty states and local governments across the country have brought comparable state common law claims against fossil fuel industry actors. California cities and counties were the first to bring these claims, *see, e.g.*, *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), soon followed by Baltimore City, Maryland. Baltimore's case has previously come before this Court and has already journeyed once to the United States Supreme Court on an appellate jurisdiction issue, *see Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019), as amended (June 20, 2019), aff'd, 952 F.3d 452 (4th Cir. 2020), vacated and remanded, 141 S. Ct. 1532 (2021), and aff'd, 31 F.4th 178 (4th Cir. 2022). Judicial discourse to date has centered not around whether the companies can be held liable, but rather, whether federal or state courts should decide. Such is the question presently before this Court.

A. *Mayor and City Council of Baltimore v. BP P.L.C., et al.*

A review of the Baltimore case is instructive.  In 2018, the Mayor and City Council of Baltimore ("Baltimore") filed a complaint in the Circuit Court for Baltimore City against "major corporate members of the fossil fuel industry" for eight alleged violations of state law (public nuisance, private nuisance, strict liability failure to warn, strict liability for design defect, negligent design defect, negligent failure to warn, trespass, and the Maryland Consumer Protection Act). *See* Complaint, *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. Aug. 16, 2018).  Baltimore alleged that Defendants had "engaged in a coordinated, multi-front effort to conceal and deny their own knowledge," discredit scientific evidence, and "persistently create doubt" in the public regarding the dangers of fossil fuel production and use. *Id.* at 1.  The complaint further alleged that Defendants' production and concealment of the known hazards of fossil fuels exacerbated sea level rise, increased temperatures, and disrupted the hydrologic cycle, which caused Baltimore's environmental, social, and economic harms. *Id.* at 5–6.

The corporate defendants immediately removed the case to federal court, presenting eight grounds for federal removal: (1) federal common law, (2) federal question jurisdiction under *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), (3) Clean Air Act preemption, (4) Outer Continental Shelf Lands Act, (5) federal officer removal statute, (6) "federal enclaves," (7) bankruptcy law, and (8) original admiralty jurisdiction.  This Court considered and rejected each of these eight proposed grounds for federal jurisdiction and granted Baltimore's motion to remand to state court. *See Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*").

Defendants appealed this Court's remand decision, and the Fourth Circuit affirmed. *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 459 (4th Cir. 2020) ("*Baltimore II*").  The

Fourth Circuit concluded that it only had statutory authority to review one of the eight jurisdictional arguments, the federal officer argument under 28 U.S.C. § 1442, because Congress generally prohibits appellate review of a remand order. *See Baltimore II*, 952 F.3d at 459 (citing 28 U.S.C. § 1447(d) ("[A]n order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal . . . .")). The Fourth Circuit considered and rejected Defendants' federal officer removal argument and affirmed the decision to remand to state court. *Id.* at 471.

Defendants sought certiorari on whether the appellate court had to consider all eight of Defendants' arguments for federal jurisdiction. *BP P.L.C. v. Mayor & City Council of Baltimore*, __ U.S. __, 141 S. Ct. 1532 (2021) ("*Baltimore III*"). The Supreme Court granted certiorari, answered in the affirmative, and sent the case back to the Fourth Circuit to consider the remaining seven jurisdictional bases. *Baltimore III*, 141 S. Ct. at 1543.

This past April, the Fourth Circuit considered and rejected Defendants' remaining seven arguments, concluding once again that there was no federal jurisdiction and that Baltimore's case belonged in state court. *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 238 (4th Cir. 2022) ("*Baltimore IV*"). To reiterate its prior holding, the Fourth Circuit copied its previous analysis on federal officer removal jurisdiction into its most recent opinion, word for word. *Id.* at 228.

The Supreme Court has granted Defendants' request for an extension to file a petition for a writ of certiorari in *Baltimore IV*. To date, no petition has been filed, although Defendants have informed this Court that a petition is "forthcoming." ECF 163 at 12.

**B.  The Instant Cases**

In February of 2021, the City of Annapolis and Anne Arundel County each filed substantively identical complaints against Defendants in the Circuit Court for Anne Arundel County, Maryland.  ECF 17.  The Complaints listed six state law causes of action: public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, trespass, and violations of Maryland's Consumer Protection Act.  *Id.*  The Complaints name a very similar list of defendants as those named in the *Baltimore* case, with minor exceptions.

The Plaintiffs alleged that Defendants, "major corporate members of the fossil fuel industry," *id.* ¶ 1, "played leadership roles in denialist campaigns to misinform and confuse consumers and the public and obscure the role of Defendants' products in causing global warming and its associated impacts, *id.* ¶ 9.  The Plaintiffs assert that the campaigns included "a long-term pattern of direct misrepresentations and material omissions to consumers, as well as a plan to influence consumers indirectly by affecting public opinion through the dissemination of misleading research to the press, government, and academia."  *Id.* ¶ 112.  Plaintiffs summarize their allegations as follows:

> Defendants' individual and collective conduct, including, but not limited to, their introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and the environmental, physical, social, and economic consequences flowing from it; and their failure to pursue less hazardous alternatives; actually and proximately caused the City's injuries.  In other words, Defendants' concealment and misrepresentation of their products' known dangers—and simultaneous promotion of their unrestrained use—drove consumption, and thus greenhouse gas pollution, and thus the climate crisis.

*Id.* ¶ 12.

Plaintiffs specifically identify Defendants' internal corporate policies and communications, *id.* ¶¶ 113–14, 128, their membership and financial contributions to organizations that engaged with the public and government on climate change, *id.* ¶¶ 116–18, 124–26, 130–35, 137–39, and their external communication and advertising on the matter, ¶¶ 119–23, 129, as examples of the tortious conduct that caused Plaintiffs' harms.  They assert that "[b]ut for such campaigns, climate crisis impacts in Annapolis [and Anne Arundel County] would have been substantially mitigated or eliminated altogether," *id.* ¶ 9, as the concealment and misinformation "unduly inflated the market for fossil fuel products," *id.* ¶ 60.

Plaintiffs allege environmental, social, and economic harms.  For example, Annapolis notes that it has experienced "the greatest recorded increase in average annual nuisance flooding events of any city in the nation—nearly tenfold," which has resulted in lost revenue and property damage to local businesses, and in turn, caused the City to spend financial resources on pumps, seawalls, and other infrastructure to mitigate sea level rise impacts.  *Id.* ¶¶ 4–5, 9.  Plaintiffs disclaim injuries arising on federal property and arising from "special-formula fossil-fuel products that Defendants designed specifically for, and provided exclusively to, the federal government for use by the military."  *Id.* ¶ 14.

After Plaintiffs filed their Complaints in state court, Defendants removed the cases to this Court.  ECF 1.  This time, Defendants assert just five grounds for removal: (1) federal common law, (2) federal question jurisdiction under *Grable*, (3) Outer Continental Shelf Lands Act, (4) federal officer removal statute, and (5) "federal enclaves."  *Id.* at 13–14.  Each of these categories of jurisdiction has already been considered and rejected by the Fourth Circuit in Baltimore's case.  *See Baltimore IV*, 31 F.4th 178 (4th Cir. 2022).  Defendants nonetheless raise these same

arguments to preserve them in the event the Supreme Court grants certiorari and overturns the Fourth Circuit's ruling.  ECF 168 at 6.

Despite largely re-arguing contentions from *Baltimore*, two aspects of Defendants' Notice of Removal present new evidence and arguments in support of removal to federal court. Specifically, Defendants "present a materially expanded evidentiary record" in support of federal officer jurisdiction and present a new argument for *Grable* jurisdiction, citing Defendants' First Amendment rights to freedom of speech.  *Id.* at 1, 5.

This opinion addresses these two new arguments.  The Fourth Circuit's opinion, *Baltimore IV*, 31 F.4th 178 (4th Cir. 2022), governs and forecloses all other arguments presented by Defendants.  Because Defendants' two new arguments similarly fail to provide grounds for federal jurisdiction, this Court will grant Plaintiffs' Motions to Remand to State Court.

## II.    DISCUSSION

### A.  Motion to Stay Proceedings

The issuance of a stay is "an exercise of judicial discretion" and "the propriety of its issue is dependent upon the circumstances of the particular case."  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citing *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)) (internal quotation marks omitted).  Courts consider four factors when determining whether to grant a stay: (1) the movant's likelihood of success on the merits; (2) whether denial would cause irreparable injury to the movant; (3) whether issuance of the stay will substantially injure the non-movant; and (4) where the public interest lies.  *Id.* at 434.

Upon review of the briefing, there is no basis to stay these proceedings. Defendants' motion depends on the grant of a petition for certiorari.[2] Assuming Defendants successfully petition for certiorari, their track record across the country fails to prove a likelihood of success on the merits sufficient to warrant a stay. To date, five out of six appellate courts have ruled against federal jurisdiction in similar cases. *See Rhode Island v. Shell Oil Prod. Co.*, 35 F.4th 44 (1st Cir. 2022) (affirming remand to state court); *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022) (same); *Baltimore IV*, 31 F.4th 178 (4th Cir. 2022) (same); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) (same); *Bd. of Cnty. Commissioners of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022) (same). *But see City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021) (holding federal common law governed plaintiffs' claims).

There is likewise no irreparable injury to Defendants in proceeding with the case. Defendants point to the risk of unnecessary litigation in the event the Supreme Court rules in their favor. However, "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."). In contrast, Plaintiffs argue that a stay would further delay reaching the merits of the case and further risk losing discoverable evidence. On the whole, the balance of harms between the parties weighs in favor of proceeding with the case.

---

[2] To date, Defendants have not yet filed their petition seeking certiorari in the Fourth Circuit case. Defendants have filed a petition for a writ of certiorari in a related case, *Board of County Commissioners of Boulder County v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022). That petition challenges only the Tenth Circuit's holding that federal common law did not govern Boulder County's claims. Thus, if the Supreme Court were to grant certiorari and affirm the lower court decision, several questions raised by Defendants in this case would remain unsettled.

The final factor, the public interest, also supports denial of the stay.  Because Defendants raise two new jurisdictional theories here, resolution of the Baltimore case by the Supreme Court may not fully dispose of the jurisdictional issues in these cases.  This Court does not believe the public interest is served by further prolonging the consideration of the actual merits and believes there is substantial public interest in moving these cases towards disposition. A stay of these cases pending resolution in the Supreme Court is therefore unwarranted.[3]

## B.  Motion to Remand

### i.    Legal Standard for Removal

District courts of the United States are "courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (internal citation omitted).  District courts "may not exercise jurisdiction absent a statutory basis," *id.*, and in turn, Congress may not confer jurisdiction absent a constitutional basis. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941) ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution.").  Thus, "removal jurisdiction raises significant federalism concerns." *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)).  For this reason, courts "must strictly construe" removal statutes and resolve all doubts in favor of remanding the case to state court. *Mulcahey*, 29 F.3d at 151.  The "burden of establishing federal jurisdiction is placed upon the party seeking removal." *Id.*

---

[3] Nonetheless, this Court grants a temporary 30-day stay of execution of its remand order, under Rule 62(a) of the Federal Rules of Civil Procedure, for the narrow purpose of ensuring Defendants have the opportunity to appeal, if desired.

Relevant here, Congress has granted federal jurisdiction through the federal officer removal statute, 28 U.S.C. § 1442, and through the general removal statute, 28 U.S.C. § 1441. Each is addressed in turn.

> ### ii.  Federal Officer Removal Statute

Defendants first argue that the case is removable under the federal officer removal statute because Defendants have at times acted under the control of the federal government when producing and distributing oil and gas products.  The federal officer removal statute permits removal to the federal courts of any civil action against "any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  The statute has antebellum roots, tracing back to the end of the War of 1812. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007).  Congress originally enacted the statute to address the ever-growing number of state-court claims filed against federal customs officials charged with enforcing an unpopular trade embargo with England.  *Id.*

Throughout the years and iterations, the removal statute's basic purpose has been "to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arrest' and bring 'to trial in a State court for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting . . . within the scope of their authority.'"  *Id.* at 150 (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (in turn quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880))).  The language of the statute is "broad," and the Supreme Court has made clear that the federal officer removal statute must be "liberally construed."  *Id.* at 147.  Congress expressly added the statutory language "or relating to," which was "intended to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. Rep. No. 112–17, pt. 1, at 6 (2011).  "But broad language is not limitless.  And a

liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Watson*, 551 U.S. at 147.  Importantly, "Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983).  Article III of the Constitution vests judicial power in the Supreme Court and "in such inferior courts as the Congress may from time to time ordain and establish," U.S. Const. Art. III, § 1, and proscribes specific categories to which this judicial power extends, U.S. Const. Art. III, § 2, cl. 1.  The federal officer removal statute and its "relating to" language are therefore constrained by proscribed categories of jurisdiction, *i.e.*, cases "arising under" federal law.  *Id.*

The federal officer removal statute, Section 1442(a), is a "pure jurisdictional statute." *Mesa v. California*, 489 U.S. 121, 136 (1989).  "Section 1442(a), therefore, cannot independently support Art. III 'arising under' jurisdiction.  Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes."  *Id.*  Interpreting Section 1442 to permit removal simply because the defendant is a federal officer (or a person acting under that officer), without more, would bootstrap federal jurisdiction and "present grave constitutional problems."  *Id.* at 137.  For this reason, beyond the explicit requirements laid out by the statute, a colorable federal defense is required to remove a case to federal court under Section 1442(a).  *Id.* at 135.

The Fourth Circuit captured the requirements of the federal officer removal statute in a three-part test.  It explained that a private defendant who seeks to remove a case under § 1442 must show: "(1) that it 'acted under' a federal officer, . . . (2) that it has 'a colorable federal defense,' . . . and (3) that the charged conduct was carried out for on [sic] in relation to the asserted official authority . . . ."  *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017).

Once again, it is instructive to begin with the rulings in the Baltimore cases on these issues. In *Baltimore I*, Defendants cited three contractual relationships they had with the federal government to support their assertion of federal officer jurisdiction: (1) fuel supply agreements between Citgo and the Navy Exchange Service Command; (2) federal oil and gas leases permitting certain Defendants to extract resources from the federally-owned Outer Continental Shelf to supply the domestic market; and (3) an agreement allowing Standard Oil, a predecessor of Chevron, to jointly operate the Navy's portion of the Elk Hills Reserve. *See Baltimore I*, 388 F. Supp. 3d at 568. Applying the three-part test for federal officer removal, the *Baltimore I* Court concluded that "[e]ven assuming that the first two requirements for removal under § 1442 are satisfied, defendants have failed plausibly to assert that the third requirement for removal under this statute is met – *i.e.*, that the charged conduct was carried out 'for or relating to' the alleged official authority." *Id.* (citing 28 U.S.C. 1442(a)(1); *Sawyer,* 860 F.3d at 257–58). The Court further explained:

> Defendants have been sued for their contribution to climate change by producing, promoting, selling, and concealing the dangers of fossil fuel products . . . They have not shown that a federal officer controlled their total production and sales of fossil fuels, nor is there any indication that the federal government directed them to conceal the hazards of fossil fuels or prohibited them from providing warnings to consumers.

*Baltimore I*, 388 F. Supp. 3d at 568. The Court therefore denied federal officer removal jurisdiction because Defendants' purported federal authority was not related to the charged conduct. The Fourth Circuit agreed. *See Baltimore IV*, 31 F.4th 232, 234. In relevant part, it reasoned:

> When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign. . . . [References to fossil fuel production] only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution. Although this story is

necessary to establish the avenue of Baltimore's climate-change-related injuries, it is not the source of tort liability.

*Id.* at 233–34.  The cited contractual arrangements related to Defendants' production and supply of fossil fuels, not to concealment of harms.  Thus, the Fourth Circuit agreed that the alleged tortious misconduct was not related to any purported direction of a federal officer.[4]

As noted above, in the instant cases, Defendants offer a "materially expanded evidentiary record."  The expansion, however, pertains exclusively to the first element laid out in *Sawyer* – that Defendants "acted under" a federal officer.  Specifically, Defendants added more examples of times when they acted at government direction, specifically when the government (1) exercised significant control over the production of high-octane aviation gasoline and the oil industry during World War II, ECF 168 at 10–13; (2) issued production mandates to ensure adequate quantities of aviation gasoline during the Korean War, *id.* at 13; (3) contracted with Shell Oil Company, BP entities, and subsidiaries of Tesoro Corporation to supply "highly specialized jet fuels," which were required to conform with "enumerated ranges for conductivity, heat of combustion, and thermal stability" and contain "military unique additives," *id.* at 14–16; (4) permitted Defendants to extract federally-owned oil and gas resources from the Outer Continental Shelf, *id.* at 19–23; (5) engaged in joint operation of the Elk Hills Reserve with Standard Oil, *id.* at 23–25; and (6) twice operated under emergency Executive control (in response to Hurricane Katrina in 2005 and disruptions to oil supply in Libya in 2011) to draw federally-owned oil from the Strategic Petroleum Reserve, which is managed and supplied by Defendants, *id.* at 25.

This expanded factual record does nothing to address the legal deficiency addressed above, identified by this Court and the Fourth Circuit in the *Baltimore* cases.  None of Defendants' new

---

[4] The Fourth Circuit also concluded that some of Defendants' federal relationships failed to meet the "acting under" prong of *Sawyer*.  *See Baltimore IV*, 31 F.4th at 230, 232.  This Court does not reach that issue.

examples of federal authority relates to the alleged concealment of the harms of fossil fuel products.  Accordingly, their arguments meet with no greater success.  Plaintiffs do, of course, refer to the harms caused by Defendants' "introduction of fossil fuel products into the stream of commerce," but they specifically refer to the "introduction of fossil fuel products into the stream of commerce *while knowing but failing to warn of the threats posed to the world's climate*."  ECF 17 ¶ 12 (emphasis added).  Thus, Plaintiffs do not take issue with the simple fact that Defendants produced oil and gas, they take issue with the fact that they hid the harms of these products while doing it.

Defendants lean on the broad nature of the "relating to" statutory language and insist that their production of oil and gas for the federal government, as an intermediary link in the causal connection between the alleged deceit and the alleged harms from climate change, grants them federal jurisdiction.  The Fourth Circuit has explained that for the charged conduct to relate to the asserted official authority, "there must be 'a connection or association between the act in question and the federal office.'" *Baltimore II*, 952 F.3d at 466 (quoting *Sawyer*, 860 F.3d at 258).  As the Fourth Circuit explained, "this 'connection or association' standard is broader than the old 'causal nexus' test that [the Fourth Circuit] abandoned after the Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545, expanded § 1442(a)(1) by inserting 'or relating to' into the third requirement for removal."  *Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021).  However, case law applying this broader language and granting federal court jurisdiction is distinguishable.

For example, in *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017), the plaintiff brought a claim against manufacturers of boilers used at shipyards for the failure to warn the shipyard workers about the dangers of asbestos, a component of the boilers.  *Id.* at 251–52.

14

Defendants removed to federal court under the federal officer removal statute, noting that it manufactured the boilers for the U.S. Navy subject to its "strict specifications." *Id.* at 252. Similar to Plaintiffs in this case, the *Sawyer* plaintiff argued the U.S. Navy's demand for the boilers was unrelated to the defendants' failure to warn. *Id.* at 253. The Fourth Circuit rejected the plaintiff's argument, however, because the record demonstrated that "the Navy dictated the content of warnings on [the manufacturers'] boilers, and [they] complied with the Navy's requirements." *Id.* at 258. The manufacturers demonstrated that the Navy had an even greater knowledge of asbestos-related hazards at the time. *Id.* at 256. In related boiler cases, other circuit courts explained that "[t]he Navy dictated the use of asbestos, workplace safety measures, and the posting of warnings both on the submarine and at the Electric Boat shipyard." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 36 (1st Cir. 2022). Thus, the alleged misconduct (the failure to warn about asbestos) plainly related to the federal authority (adhering to U.S. Navy's required boiler warnings).

The same is not true here. Defendants present no evidence that the alleged concealment of the harms of fossil fuel products was for or related to their purported federally authorized actions. In contrast to *Sawyer*, there is no suggestion that the government influenced Defendants' alleged decision to misrepresent the safety of their products. In fact, Annapolis and Anne Arundel County allege that Defendants misled them regarding the safety of fossil fuel products, leading to increased reliance and use. ECF 17 ¶ 112 ("The campaign included a long-term pattern of direct misrepresentations and material omissions to consumers, as well as a plan to influence consumers indirectly by affecting public opinion through the dissemination of misleading research to the press, government, and academia."). The fact that the federal government may have been a target of Defendants' misrepresentations does not manufacture a federal relationship Defendants may now rely upon to access federal courts.

Defendants argue that Plaintiffs craft their complaint to focus on alleged misrepresentations, yet nonetheless seek damages for all injuries suffered as a result of global climate change.  ECF 168 at 30.  But Plaintiffs' claims are not quite so broad.  They explicitly disclaim injuries arising on federal property and arising from "special-formula fossil-fuel products that Defendants designed specifically for, and provided exclusively to, the federal government for use by the military."  ECF 17 ¶ 14.  This disclaimer further distances the alleged misconduct from the purported federal authority.  Plaintiffs craft their Complaints in this manner not to disguise federal claims, but rather, to "carve out a small island that would needlessly complicate their cases."  *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022).

Defendants further argue that the federal government controlled "significant quantities" of their oil and gas production, ECF 168 at 5, which contributed to climate change and caused Plaintiffs' injuries.  But this straw man argument should not distract from the proper legal question: was the alleged tortious conduct "for or relating to any act under color of such office"?  Defendants point to no such evidence.  Defendants' misrepresentation of the harms of fossil fuel products was not for or related to the government's control of oil production during World War II and the Korean War.  Defendants' misrepresentation of the harms of fossil fuel products was not for or related to the government's leasing of oil and gas permits on the Outer Continental Shelf.  This analysis applies equally for every instance Defendants cite as examples of federal government control.  Simply because a company acts under the direction of a federal officer at some point during its manufacturing and distribution of a product does not bring all of the company's prior and subsequent product-related actions under the umbrella of federal officer authority.  Other courts agree.  *See, e.g.*, *Rhode Island v. Shell Oil Prod. Co.*, 979 F.3d 50, 60 (1st Cir. 2020), cert. granted, judgment vacated on other grounds, 141 S. Ct. 2666 (2021) ("Rhode Island is alleging the oil

companies produced and sold oil and gas products in Rhode Island that were damaging the environment and engaged in a misinformation campaign about the harmful effects of their products on the earth's climate. The contracts the oil companies invoke as the hook for federal-officer jurisdiction mandate none of those activities. . . . There is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer.").

Because Defendants' expanded factual record does not correct the relational legal deficiency identified in *Baltimore IV*, federal officer jurisdiction still does not lie.

### iii.   *Grable* Jurisdiction

Under 28 U.S.C. § 1441, the general removal statute, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" may be "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *Id.* § 1441(a).  In other words, "[i]t is the general rule that an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 430 (1999).  Litigants may invoke this original jurisdiction through actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

Generally, civil litigants bring cases that satisfy § 1331 federal-question jurisdiction by pleading a cause of action created by federal law. *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  "There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction, [the Supreme Court] having recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."  *Id.*  This "*Grable* jurisdiction" exists in only a "slim

category" of cases.  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Such cases present state law claims that "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.

A federal issue is necessarily raised only "where the vindication of a right under state law necessarily turned on some construction of federal law."  *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 9 (1983).  For example, in *Grable*, Mr. Grable brought a quiet title action in state court, claiming that the current owner's record title was invalid because the IRS had notified Mr. Grable of the property's seizure via certified mail – a method not sanctioned by federal statute.  *Grable*, 545 U.S. at 311.  Thus, to resolve the state law claim over the property's title, the court would have to decide whether the IRS violated the federal statute's notice requirements.  Although Mr. Grable brought a state law claim, the Supreme Court concluded that such a case necessarily raised a federal question warranting federal jurisdiction.  *Id.* at 314–15.

Defendants now attempt to invoke this narrow category of *Grable* jurisdiction by arguing this case necessarily implicates affirmative federal constitutional elements imposed by the First Amendment.  ECF 168 at 33.  Although Defendants recognize that "most state-law misrepresentation claims are not subject to removal," *id.* at 34, they argue this case raises First Amendment concerns because the state-law tort claims target speech on matters of public concern. *Id.* at 33.

To begin, it would dramatically expand *Grable* to conclude that any state tort claim involving speech on matters of public concern could invoke federal court jurisdiction.  Such an expansive holding would raise federalism concerns and counter the mandate for federal courts to

"strictly construe" removal statutes. *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994). Plaintiffs bring nuisance, failure to warn, and trespass claims, none of which on their face necessarily raise First Amendment concerns. And even if Defendants could successfully show that Plaintiffs' claims necessarily raised a federal question, granting federal court jurisdiction on this ground would impermissibly upset the Congressionally approved federal-state balance.

Defendants fail to point to a single case that has relied on *Grable* to support federal jurisdiction in this way. Instead, Defendants rely on cases that generally address the constitutional limits of state common law defamation claims. These cases raise First Amendment defenses but do not attempt to argue for federal court jurisdiction. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964) (reviewing state court claims considered by the Alabama Supreme Court); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 771 (1986) (reviewing state court claims considered by the Pennsylvania Supreme Court); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 48 (1988) (explaining that the respondent originally filed a diversity action in district court); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 10 (1990) (reviewing state court claims considered by the Ohio Supreme Court); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 761–63 (S.D. Tex. 2005) (concluding the court has subject matter jurisdiction pursuant to the bankruptcy removal statute). In fact, Defendants have raised this First Amendment *Grable* jurisdiction argument in other district courts, none of which have found federal jurisdiction to lie. *See City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 204 (D.N.J. 2021), aff'd sub nom. *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022); *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 634 (D. Del.), aff'd sub nom. *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir.

2022); *Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555, 2021 WL 2389739, at \*10 (D. Conn. June 2, 2021).

In the absence of any authority supporting Defendants' expansive assertion of *Grable* jurisdiction, this Court declines to extend the "slim category" of cases to the breadth Defendants urge. Accordingly, Plaintiffs' motions for remand will be granted.

## III.   CONCLUSION

For the reasons stated above, this Court joins the majority of federal district and circuit courts around the country to conclude that these state law claims for private misconduct belong in state court. Defendants' Motions to Stay Proceedings in both cases are denied and the Plaintiffs' Motions to Remand to State Court are granted. To ensure an opportunity to appeal, and in accordance with Fed. R. Civ. P. 62(a), this Court will stay execution of its order to remand for thirty days. This Court is not amenable to further staying its remand order on the present record, so if the Defendants intend to appeal and to request an additional stay pending appeal as they did in the *Baltimore* case, they should confer with Plaintiffs to establish a briefing schedule that will allow this Court at least one week to decide any motion for further stay before this thirty-day temporary stay expires. Separate Orders follow.

Dated: September 29, 2022                           _____/s/_____
                                                    Stephanie A. Gallagher
                                                    United States District Judge